## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

TOWN & COUNTRY LINEN CORP.; and
TOWN & COUNTRY HOLDINGS, INC.,

       *Plaintiffs*,

  v.

INGENIOUS DESIGNS LLC; JOY
MANGANO; and HSN, INC.,

       *Defendants*.

Civil Action No.

Jury Trial Demanded

**FILED UNDER SEAL**

## COMPLAINT

Town & Country Linen Corp. and Town & Country Holdings, Inc. (collectively, "Plaintiffs" or "TNC"), by and through their undersigned attorneys, alleges for their Complaint against Defendants Ingenious Designs LLC ("IDL"), Joy Mangano ("Mangano"), and HSN, Inc. ("HSN") (collectively, "Defendants"), as follows:

## NATURE OF THIS ACTION

This is a civil action for patent infringement, copyright infringement, trade secret and idea misappropriation, unjust enrichment, unfair competition, and breach of contract.

## THE PARTIES

1. Plaintiff Town & Country Linen Corp. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 475 Oberlin Ave S, Lakewood, New Jersey, 08701, and a regular and established place of business in Manhattan at 295 5th Avenue, Suite 412, New York, New York 10016. Plaintiff Town & Country Linen Corp. does business as Town & Country Living.

2. Plaintiff Town & Country Holdings, Inc. is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business located at 475
Oberlin Ave S, Lakewood, New Jersey, 08701, and a regular and established place of business in
Manhattan at 295 5th Avenue, Suite 412, New York, New York 10016.  Plaintiff Town &
Country Holdings, Inc. is the parent company of Plaintiff Town & Country Linen Corp.

3.      Upon information and belief, Defendant IDL is a limited liability company
organized and existing under the laws of the State of Delaware, with its principal place of
business located at 2060 9th Avenue, Ronkonkoma, New York 11779.

4.      Upon information and belief, Defendant Mangano is an individual residing in
Long Island, New York.

5.      Upon information and belief, Defendant HSN is a corporation organized and
existing under the laws of the State of Delaware, with its principal place of business located at 1
HSN Drive, St. Petersburg, Florida 32729 and a regular and established place of business at 152
West 57th Street, New York, NY 10019.

## JURISDICTION

6.      This Court has personal jurisdiction over Defendants by virtue of Defendants,
upon information and belief, transacting business in the State of New York and in this District,
including, but not limited to, doing business with Plaintiffs at Plaintiffs' Manhattan office,
operating interactive websites, and selling products to residents in this District.

7.      This Court has subject matter jurisdiction over Defendants under 18 U.S.C. §
1836(c) (trade secret misappropriation), 28 U.S.C. § 1331 (civil actions arising under the
Constitution, laws, or treaties of the United States), 28 U.S.C. § 1338(a) (any Act of Congress
relating to patents and copyrights), 28 U.S.C. § 1338(b) (unfair competition claim joined with a
substantial and related claim under copyright or patent law), and 28 U.S.C. § 1367 (supplemental

jurisdiction). This Court also has diversity jurisdiction with respect to Defendant HSN under 28 U.S.C. § 1332 because Plaintiff Town & Country Linen Corp. and Defendant HSN are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      The Parties' February 25, 2015 Mutual Non-Disclosure Agreement (the "MNDA") provides for "exclusive jurisdiction of the federal and state courts sitting in New York County" for "any dispute arising out of or relating to" the MNDA.

## FACTS COMMON TO ALL COUNTS

### Plaintiffs' Business

9.      Founded in 1954, Plaintiffs design, source, manufacture, market, and sell a variety of consumer products, including linens, textiles, electronics, and other innovative solution-based products.

10.     Plaintiffs have created products for well-known brands, such as KitchenAid, Clorox, Calvin Klein, Ralph Lauren, and Kate Spade New York.

11.     Over the years, Plaintiffs have developed a network of retail partners and are now a leading supplier of national brands and private label programs to major retailers across the globe. Examples of Plaintiffs' retail partners include Amazon.com, Bed Bath & Beyond, Bloomingdales, Costco Wholesale, HomeGoods, Macy's, and Walmart.

12.     Over the years, Plaintiffs also have developed and curated, and continue to develop and curate, by a considerable expenditure of time and effort, a network of factories and suppliers that they utilize to source and manufacture the various products they create.

13.     Plaintiffs have worked with factories and suppliers in China for over 50 years.

14.     Plaintiffs maintain an office in Shanghai, China.

15.     Plaintiffs devote considerable time, energy and money in the development of their

3

products and intellectual property.  Plaintiffs provide products with distinctive and innovative ornamental designs and creative works of authorship, as well as innovative structure and functionality.  In addition, Plaintiffs source the manufacturers of their products from their network of factories that Plaintiffs have developed and curated, at great expense, during their over 60 years of operation.  Plaintiffs take orders from their customers for products, have them manufactured and delivered to their retail customers who in turn sell the products, typically under the retail customers' brands, to end-consumers.  Most of Plaintiffs' products are high volume mass market products, that sell in volumes between 10,000 and 500,000 or more units.

**The Patent-in-Suit**

16.     Plaintiff Town & Country Linen Corp. owns the entire right, interest and title to United States Patent D800,399 (the "D399 Patent").  The D399 Patent is titled "Portable Garment Drying Apparatus" and names Jeffrey Beyda, Gina Barnaba, Robert Passaretti, and Ozcan Caliskanlar as inventors.  The United States Patent and Trademark Office duly and legally issued the D399 Patent on October 17, 2017, based on an application filed September 23, 2016. A true and correct copy of the D399 Patent is attached as **Exhibit A** to this Complaint.

17.     The D399 Patent is unexpired and enforceable and has not been licensed to Defendants.

18.     The D399 Patent claims an ornamental design for a portable garment drying apparatus.  One depiction of the claim is shown below:



4

**The Copyright-in-Suit**

19.     Plaintiff Town & Country Linen Corp. owns the entire right, title and interest in and to an original work of art identified by the title of "Town and Country Linen Corp. graphic rendering" which was accorded U.S. Copyright Registration Number VAu 1-316-010, having an effective date of registration of May 2, 2018 (TNC's "GUI work").   The U.S. Copyright Office duly and legally granted a Certificate of Registration for this work, a true and correct copy of which is attached as **Exhibit B** to this Complaint.   The original work of art so registered is as follows:



20.     TNC's GUI work was created in 2016 by Ozcan Caliskanlar, who was at the time a professional designer employed by TNC, with ten (10) years of experience in industrial design. Mr. Caliskanlar was awarded a Bachelor in Fine Arts degree in Industrial Design by the Academy of Art University, San Francisco, California, in 2008.   Mr. Caliskanlar was advised that his objective was to create a visually appealing graphic overlay for a digital computer control for a portable garment drying apparatus.   He began his efforts with a review of various button designs from different sources, including on-line and retail store resources for various commercial consumer appliances.   Then, using his abilities and experience, created an original arrangement and spacing of on/off, mode, time increment, time decrement, and start of operation

5

buttons, as well the wording and symbols associated therewith. The work took into consideration placement of these elements with respect to each other and an LCD clock display and three LED indicator lights and utilized circles and lines. Further, Mr. Caliskanlar's GUI work has a slightly curved upper border, intended to match the curved top of the portable garment dryer, straight side and bottom edge borders, and a distinctive border around the perimeter utilizing a gold accent. The result is an original work that is aesthetically pleasing, evinces a high technological sophistication to a comparatively inexpensive consumer home product, and importantly does not interfere with the ability of a consumer to operate the portable garment dryer. This work was copyrighted.

**Defendants' Business**

21.     Upon information and belief, Defendant Mangano is the Founder and President of Defendant IDL. Mangano also is a television personality and salesperson associated with a JOY brand of consumer goods sold on television, online, and in retail stores throughout the country, including in this District. Joy is Defendant Mangano's first name.

22.     Upon information and belief, Defendant IDL sells consumer products on television, online, and in retail stores, which consumer products are developed by or for IDL. These include the products sold under the JOY brand associated with Defendant Mangano.

23.     Upon information and belief, Defendant IDL is a subsidiary of Defendant HSN.

24.     Upon information and belief, Defendant HSN is a home shopping channel on cable television and has an online store at www.hsn.com. Defendant Mangano is one of Defendant HSN's television personalities and appears regularly on HSN's cable network promoting, among other items, JOY branded goods. Defendant HSN sells products from Defendants Mangano and IDL under the JOY brand.

6

25.     Upon information and belief, in a typical hour segment on HSN, Defendant Mangano can sell $1 million worth of product. *See* https://www.dailyworth.com/posts/4104-10-fast-facts-on-the-real-joy-mangano.

26.     According to HSN's website, HSN has "a New York City office that gives [HSN's] traveling executives and teams a place to meet with Partners and [HSN's] Ingenious Designs offices [are] located on Long Island, NY." *See* https://jobs.hsn.com/locations.

27.     Upon information and belief, HSN must approve all products presented by Defendants Mangano and IDL on HSN's home shopping channel.

28.     Upon information and belief, Defendant Mangano exercises complete domination over Defendant IDL.

29.     Upon information and belief, Defendant IDL is the corporate alter ego of Defendant Mangano.

30.     Upon information and belief, Defendant Mangano founded Defendant IDL for the purpose of developing, marketing, and selling the products that she created or had created for her.

31.     Upon information and belief, and based on Plaintiffs' business dealings with Defendants, Defendant Mangano must approve and supervises all projects undertaken by IDL, including the CloseDrier and Kevlar® Luggage projects discussed herein.

32.     IDL's website is www.joymangano.com, which on information and belief, sells only JOY branded products. The site also refers to IDL and www.joymangano.com collectively as "IDL."

33.     The homepage of www.joymangano.com refers to Defendant Mangano as an "inventor, innovator, what-iffer, game-changing dynamo and the philosopher behind every

7

product she makes."

34.      IDL's website of www.joymangano.com links to Defendant Mangano's Facebook, Instagram, and Pinterest accounts.

**Plaintiffs' Relationship with Defendants**

35.      Plaintiffs began working with Defendants in approximately 2012 to develop and manufacture products to be sold by Defendants.

36.      These product development projects begin by either Plaintiffs presenting a concept to Defendants Mangano and IDL, or vice versa.  The parameters of each project are then discussed between Plaintiffs and Defendants, and a joint decision is made on whether to proceed to further develop the concept into a product.  If Plaintiffs decide to proceed with developing a product for Defendants, Plaintiffs will develop, qualify, and manufacture the product using Plaintiffs' resources, vendors, factories, and supply chain for Defendants Mangano and IDL to purchase from Plaintiffs.  In one instance, Plaintiffs agreed to develop a particular product (Kevlar Luggage) for Defendants Mangano and IDL to manufacture through Defendants' factories.  On information and belief, Defendants Mangano and IDL then sell these products through Defendant HSN.

37.      During the course of their dealings, the Parties developed an understanding that any information exchanged during their joint developments about the product concepts to be developed would be kept confidential and only used to pursue completion and joint commercialization of the project as agreed.

38.      In February 2015, Plaintiff Town & Country Holdings, LLC and its affiliates entered into the MNDA with Defendant IDL and its affiliates.

39.      The MNDA provided for the exchange of Evaluation Material in order to pursue

8

"the mutual business purpose of a possible transaction" between Plaintiffs and Defendants, wherein the Evaluation Material was to be used "solely for the purpose of evaluating the Transaction" and "kept strict confidential."

40.     The MNDA's effective date is February 25, 2015 and had a term of three years.

41.     The Parties also developed an understanding regarding Plaintiffs' compensation. In the normal course, when Plaintiffs developed the product, they would have the product manufactured and sell it to Defendants and keep the profits they earned from fulfilling orders with their supply chain. In the one exception, for which Plaintiffs were to develop the Kevlar Luggage product and Defendants would have the product manufactured by Defendants' supply chain factory, then Defendants would reimburse Plaintiffs' development costs, purchase the fabric from Plaintiffs, and pay Plaintiffs a royalty based on a percent mark-up on the purchase price of the products sold.

42.     Plaintiffs have developed and manufactured at least seventeen different product categories for Defendants, including pillows, pillow cases, mops, massagers, and mirrors.

**Defendants' Unlawful Activities**

### *The CloseDrier Garment Dryer Project*

43.     In or about October 2015, Defendants Mangano and IDL asked Plaintiffs to redesign a portable clothes dryer system previously sold by Defendants known as the Joy Mangano CloseDrier Easy Portable Drying System ("Original CloseDrier"). Depictions of the Original CloseDrier are below:

9



44.     Defendants were unhappy with their suppliers of the Original CloseDrier and wanted Plaintiffs to redesign and take over the product.  More specifically, Mangano requested that Plaintiffs change the colors and make the product in its expanded configuration slightly taller.  Mangano also invited Plaintiffs to suggest modest design updates if Plaintiffs thought they had a better idea.

45.     Plaintiffs thereafter undertook an analysis of the Original CloseDrier and concluded that they had a much better idea and set about to design a superior and innovative product.

46.     Plaintiffs spent approximately three years completely revamping the product, including designing, building, and testing prototypes for Defendants.  Plaintiffs further conducted testing for safety and efficacy to comply with Underwriter Laboratories ("UL") and Intertek's Edison Testing Laboratories ("ETL") standards.

47.     The Parties had an express contract, contract implied in fact, and/or contract implied in law relating to this CloseDrier project, including but not limited to the MNDA.

48.     Pursuant to these agreements, information exchanged during the CloseDrier project was to be kept confidential and used only for purposes of jointly commercializing the product.

49.     If commercialized, the Parties also agreed that Plaintiffs would be compensated

according to the Parties' regular course of business dealings, *i.e.* Plaintiffs would have the product manufactured at one of their supply chain factories and Defendants would purchase the product from Plaintiffs at a mark-up.

50.     At Defendants' request, between December 2015 and August 2016, Plaintiffs provided Defendants with at least six design concepts:



| **Dec. 10, 2015** | **Feb. 5, 2016** | **Feb. 17, 2016** |
|---|---|---|

| **Mar. 2, 2016** | **Mar. 3, 2016** | **Aug. 4, 2016** |
|---|---|---|

51.     Plaintiffs' design concepts had novel ornamental designs and original creative graphic user interfaces ("GUI") for the computer panel, as well as a number of technical and functional innovations.   The technical and functional revisions included innovations such changes to the heating element, fan, motor, control system, GUI function, and the method and theory by which garments are dried.   Plaintiffs also updated the placement of the telescoping poles and the locking mechanism for ease of use and stability.

52.     The February 17, 2016 GUI (the "TNC GUI work") is shown below:

11



53.     Plaintiffs further provided Defendants Mangano and IDL with prototypes, which were 3D printed, working prototypes. A first prototype was provided in July 2016, a second prototype was provided in September 2016, and a third prototype was provided in January 2017. Plaintiffs covered the expenses of developing and manufacturing these prototypes.

54.     Plaintiffs further suggested incorporating Defendant Mangano's Forever Fragrant products into the redesigned CloseDrier to refresh clothing using a refresh cycle. After Defendants approved the idea, Plaintiffs proceeded to incorporate a slot in the redesigned CloseDrier and design a special Forever Fragrant disc for the product. Upon information and belief, this product feature added appeal to the CloseDrier and provided Defendants with a further revenue stream involving a consumable Forever Fragrant disc.

55.     During this time, the Parties conducted prolonged negotiations over the functional and structural specifications for the redesigned product and over the cost targets based on anticipated unit sales volumes and retail pricing. At Defendants' request, Plaintiffs also provided Defendants with factory information, prototypes, renderings, marketing materials, testing data, and detailed technical specifications regarding the redesigned product. Defendant Mangano was integral in these negotiations and had the final say on all project specifications and terms.

56.     As of September 23, 2016, although Defendants had not committed to purchasing

any specific quantities of Plaintiffs' proposed portable garment dryer, Plaintiff Town & Country Linen Corp. proceeded to file the design patent application that ultimately issued as the D399 Patent.

57.     Although Plaintiffs completed their development of the new CloseDrier product, Defendants continued to request changes to the product's fan speed based on direction from Defendant Mangano.  The Parties ultimately could not agree on final product specifications and commercialization terms, and discussions ceased in approximately March 2017.  At this point, Plaintiffs understood that their redesigned product was not going to be produced for or by Defendants.

58.     On March 23, 2018, Mangano posted on Twitter regarding the JOY CloseDrier Portable Garment Drying Unit with Forever Fragrant ("JOY CloseDrier with FF") product being offered for sale through Defendant HSN.  A screenshot of the tweet is below:



Similar posts were made by Defendant Mangano on Facebook and Instagram on March 23, 2018 regarding the JOY CloseDrier with FF.

13

59.     Upon information and belief, in March 2018, Mangano appeared on HSN's Home Shopping Network channel on national cable television, and offered for sale and sold quantities of the JOY Close Drier with FF product, including in this District.  Significantly, this product was offered as a "Today's Special" on HSN, which upon information and belief, means that it was offered to consumers at a discount off the suggested retail price if purchased that day, after which consumers would have to pay the higher suggested retail price.

60.     As part of the Today's Special program, Defendant HSN featured the JOY CloseDrier with FF product during at least nine infomercial shows, broadcast at different times during the day on its Home Shopping Network channels.  Defendant Mangano promoted the JOY CloseDrier with FF product during each of the infomercial shows.  Examples of these programs can be found at:

- https://www.youtube.com/watch?v=ryJY8TvFdqg (March 24, 2018 12 AM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=esD1M3A0lWk (March 24, 2018 1 AM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=SojbL-AJhPY (March 24, 2018 5 AM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=bC--ZqodIwc (March 24, 2018 11 AM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=P-YKqZwonNI (March 24, 2018 12 PM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=N-6bEzHButA (March 24, 2018 4 PM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=YB5wC9WFLS4 (March 24, 2018 5 PM) (last visited May 25, 2018)

- https://www.youtube.com/watch?v=48P7j-RnZyc (March 24, 2018 9 PM) (last visited May 25, 2018)

14

- https://www.youtube.com/watch?v=jr_WUoIqs9U (March 24, 2018 10 PM) (last visited May 25, 2018)

61.     These programs indicate that Defendants sold approximately 24,000 JOY CloseDrier with FF products in the first day.

62.     Upon information and belief and based on the comments on the March 23, 2018 Facebook post regarding the JOY CloseDrier with FF, consumers from at least the Bronx and Orangeburg, New York purchased the JOY CloseDrier with FF product.

63.     During these programs, Defendant Mangano and her HSN co-hosts touted various design and technical features of the JOY CloseDrier with FF product that were developed by Plaintiffs.  Exemplary quotes are provided below:

- When introducing the JOY CloseDrier with FF and its new features on the March 24, 2018 1 AM show, Defendant Mangano stated: "We even have just a [] brand new world premiere today in this, a refresh cycle with Forever Fragrant that not only has a fresh linen scent in it that lasts for years, two years … but it has the most powerful odor eliminator." *See* https://www.youtube.com/watch?v=esD1M3A0lWk at approximately 0:38, (March 24, 2018 1 AM) (last visited May 25, 2018)

- When comparing the JOY CloseDrier with FF to the Original CloseDrier, HSN co-host Shannon stated: "I have to say it's a prettier design." *See* https://www.youtube.com/watch?v=esD1M3A0lWk at approximately 1:24, (March 24, 2018 1 AM) (last visited May 25, 2018)

- When talking to a caller who owned the Original CloseDrier, Defendant Mangano stated: "Oh my gosh. Jerri, you need another one, because this has so many other new features. … But now we have updated so much more technology. … As beautiful and simple as it looks, this is awesome." *See* https://www.youtube.com/watch?v=esD1M3A0lWk at approximately 17:50, (March 24, 2018 1 AM) (last visited May 25, 2018)

- When discussing the refresh cycle of the JOY CloseDrier with FF, Defendant Mangano stated, "Remember this has a refreshing cycle which is really, really important," to which co-host Shannon stated, "Oh yeah. You know what, it's so funny, I'm upgrading to this, and I got the lilac before it sells out, for that refresh cycle alone." *See* https://www.youtube.com/watch?v=esD1M3A0lWk at approximately 28:35, (March 24, 2018 1 AM) (last visited May 25, 2018)

15

- During the March 24, 2018 4 PM show, the camera zooms in to focus on the GUI of the JOY CloseDrier with FF and Defendant Mangano proceeds to explain the features of the GUI: "So you have on/off. Then you have temperature, I have it on high heat, there's your new refresh, you have low heat, so the refresh is no heat and that's what the – and I have Forever Fragrant in there, so we're going to eliminate odors. ... Then we have the timing button here, this is so simple, I mean it's like your toaster, right? Five minute increments." *See* https://www.youtube.com/watch?v=N-6bEzHButA at approximately 12:42, (March 24, 2018 4 PM) (last visited May 25, 2018)

- When introducing the JOY CloseDrier with FF and its new features on the March 24, 2018 10 PM show, HSN co-host Shannon stated: "[The JOY CloseDrier with FF has] new innovations. This was years in the making and you have now harnessed not only one touch controls, the new refresher function, which I upgraded tonight, and you should. ... Now you have the power of Forever Fragrant in this as well." *See* https://www.youtube.com/watch?v=jr_WUoIqs9U at approximately 1:45, (March 24, 2018 10 PM) (last visited May 25, 2018)

- When discussing the features of the JOY CloseDrier with FF that customers like, Defendant Mangano quoted a customer as saying: "So, it's so pleasing to the eye. I'm a very visual person. It gets the job done too." *See* https://www.youtube.com/watch?v=jr_WUoIqs9U at approximately 31:28, (March 24, 2018 10 PM) (last visited May 25, 2018)

- When closing the March 24, 2018 10 PM show, Defendant Mangao stated, "Really, it took years to come back, with the technology, the refresher in it. This is something again, you can't find anywhere in the world. ... There are a lot of patents on this by the way. ... This item is amazing." *See* https://www.youtube.com/watch?v=jr_WUoIqs9U at approximately 39:21, (March 24, 2018 10 PM) (last visited May 25, 2018)

64. Upon information and belief, Defendants have also sold Forever Fragrant products for use in the JOY CloseDrier with FF product.

65. The JOY CloseDrier with FF product sold by Defendants is substantially similar to the redesigned product Plaintiffs created for Defendants, both in terms of physical appearance and technical function. The below pictures compare the appearance of one version of Plaintiffs' redesigned product with Defendants' unauthorized commercialized product:

16

*Plaintiffs' Redesigned Product*          *Defendants' Unauthorized Commercial Product*



66.     Upon information and belief and in breach of at least the MNDA and the Parties' confidential relationship, Defendants unlawfully utilized the information provided to them by Plaintiffs during the CloseDrier project to create the JOY CloseDrier with FF product.

67.     Defendants' manufacturing, promotion, and sales of the JOY CloseDrier with FF products are without the consent of, license from, or compensation to Plaintiffs.

68.     Defendants' manufacturing, promotion, and sales of the JOY CloseDrier with FF product are a breach of the Parties' agreements relating to the CloseDrier redesign, including but not limited to the MNDA.

69.     Furthermore, the JOY CloseDrier with FF product incorporates and infringes Plaintiff Town & Country Linen Corp.'s D399 Patent.  A side by side comparison of the D399 Patent and corresponding views of a JOY CloseDrier with FF purchased by Plaintiffs, is below:

*Front Elevated Perspective View*



*Top View*



*Front Expanded View*



70.     The JOY CloseDrier with FF product has a GUI for its control panel that incorporates and infringes Plaintiff Town & Country Linen Corp.'s Copyright Registration No. VAu001316010 / 2018-05-02 (entitled: "Town and Country Linen Corp. graphic rendering"), *i.e.*, TNC's GUI work.     A side-by-side comparison of the TNC's GUI work and the unauthorized GUI of the JOY CloseDrier with FF product, demonstrating their striking similarities, is below:

*TNC's GUI work*                          *Defendants' Unauthorized GUI*

71.     Defendants copied the protectable features of TNC's GUI work, including the arrangement and positioning of the "ON/OFF", "+," "-," and "START" buttons, their placement relative to the LCD clock display and the three indicator LEDs, and a distinctive border including straight sides and bottom and a curved top edge.

72.     Defendants' copying of Plaintiff Town & Country Linen Corp.'s innovative ornamental design of the D399 Patent and the original and creative copyrighted GUI work were for their own profit, without the consent of, license from, or compensation to Plaintiff Town & Country Linen Corp.

73.     Upon information and belief, and based on Plaintiffs' business dealings with Defendants on the CloseDrier project, Defendant Mangano actively participated in, directed, ordered, ratified, approved, and/or consented to Defendants' design, manufacturing, promotion,

19

and sale of the JOY CloseDrier with FF product.  Upon information and belief, Defendant Mangano approved the final product design, marketed the product, and offered the product for sale during her appearances on Defendant HSN's home shopping network channel.

74.     Plaintiff Town & Country Linen Corp. provided Defendants with notice of the D399 Patent and the copyright for TNC's GUI work on May 25, 2018.

### The Kevlar® Luggage Project

75.     In 2014, Plaintiffs approached Defendants with a proposed project that would incorporate DuPont's Kevlar, aramid synthetic fibers, into luggage.  Plaintiffs had a pre-existing relationship with the company who had the rights to license Kevlar fibers for use in luggage from DuPont, the developer of the Kevlar fibers. Defendants were excited by the idea and Plaintiffs began working on the Kevlar Luggage project.

76.     Plaintiffs expended considerable time, effort, and capital to locate a suitable fabric weaver for this project, which included numerous trips to China.

77.     Plaintiffs then spent months working with their weaver to develop and test a fabric that incorporated Kevlar fibers that would be durable, cost-effective, and aesthetically pleasing.  Plaintiffs ultimately developed a proprietary weaving pattern and method using a novel Kevlar aramid fiber blend for Defendants.

78.     Defendants were pleased with Plaintiffs' work and wanted to move forward with commercializing the Kevlar Luggage.

79.     The Parties had an express contract, contract implied in fact, and/or contract implied in law relating to this Kevlar Luggage project, including but not limited to the MNDA.

80.     Pursuant to these agreements, information exchanged during the Kevlar Luggage project was to be kept confidential and used only for purposes of evaluating the joint

commercialization of the Kevlar Luggage product.

81.     The Parties initially agreed that Plaintiffs would purchase the Kevlar fibers directly from DuPont.  Plaintiffs' weaver would then create the fabric for the luggage using the Kevlar fibers, according to Plaintiffs' proprietary method.  Defendants and/or their factory would purchase this fabric from Plaintiffs at a mark-up and use the fabric to manufacture the luggage for Defendants.

82.     Although the Parties typically used Plaintiffs' factories to manufacture their products, at Defendants' request, Plaintiffs made an exception and agreed that Defendants could use their factory partner to manufacture the luggage with Plaintiffs' Kevlar fabric.

83.     The Parties also agreed that Plaintiffs would be reimbursed their development costs.  Defendants would further pay a running royalty based on a percent mark-up on the purchase price of the Kevlar Luggage products to Plaintiffs and a royalty based on the purchase price to DuPont.

84.     By May 2015, Plaintiffs and Defendants agreed upon the royalty that would be paid to Plaintiffs.  Mangano stated that she wanted to "move ahead" with the project.

85.     Thereafter, Defendants refused to pay the agreed upon royalty, offering a much lower royalty to Plaintiffs.  Plaintiffs declined to continue the deal under these terms and agreed to let Defendants contract directly with DuPont to buy the Kevlar fibers to commercialize the luggage. In exchange, Defendants agreed to reimburse Plaintiffs for their direct expense development costs and pay Plaintiffs a reasonable royalty going forward.

86.     In September 2015, at IDL's request and pursuant to the Parties' confidential relationship, MNDA, and Defendants' agreement to reimburse Plaintiffs, Plaintiffs provided IDL

with their proprietary information on their weavers and the design specifications for the proprietary fabric woven with Kevlar.

87.     In November 2015, Defendants sought Plaintiffs' assistance in connection with Defendants' efforts to obtain a license from DuPont for Kevlar fibers for luggage. Plaintiffs agreed and contacted DuPont and assisted Defendants with making a presentation to DuPont about the significant business opportunity Defendants offered.

88.     Defendants ultimately failed to secure a license from DuPont to use the Kevlar fabric.

89.     In November 2015, after the deal with DuPont fell through, Defendants wanted to develop a Kevlar fiber alternative and again turned to Plaintiffs for help. Pursuant to the Parties' confidential relationship and MNDA, Plaintiffs provided Defendants with information on Kevlar fiber alternatives.

90.     Despite Defendants agreeing to reimburse Plaintiffs and Plaintiffs sending IDL a significantly discounted invoice for direct expenses relating to the project, Plaintiffs were never compensated for the development work they did or the expenses they incurred on the Kevlar Luggage project.

91.     Upon information and belief, in September 2016, approximately one year after the DuPont deal fell through, Defendants launched a luggage product called TuffTech®.

92.     In September 2016, Defendant Mangano posted on Twitter regarding the launch of her TuffTech luggage on HSN. A Screenshot of the tweet is below:

22



Similar posts regarding the launch of Defendants' TuffTech luggage were made by Defendant Mangano on Facebook and Instagram in September 2016.

93.     In February 2017, Defendants Mangano and HSN posted on Twitter regarding the durability of the TuffTech luggage, which was being offered as a Today's Special on HSN. Screenshots of the tweets are below:





94.     Upon information and belief, Defendants' TuffTech luggage utilizes an aramid fiber blend and the same and/or substantially similar weaving pattern and backing as the Kevlar fabric prototypes developed by Plaintiffs.

95.     Upon information and belief, Plaintiffs' weaver is one of the weavers manufacturing the fabric for Defendants' TuffTech luggage.

96.     Upon information and belief, Defendants are utilizing two additional weavers to manufacture the fabric for Defendants' TuffTech luggage.

97.     Upon information and belief and in violation of at least the MNDA and the Parties' confidential relationship, Defendants unlawfully utilized the information provided to them by Plaintiffs during the Kevlar Luggage project to create the TuffTech luggage products.

98.     Upon information and belief and in violation of at least the MNDA and the Parties' confidential relationship, Defendants unlawfully disclosed Plaintiffs' trade secrets, confidential information, and/or Evaluation Material to the weavers and/or other factories that Defendants utilized to manufacture the TuffTech luggage products.

99.     Defendants' manufacturing, promotion, and sales of their TuffTech luggage are without the consent of, license from, or compensation to Plaintiffs.

100.    Defendants' manufacturing, promotion, and sales of their TuffTech luggage are a breach of the Parties' agreements relating to the Kevlar Luggage product, including but not limited to the MNDA.

101.    Upon information and belief, Defendants have sold hundreds of thousands of units of their TuffTech luggage.

102.    Upon information and belief, and based on Plaintiffs' business dealings with Defendants on the Kevlar Luggage project, Defendant Mangano actively participated in,

24

directed, ordered, ratified, approved, and/or consented to Defendants' design, manufacturing, promotion, and sale of the Kevlar Luggage products. Upon information and belief, Defendant Mangano approved the final product design, marketed the product, and offered the product for sale during her appearances on Defendant HSN's home shopping network channel.

### *Water Filter Project*

103. Plaintiffs had an express contract, contract implied in fact, and/or contract implied in law relating to the development and sale of a collapsible water filter product and replacement filters (collectively, "water filter products") for Defendants.

104. As part of the agreement, Defendants agreed to purchase a certain volume of water filter products from Plaintiffs. Defendants further agreed to feature the item as a "Today's Special" that would be sold by Defendant Mangano on HSN. In exchange, Plaintiffs agreed to develop the water filter products, conduct NSF testing, and meet Defendants' price targets.

105. The development and testing of the water filter products was done at considerable expense to Plaintiffs, including but not limited to paying for factory molds and conducting third party testing.

106. Despite Plaintiffs developing, testing, and manufacturing the water filter products to Defendants' satisfaction, Defendants did not purchase the agreed upon volumes.

107. Defendants further did not sell the water filter product as agreed. Upon information and belief, it was not offered as a "Today's Special" and was not sold by Defendant Mangano.

### *Project Bundling*

108. As part of the Parties' course of dealings, Defendants would demand that Plaintiffs supply certain products at particular prices below the regular price for defined volumes

of product.  In at least two instances, Plaintiffs agreed to provide Defendants with the requested discounts only in exchange for commitments from Defendants to purchase other specific products, in specific quantities, at specific prices.

109.    In these two instances, in exchange for certain commitments by Defendants relating to the purchase of minimum quantities of certain products at specific prices, Plaintiffs provided Defendants with favorable discounted pricing on new two-pack and three-pack pillow offerings.

110.    Had Defendants not promised to purchase these other products at the specific volumes and prices, Plaintiffs would not have agreed to sell the products that they sold at the discounted pricing.

111.    Defendants, however, ultimately did not purchase the quantities of various other products from Plaintiffs that were promised.  Plaintiffs' damages from Defendants' failure to purchase are in excess of $2.4 million.

*Plaintiffs' Factories*

112.    Over the years, Plaintiffs have spent considerable time, effort, and capital to locate and vet factories (including manufacturers and weavers) around the world, particularly in China, to manufacture the products they develop.  Plaintiffs' efforts included, but were not limited to, traveling abroad to visit factories, establishing and operating an office in China, paying for molds and samples, testing prototypes, and ensuring compliance with customer, UL, ETL and other applicable standards.  Plaintiffs have thus developed and curated a network of factories that they can source from for any given project.

113.    At Defendants' request and pursuant to the Parties' confidential relationship and MNDA, Plaintiffs disclosed the names and locations of their factories to Defendants.  For

example, Plaintiffs disclosed the name of their mop and Flexassage factories, as well as the weaver used for the Kevlar Luggage project, to Defendants.

114.    Upon information and belief, in approximately 2017, Defendant IDL created its own sourcing department.

115.    In December 2017, IDL suggested a licensing agreement for a particular product where IDL would work directly with Plaintiffs' factory.  Plaintiffs rejected the proposal and insisted that Defendants not go directly to Plaintiffs' factories.

116.    In March 2018 after Plaintiffs indicated that they could not hit IDL's price targets for a particular product, IDL requested to work directly with Plaintiffs' factories.  Plaintiffs told IDL that they did not agree, and explicitly stated that IDL did not have permission to contact Plaintiffs' factories.

117.    Despite Plaintiffs rejecting IDL's proposals and advising Defendants on numerous occasions to not work directly with Plaintiffs' factories, Defendants went directly to Plaintiffs' factories to have products made.  Upon information and belief, Defendants went directly to at least Plaintiffs' mop factory, Flexassage factory, and luggage fabric weaver.  This was done without the consent of, or compensation to, Plaintiffs.

118.    Upon information and belief, Defendants received more favorable pricing by going direct to Plaintiffs' factories.

119.    Upon information and belief and in violation of the Parties' confidential relationship and MNDA, Defendants unlawfully disclosed and utilized Plaintiffs' Evaluation Material and confidential and proprietary information with Plaintiffs' factories.

120.    Upon information and belief, Defendants also jump-started their sourcing department by utilizing factories that Plaintiffs had invested considerable time and money in

developing and bringing up to the standards acceptable to Plaintiffs to produce products for Plaintiffs' customers, including Defendants, and are utilizing know-how that Plaintiffs paid for and developed.

121.    Upon information and belief, Plaintiffs lost goodwill with their factories due to Defendants' actions because they, *inter alia*, did not ultimately purchase the product volumes promised to them for cost concessions and were no longer needed as a contact for Defendants.

### COUNT I
*(Patent Infringement, 35 U.S.C. § 271)*

122.    Plaintiffs repeat and reallege the averments contained in all preceding Paragraphs as if fully stated herein.

123.    Defendants' actions, as set forth herein, constitute patent infringement under 35 U.S.C. § 271.

124.    Defendants have infringed and continue to infringe the D399 Patent by using, selling and/or offering to sell in the United States, and/or importing into the United States the JOY CloseDrier with FF products, which embody the ornamental design covered by the D399 Patent (Exhibit A).

125.    Upon information and belief, Defendants' infringement of the D399 Patent has been and continues to be intentional, willful, and without regard to Plaintiff Town & Country Linen Corp.'s rights.

126.    Upon information and belief, Defendants have gained profits by virtue of their infringement of the D399 Patent.

127.    Plaintiff Town & Country Linen Corp. has sustained damages as a direct and proximate result of Defendants' infringement of the D399 Patent.

128.    Plaintiff Town & Country Linen Corp. is entitled to recover a reasonable royalty,

Defendants' profits, attorney fees, treble damages, and all other relief allowed under the Patent Act.

129.    Plaintiff Town & Country Linen Corp. will suffer and is suffering irreparable harm from Defendants' infringement of the D399 Patent. Plaintiff Town & Country Linen Corp. has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the D399 Patent. Unless enjoined, Defendants will continue their infringing conduct.

## COUNT II
*(Copyright Infringement, 17 U.S.C. §§ 106, 501)*

130.    Plaintiffs repeat and reallege the averments contained in all preceding Paragraphs as if fully stated herein.

131.    Defendants' actions, as set forth herein, constitute copyright infringement under the Copyright Act, 17 U.S.C. §§ 106, 501.

132.    Plaintiff Town & Country Linen Corp. is the sole owner of the copyright in an original work that is fixed in tangible medium of expression. On or about May 4, 2018, the United States Copyright Office granted Plaintiff Town & Country Linen Corp.'s application for copyright registration for the original work entitled "Town and Country Linen Corp. graphic rendering" and issued copyright registration No. VAu001316010 / 2018-05-02, *i.e.*, TNC's GUI work (Exhibit B). The effective date of the copyright registration is May 2, 2018.

133.    Upon information and belief, Defendants have produced, reproduced, prepared derivative works based upon, distributed, and/or publicly displayed Plaintiff Town & Country Linen Corp.'s protected GUI work and/or derivatives of Plaintiff Town & Country Linen Corp.'s protected GUI work without Plaintiff Town & Country Linen Corp.'s consent. Defendants' acts violate Plaintiff Town & Country Linen Corp.'s exclusive rights under the Copyright Act, 17

U.S.C. §§ 106 and 501, including Plaintiff Town & Country Linen Corp.'s exclusive rights to produce, reproduce, and distribute copies of its GUI work, to create derivative works, and to publicly display its GUI work.

134.    Defendants' infringement has been undertaken knowingly, and with intent to financially gain from Plaintiff Town & Country Linen Corp.'s protected copyrighted work. Defendants have failed to exercise their right and ability to supervise persons within their control to prevent infringement, and they did so with the intent to further their financial interest in the infringement of TNC's GUI work.  Accordingly, Defendants have directly, contributorily, and vicariously infringed Plaintiff Town & Country Linen Corp.'s copyrighted GUI work.

135.    Because of Defendants' infringing acts, Plaintiff Town & Country Linen Corp. is entitled to recover its actual damages and Defendants' profits attributable in an amount to be proved at trial and all other relief allowed under the Copyright Act.

136.    Defendants' infringement has caused and is causing irreparable harm to Plaintiff Town & Country Linen Corp., for which Plaintiff Town & Country Linen Corp. has no adequate remedy at law. Unless this Court restrains Defendants from infringing Plaintiff Town & Country Linen Corp.'s protected work, the harm will continue to occur in the future. Accordingly, Plaintiff Town & Country Linen Corp. is entitled to preliminary and permanent injunctive relief.

## COUNT III
*(Trade Secret Misappropriation, 18 U.S.C. § 1836)*

137.    Plaintiffs repeat and reallege the averments contained in all preceding Paragraphs as if fully stated herein.

138.    Defendants' actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

139.    Plaintiffs possess confidential and trade secret information, including but not

limited to technical specifications, testing data, and factory information relating to the CloseDrier and Kevlar Luggage projects that constitute trade secrets.

140.    Plaintiffs made reasonable efforts to maintain the secrecy of this information, such as by limiting its disclosure to those who, like Defendants, had confidentiality obligations.

141.    Plaintiffs' trade secrets derive independent economic value from not being generally known and not being readily ascertainable.

142.    Plaintiffs' trade secrets relate to products that were used and/or were intended to be used in interstate or foreign commerce.

143.    The Parties agreed that the information exchanged as part of the CloseDrier and Kevlar projects would be kept confidential and would only be used in furtherance of, and to jointly commercialize, the products.  Defendants thus had a duty to maintain the secrecy of Plaintiffs' trade secrets.

144.    In reliance on the trust and confidence stemming from the Parties' confidential relationship and MNDA, Plaintiffs provided Defendants with their trade secrets during the CloseDrier and Kevlar projects.

145.    After the respective CloseDrier and Kevlar negotiations broke down, Defendants had no right to retain or use any of Plaintiffs' trade secret information beyond residual information permitted by the MNDA.

146.    Upon information and belief, Defendants knowingly and improperly retained and used Plaintiffs' trade secrets, including but not limited to by manufacturing, promoting, and selling the JOY CloseDrier with FF and TuffTech products and by using Plaintiffs' industry contacts to manufacture these and other products.

147.    Plaintiffs did not consent to Defendants' use of their trade secrets in this manner.

31

148.     Upon information and belief, Defendants knew or should have known that Plaintiffs' trade secrets were improperly used to manufacture, promote, and sell the JOY CloseDrier with FF and TuffTech products.

149.     Upon information and belief, Defendants' conduct constitutes knowing, willful, and/or malicious misappropriation.

150.     By misappropriating Plaintiffs' trade secrets, Defendants obtained immediate, direct, and substantial commercial benefits, including but not limited to financial benefits from a shortened time to market, substantially reduced development costs, and sales of the JOY CloseDrier with FF and TuffTech products, as well as gaining a competitive advantage.

151.     As a result of Defendants' misappropriation, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory or actual damages, unjust enrichment damages, a reasonable royalty, attorney fees, exemplary damages, and other damages in an amount to be proved at trial.

152.     Defendants' misappropriation has caused and is causing irreparable harm to Plaintiffs, for which Plaintiffs have no adequate remedy at law. Unless this Court restrains Defendants from misappropriating Plaintiffs' trade secrets, the harm will continue in the future. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief.

## COUNT IV
*(Trade Secret Misappropriation under New York Common Law)*

153.     Plaintiffs repeat and reallege the averments contained in all preceding Paragraphs as if fully stated herein.

154.     Defendants' actions, as set forth herein, constitute misappropriation under New York law.

155.     Plaintiffs possess confidential and trade secret information, including but not

limited to technical specifications, testing data, and factory information relating to the CloseDrier and Kevlar Luggage projects that constitute trade secrets under New York law.

156.    Plaintiffs made reasonable efforts to maintain the secrecy of this information, such as by limiting its disclosure to those who, like Defendants, had confidentiality obligations.

157.    Plaintiffs expended substantial time, labor, skill, research and development, and capital to develop its trade secrets, which are extremely valuable to Plaintiffs and give them a competitive advantage.  Plaintiffs' trade secrets are not generally known in the industry and cannot be easily acquired or duplicated by others.

158.    The Parties agreed that the information exchanged as part of the CloseDrier and Kevlar projects would be kept confidential and would only be used in furtherance of, and to jointly commercialize, the products.  Defendants thus had a duty to maintain the secrecy of Plaintiffs' trade secrets.

159.    In reliance on the trust and confidence stemming from the Parties' confidential relationship and the MNDA, Plaintiffs provided Defendants with their trade secrets during the CloseDrier and Kevlar projects.

160.    After the respective CloseDrier and Kevlar negotiations broke down, Defendants had no right to retain or use any of Plaintiffs' trade secret information beyond residual information permitted by the MNDA.

161.    Upon information and belief, Defendants knowingly and improperly retained and used Plaintiffs' trade secrets, including but not limited to by manufacturing, promoting, and selling the JOY CloseDrier with FF and TuffTech products and by using Plaintiffs' industry contacts to manufacture these and other products.

162.    Plaintiffs did not consent to Defendants' use of their trade secrets in this manner.

33

163.    Upon information and belief, Defendants knew or should have known that Plaintiffs' trade secrets were improperly used to manufacture, promote, and sell the JOY CloseDrier with FF and TuffTech products.

164.    Upon information and belief, Defendants' conduct constitutes knowing, willful, gross, and/or wanton misappropriation.

165.    By misappropriating Plaintiffs' trade secrets, Defendants obtained immediate, direct, and substantial commercial benefits, including but not limited to financial benefits from a shortened time to market, substantially reduced development costs, and sales of the JOY CloseDrier with FF and TuffTech products, as well as gaining a competitive advantage.

166.    As a result of Defendants' misappropriation, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory or actual damages, unjust enrichment damages, a reasonable royalty, attorney fees, punitive damages, and other damages in an amount to be proved at trial.

167.    Defendants' misappropriation has caused and is causing irreparable harm to Plaintiffs, for which Plaintiffs have no adequate remedy at law.  Unless this Court restrains Defendants from misappropriating Plaintiffs' trade secrets, the harm will continue in the future. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief.

## COUNT V
*(Misappropriation of Ideas under New York Common Law)*

168.    Plaintiffs repeat and reallege the averments contained in all preceding paragraphs as if fully stated herein.

169.    The Parties had express contracts, contracts implied in fact, and/or contracts implied in law relating to the CloseDrier and Kevlar Luggage projects.

170.    The information Plaintiffs provided to Defendants during the CloseDrier and

34

Kevlar Luggage projects was novel and concrete.

171.   The Parties' agreed that Plaintiffs would, and Plaintiffs expected to, be compensated for the information they provided to Defendants during the CloseDrier and Kevlar Luggage projects.

172.   In violation of the Parties' agreements, Defendants misappropriated Plaintiffs' ideas by manufacturing, promoting, and selling the JOY CloseDrier with FF and TuffTech products and by using Plaintiffs' industry contacts to manufacture these and other products. This was done without the consent of or compensation to Plaintiffs.

173.   As a result of Defendants' misappropriation, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory or actual damages, unjust enrichment damages, a reasonable royalty, attorney fees, punitive damages, and other damages in an amount to be proved at trial.

174.   Defendants' misappropriation has caused and is causing irreparable harm to Plaintiffs, for which Plaintiffs have no adequate remedy at law.   Unless this Court restrains Defendants from misappropriating Plaintiffs' ideas, the harm will continue in the future. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief.

### COUNT VI
*(Quantum Meruit under New York Common Law)*

175.   Plaintiffs repeat and reallege the averments contained in all preceding paragraphs as if fully stated herein.

176.   Plaintiffs performed services and created products for Defendants with respect to the CloseDrier and Kevlar Luggage projects, including but not limited to prototypes and design, manufacturing, testing, marketing, and negotiation services.   Plaintiffs further located and vetted factories to manufacture products for Defendants.   Plaintiffs expended substantial time, labor,

35

skill, research and development, and capital to perform these services and create these products for Defendants. Plaintiffs also provided Defendants with discounts on certain products and volumes based on Defendants' purchase volume and price commitments with respect to other products.

177. The information and products Plaintiffs provided to Defendants were novel and concrete.

178. Plaintiffs performed its services and created their products in a professional manner, in good faith, and with the expectation that they would be compensated by Defendants for the reasonable value of those services and products.

179. Defendants accepted Plaintiffs' services and products, received a benefit therefrom, and impliedly and expressly promised to pay for the services and products that Plaintiffs provided.

180. Defendants did not provide reasonable compensation to Plaintiffs for the services and products provided.

181. It would be unjust, unfair, and inequitable for Defendants to retain the benefits they have gained from the sales of the JOY CloseDrier with FF and TuffTech products, utilizing Plaintiffs' factories, and Plaintiffs' discounted pricing whilst withholding payment for Plaintiffs' services and products.

182. As a result of the conduct alleged herein, Plaintiffs have suffered damages. Plaintiffs seek a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Defendants' inequitable activities.

### COUNT VII
*(Unjust Enrichment under New York Common Law)*

183. Plaintiffs repeat and reallege the averments contained in all preceding paragraphs

as if fully stated herein.

184.    Plaintiffs performed services and created products for Defendants with respect to the CloseDrier and Kevlar Luggage projects, including but not limited to prototypes and design, manufacturing, testing, marketing, and negotiation services.  Plaintiffs further located and vetted factories to manufacture products for Defendants.  Plaintiffs expended substantial time, labor, skill, research and development, and capital to perform these services and create these products for Defendants. Plaintiffs also provided Defendants with discounts based on Defendants' purchase volume and price commitments.

185.    The information and products Plaintiffs provided to Defendants were novel and concrete.

186.    Plaintiffs provided services and products to Defendants and reasonably expected payment for same.

187.    Defendants had notice and knowledge that Plaintiffs expected to be paid for the services and products they provided.

188.    Defendants accepted Plaintiffs' services and products, received a benefit therefrom, and impliedly and expressly promised to pay for the services and products that Plaintiffs provided.

189.    Defendants did not provide reasonable compensation to Plaintiffs for the services and products provided.

190.    It would be unjust, unfair, and inequitable for Defendants to retain the benefits they have gained from the sales of the JOY CloseDrier with FF and TuffTech products, utilizing Plaintiffs' factories, and discounted pricing whilst withholding payment for Plaintiffs' services and products.

37

191.    As a result of the conduct alleged herein, Defendants have been unjustly enriched to Plaintiffs' detriment.  Plaintiffs seek a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Defendants' inequitable activities.

### COUNT VIII
*(Unfair Competition under New York Common Law)*

192.    Plaintiffs repeat and reallege the averments contained in all preceding paragraphs as if fully stated herein.

193.    Plaintiffs expended substantial time, labor, skill, research and development, and capital on their work for the CloseDrier and Kevlar Luggage projects.  Plaintiffs further located and vetted factories to manufacture products for Defendants.

194.    Defendants obtained access to Plaintiffs' confidential business information through the Parties' confidential relationship and for the purposes of jointly commercializing a product.

195.    In violation of the Parties' agreements, including the MNDA, Defendants misappropriated Plaintiffs' confidential business information by going direct to Plaintiffs' factories and by manufacturing, promoting, and selling the JOY CloseDrier with FF and TuffTech products.

196.    In further violation, Defendants did not purchase the products at the specific prices and quantities that they committed to in order to receive Plaintiffs' discounted bundled pricing.

197.    In further violation, Defendants directly contacted Plaintiffs' factories, which make it difficult and sometimes impossible for Plaintiffs to compete on pricing.  Defendants' actions put Plaintiffs at a disadvantage with their factories and with bidding on projects for Defendants.

198.     In further violation, upon information and belief, Defendants unlawfully disclosed Plaintiffs' Evaluation Material and/or proprietary and confidential information to these factories in violation of the Parties' confidential relationship and the MNDA.

199.     Defendants' misappropriation and actions constitute unfair competition.

200.     By misappropriating Plaintiffs' confidential information and unfairly competing, Defendants obtained immediate, direct, and substantial commercial benefits, including but not limited to financial benefits from a shortened time to market, substantially reduced development costs, and sales of the JOY CloseDrier with FF and TuffTech products, as well as gaining a competitive advantage.

201.     As a result of Defendants' unfair competition, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory or actual damages, a reasonable royalty, attorney fees, punitive damages and other damages in an amount to be proved at trial. Plaintiffs also seek a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Defendants' unfair competition.

202.     Defendants' unfair competition has caused and is causing irreparable harm to Plaintiffs, for which Plaintiffs have no adequate remedy at law.  Unless this Court restrains Defendants from unfairly competing, the harm will continue in the future.  Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief.

## COUNT IX
*(Breach of Contract under New York Common Law)*

203.     Plaintiffs repeat and reallege the averments contained in all preceding Paragraphs as if fully stated herein.

204.     The Parties had express contracts and/or contracts implied in fact relating to their business dealings, including but not limited to the MNDA.

205.    The information Plaintiffs disclosed to Defendants during and in connection with the CloseDrier and Kevlar Luggage projects constitutes Evaluation Material under the MNDA.

206.    The identity, location, and capabilities of the factories vetted by Plaintiffs for projects and products to be developed or manufactured for Defendants constitutes Evaluation Material under the MNDA.

207.    In violation of these agreements, Defendants utilized and/or disclosed Plaintiffs' confidential information and Evaluation Materials to third parties, including but not limited to Defendants' partner factories and the factories that Plaintiffs vetted for Defendants' projects, to commercialize the JOY CloseDrier with FF and TuffTech products without compensation to, or the consent of, Plaintiffs.

208.    In further violation, Defendants did not purchase the products at the specific prices and quantities that they committed to in order to receive Plaintiffs' discounted bundled pricing.

209.    In further violation, Defendants did not purchase the agreed upon volumes of the water filter product or offer the product for sale in the manner agreed upon by the Parties.

210.    As a result of Defendants' breaches, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory or actual damages, a reasonable royalty, attorney fees, and other damages in law and equity in an amount to be proved at trial.

211.    Defendants' breaches have caused and are causing irreparable harm to Plaintiffs, for which Plaintiffs have no adequate remedy at law.  Unless this Court restrains Defendants from breaching the Parties' agreements, the harm will continue in the future.  Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for the following relief:

A.     A judgment that Defendants have directly and/or indirectly infringed Plaintiff Town & Country Linen Corp.'s D399 Patent and copyright (TNC's GUI work), misappropriated Plaintiffs' trade secrets and ideas, were unjustly enriched, are liable under *quantum meruit*, unfairly competed, and breached their contracts with Plaintiffs.

B.     An order preliminarily and permanently enjoining Defendants, their respective owners, subsidiaries, divisions, branches, affiliates, predecessors or successors in business, parents and wholly owned or partially owned entities of the party, and any entities acting or purporting to act for or on behalf of the foregoing, including any agents, employees, representatives, officers, directors, servants, partners, and those persons in active concert or participation with them, from further acts of infringement of Plaintiff Town & Country Linen Corp.'s asserted D399 Patent and TNC's GUI work, misappropriating Plaintiffs' trade secrets and ideas, being unjustly enriched, unfairly competing, and breaching their contracts with Plaintiffs.

C.     An order impounding any infringing products and related material, as well as any other articles that contain or embody copies of Plaintiff Town & Country Linen Corp.'s original GUI work, pursuant to 17 U.S.C. § 503(a);

D.     An order destroying any infringing products and related material, as well as any other articles that contain or embody copies of Plaintiff Town & Country Linen Corp.'s original TNC GUI work, pursuant to 17 U.S.C. § 503(b);

E.     An award of damages to compensate Plaintiff Town & Country Linen Corp. for Defendants' infringement pursuant to 35 U.S.C. § 284;

41

F.      An order (a) requiring an accounting of Defendants' profits pursuant to Defendants' unlawful activities and (b) awarding all of said profits to Plaintiffs as damages sustained by Plaintiffs due to Defendants' acts complained of herein, including the award of Defendants' profits from its infringement pursuant to 35 U.S.C. § 289 and/or 17 U.S.C. § 504;

G.      An order awarding restitutionary relief against Defendants in favor of Plaintiffs, including disgorgement of wrongfully obtained profits and any other appropriate relief;

H.      An order awarding actual and compensatory damages suffered by Plaintiffs as a result of Defendants' unlawful conduct, in an amount to be proven at trial;

I.      An order awarding Plaintiffs a reasonable royalty;

J.      An award of all damages, including treble damages, based on any infringement found to be willful, pursuant to 35 U.S.C. § 284 and/or 17 U.S.C. § 504;

K.      An order awarding Plaintiffs punitive damages;

L.      An order awarding Plaintiffs pre-judgment and post-judgment interest on all applicable damages at the maximum rate(s) permitted by law;

M.      An order awarding Plaintiffs their expenses and costs of suit and reasonable attorney fees as to each claim as permitted by law, including a judgment finding that this case is exceptional and awarding Plaintiffs' attorney fees pursuant to 35 U.S.C. § 285; and

N.      An order awarding Plaintiffs such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues triable to a jury.

42

Dated:  June 6, 2018
       White Plains, New York

Respectfully submitted,

LEASON ELLIS LLP

By:_____

Robert Isackson (RI 4303)
Lauren Sabol (LS 2136)
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, New York 10601
Phone: (914) 288-0022
Fax: (914) 288-0023
Email: isackson@leasonellis.com
Email: sabol@leasonellis.com

*Attorneys for Plaintiffs*