UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                         :

TOWN & COUNTRY LINEN CORP. and        :
TOWN & COUNTRY HOLDINGS, INC.,       :
                         :

              Plaintiffs,      :         18-cv-5075 (LJL)
                         :

         -v-                 :      OPINION AND ORDER
                         :

INGENIOUS DESIGNS LLC, JOY MANGANO, and  :
HSN, INC.,                    :
                         :

              Defendants.      :
                         :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/23/2021

LEWIS J. LIMAN, United States District Judge:

       Plaintiffs Town & Country Linen Corp. and Town & Country Holdings, Inc. (collectively, "TNC" or "Plaintiffs") and Defendants Ingenious Designs LLC ("IDL"), Joy Mangano ("Mangano"), and HSN, Inc. ("HSN," and collectively with IDL and Mangano, "Defendants")[1] cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs also move to strike certain exhibits offered by Defendants in opposition to summary judgment.

       For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiffs' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

       Familiarity with the Court's prior opinions granting in part and denying in part Defendants' motion to dismiss the complaint, Dkt. No. 126, granting Plaintiffs' motion for

---

[1] Defendants are also Counterclaim Plaintiffs. For convenience, the Court refers to IDL, Mangano, and HSN as Defendants.

reconsideration, Dkt. No. 142, and granting in part and denying in part Plaintiffs' motion to dismiss certain Counterclaims and affirmative defenses, Dkt. No. 171, is assumed.

The following facts are undisputed for the purposes of summary judgment except as otherwise indicated.

### A.  The Parties

Plaintiffs are companies that "design, source, manufacture, market, and sell a variety of consumer products."  Dkt. No. 47 ("Second Amended Complaint" or "SAC") ¶ 9.  They provide products with distinctive and innovative structure and functionality, and they source the manufacturers of those products from a network of factories that they have developed and curated during their over sixty years in operation.  *Id.* ¶ 16.  Plaintiffs then take orders for these products, which are manufactured and delivered to their retail customers, who in turn sell the products, typically under the retail customers' brands, to end-consumers.  *Id.*  Plaintiffs began working with Defendants in approximately 2012 to develop and manufacture products to be sold by Defendants.  *Id.* ¶ 35.  Beyda was TNC's President.  Dkt. No. 256 ¶ 1.  The Vice President of Design at TNC is Gina Barnaba ("Barnaba").  Dkt. No. 257 ¶ 1.

Defendant Mangano is an inventor and designer who founded IDL through its predecessor Ingenious Designs, Inc.  SAC ¶ 22.  IDL develops, markets, and sells products that Mangano creates, either alone or with others, or that others create for her.  *Id.*  Among the products for which it is renowned are mops, pillows, and luggage.  IDL is a subsidiary of HSN, which operates a home shopping channel on cable television and has an online store.  *Id.* ¶¶ 24, 26.  Mangano is also a television personality and salesperson associated with a JOY brand of consumer goods sold on television, online, and in retail stores.  *Id.* ¶ 22.  As one of HSN's television personalities, Mangano appears regularly on HSN's cable network promoting, among other items, JOY branded goods that are sold by HSN.  *Id.* ¶ 26.  IDL's business model involves

the development, sourcing, and packaging of products that would be sold on HSN.  Dkt. No. 253,

Ex. A ("Miranne Dep.") at 13.  Christine Miranne was head of brand development for IDL.  *Id.*

at 12.

### B.  The Relationship Between the Parties

IDL, Mangano, and TNC began their relationship in approximately 2012.  TNC was one

of several vendors who supplied a wide range of products to IDL for sale on HSN as well as for

HSN's retail customers.  Dkt. No. 211 ¶ 3.  The parties shared ideas.  IDL and Mangano

presented specifications for certain products that they wanted developed, and TNC engaged in

development work, provided renderings, and arranged for the sourcing and the manufacture of

the products.

The relationship between the parties was governed by two separate sets of contracts:

### 1.    The MTC

IDL's obligations to purchase products from TNC was governed by an agreement of

Master Terms and Conditions for Direct Source Purchase Orders with IDL ("MTC") signed by

the parties in July 2012.  Dkt. No. 201, Ex. F.  The MTC set forth the terms and conditions under

which IDL would purchase goods from TNC.  It provided: "All goods purchased from You

[TNC] ("Goods") pursuant to a purchase order ("PO") will conform to the samples and other

descriptions provided to IDL or a third party designated by IDL" and that "all Goods will comply

with all of IDL's quality assurance and fulfillment policies, standards, and procedures, including

those contained in [HSN's] Supply Chain Requirements Manual."  *Id.* ¶ 1.  Any costs or

expenses incurred by TNC to satisfy IDL's procedures, standards, or requirements would be

TNC's sole responsibility.  The MTC also contained TNC's acknowledgement that "a duly

issued PO by an authorized agent of IDL is the only evidence of a commitment to purchase

Goods as between You and IDL."  *Id.* ¶ 11.  Under the MTC, "[a]ny costs incurred by either

party . . . prior to the receipt and acceptance of a PO will be at the incurring party's risk, and IDL shall have no obligation to pay for any unavoidable, out-of-pocket costs incurred by [TNC]." *Id.* ¶ 11. The MTC was governed by Florida law. *Id.* ¶ 10.

## 2. The MNDAs

The disclosure of information between TNC and IDL for the purpose of developing products was governed by a Mutual Non-Disclosure Agreement ("MNDA"). Over time, the parties signed two MNDAs. The first was effective as of April 6, 2012 and had a one-year term. Dkt. No. 252, Ex. 165. The second was effective as of February 25, 2015 and had a three-year term. Dkt. No. 47, Ex. A. Aside from their dates and durations, the two MNDAs appear to be identical. For convenience, and because it was the agreement that addressed the provision of information at issue in this case, the Court describes the February 2015 MNDA, which it refers to as the MNDA. The MNDA recognizes that, "[i]n order [for the parties] to pursue the mutual business purpose of a possible transaction involving IDL and [TNC] and/or their respective affiliates . . . , both IDL and [TNC] recognize that there is a need to disclose to one another certain information in respect of itself and/or its affiliates." *Id.* It further defines as Evaluation Material:

> [a]ll such information, delivered by or on behalf of one party (the "Disclosing Party") and/or its Representatives (as defined below) to the other party (the "receiving Party") and/or its Representatives, whether furnished before or after the date of this Agreement and regardless of the manner in which it is furnished, together with all analyses, compilations, studies or other documents or records prepared by the Receiving party and/or its Representatives, to the extent such analyses, compilations, studies, documents or records contain, otherwise reflect, or are generated from such information.

*Id.* The MNDA provides that "Evaluation Material will be used by the Receiving Party solely for the purpose of evaluating the Transaction." *Id.* It also requires the Receiving Party to keep Evaluation Material "strictly confidential . . . , except that Evaluation Material or any portion

thereof may be disclosed to [Representatives] of the Receiving Party who need to know such

Evaluation Material for the purpose of evaluating the Transaction and who agree to treat such

Evaluation Material in accordance with the terms of this Agreement." *Id.*

At the same time, however, the MNDA reflects and embodies the understanding and

acknowledgement by each party that the other "may currently or in the future be developing

information, knowledge or technology internally, or obtaining information, knowledge or

technology from other persons, that may be similar to information, knowledge or technology

contained or reflected in the Disclosing Party's Evaluation Material," and that either party may

"pursu[e] any of its present or future business activities or interests [and may] enter[] into any

agreement or transaction with any person, regardless of whether such business activities or

interests are competitive with the business activities or interests of the other party and regardless

of whether the subject matter of any such agreement or transaction is in any way similar to the

Transaction and/or any Evaluation Material." *Id.* It permits the parties to do so "[p]rovided that

each party complies with its obligations [under the MNDA]." *Id.*

The MNDA contains a number of provisions that envision that each party may pursue

business objectives that are similar to the Transaction or Evaluation Material and permits them to

do so. It provides that:

> The term "Evaluation Material" does not include information which (i) is or
> becomes generally available to the public other than as a result of the breach of the
> terms of this Agreement by the Receiving Party and/or any of its Representatives,
> (ii) is or has been independently acquired or developed by the Receiving Party
> and/or any of its Representatives without violating any of the terms of this
> Agreement.

*Id.* The MNDA also contains a clause which provides that:

> This Agreement shall not be construed to limit the Disclosing Party's, the Receiving
> Party's, or any of their respective Representatives' right to independently develop
> or acquire products, services, or technology without use of the other party's
> Evaluation Material. Further, the Receiving Party shall be free to use for any

> purpose any residuals resulting from consideration of the Disclosing Party's Evaluation Material, provided that the Receiving Party shall not disclose the Disclosing Party's Evaluation Material except as expressly permitted pursuant to the terms of this Agreement. The term "residuals" means information in intangible form, which is retained in memory by persons who have had access to Evaluation Material, including ideas, concepts, know-how or techniques contained therein. Neither the Receiving Party nor any of its Representatives shall have any obligation to limit or restrict the assignment of such persons or to pay royalties for any work resulting from the use of residuals. However, this paragraph shall not be deemed to grant to the Receiving Party a license under the Disclosing Party's copyrights or patents.

*Id.*

TNC signed the MTC in July 2012, and IDL placed its first order with TNC for placemats shortly thereafter in September 2012.  Dkt. No. 256 ¶ 30.  The relationship between TNC and IDL came to an end in 2017.  *See* Dkt. No. 199 at 9.

### C.  The Relevant Projects

This case principally concerns two projects worked on by TNC and IDL.  The parties dispute many facts regarding these projects.  There are only a few facts that they do not dispute; these include that TNC worked on both projects and that the products the two parties were developing were ultimately manufactured in some form, but not by TNC.  TNC was not paid for its work in connection with the projects.

### 3.  The AFL Project

In chronological order, the first project was an improvement to IDL's line of luggage which was sold on HSN under the Joy Mangano brand.  In August 2014, TNC and IDL discussed replacing the previous fabric used on the line of luggage with a fabric made with aramid fibers.  Aramids are a class of strong synthetic fibers that are used, among other applications, in aerospace and military applications and for ballistic-rated body armor.[2]  One

---

[2] "Aramid" is defined by the Merriam-Webster Dictionary as "any of a group of lightweight but

brand of aramid fiber, manufactured by DuPont Corporation, is known as Kevlar.  The idea was

that the fabric would be lighter, stronger, and more "puncture-proof" than what was previously

used by IDL in its luggage.  The addition of a fiber which was used in bullet-proof vests would

also provide cachet and promotional benefits to Mangano's luggage line.

In March 2015, TNC delivered a swatch aramid fabric sample to Defendants; that swatch

sample survived a "puncture test" administered by Mangano using a letter opener and scissors.

Dkt. No. 251 ¶ 99.  TNC subsequently delivered further samples to Defendants, including

swatches and rolls of fabric.  Dkt. No. 251 ¶ 101.  In July 2015, after IDL refused to agree to the

royalty rate requested by TNC, TNC announced in an email that it was not going to work on the

project "any longer" or spend "another minutes [sic] on this."  Dkt. No. 209, Ex. 116.  In the

same communication, it offered to put IDL in contact with a manufacturer who would

collaborate directly with IDL (Earthbound) and stated its expectation that TNC's development

costs would be paid by IDL.  *Id.*  By November 2015, the parties parted ways on the project.

Dkt. No. 251 ¶ 112.

TNC claims that it provided the following trade secrets to IDL during the course of its

work under the MNDA, that IDL misappropriated these trade secrets in violation of common law

and federal statute, and that IDL's usage of this information violated the MNDA:

- Luggage Trade Secret 1: Utilization of a relatively low percentage (less than approximately 10%) of aramid fibers in a fabric for luggage. A minimum specification to be sufficiently abrasion, tear and puncture resistant is 98.3% polyester and 1.7% aramid fiber.

---

very strong heat-resistant synthetic aromatic polyamide materials that are fashioned into fibers, filaments, or sheets and used especially in textiles and plastics."  Merriam-Webster Online Dictionary, accessible at https://www.merriam-webster.com/dictionary/aramid (accessed July 13, 2021).

- Luggage Trade Secret 2: Utilization of a relatively low percentage (less than approximately 10%) of aramid fibers in an Oxford fabric weave for luggage. A minimum specification to be sufficiently abrasion, tear and puncture resistant is 98.3% polyester and 1.7% aramid fiber.

- Luggage Trade Secret 3: For luggage with fabric that contains aramid fibers, weaving an aramid fiber in the weft at a maximum of approximately every 1/2 inches so that the resulting fabric is sufficiently abrasion, tear and puncture resistant.

- Luggage Trade Secret 4: For luggage with fabric that contains aramid fibers, weaving an aramid fiber in the weft in an Oxford fabric weave at approximately every 1/2 inches so that the resulting fabric is sufficiently abrasion, tear and puncture resistant.

- Luggage Trade Secret 5: For luggage with fabric that contains aramid fibers, weaving an aramid fiber only in the weft so that the aramid fiber is not visible from what will be the outside of the luggage.

- Luggage Trade Secret 6: For luggage with fabric that contains aramid fibers, weaving an aramid fiber only in the weft in an Oxford fabric weave so that the aramid fiber is not visible from what will be the outside of the luggage.

- Luggage Trade Secret 7: For luggage with fabric that contains aramid fibers, weaving the aramid fiber in the fabric and using a backing on the fabric.

- Luggage Trade Secret 8: For luggage with fabric that contains aramid fibers, weaving the aramid fiber in an Oxford fabric weave and using a backing on the fabric.

- Luggage Trade Secret 9: For luggage with fabric that contains aramid fibers, utilizing a fabric that is a maximum of approximately 360 +/- 5% grams per square meter (GSM) before application of any coating.

- Luggage Trade Secret 10: For luggage with fabric that contains aramid fibers, utilizing a fabric that is approximately 75 +/- 2 threads per inch in the warp and weft, and preferably with a 75 x 76 per inch thread count.

- Luggage Trade Secret 11: For luggage with fabric that contains aramid fibers, utilizing an aramid fiber that has approximately 600 Denier.

- Luggage Trade Secret 12: For luggage with fabric that contains aramid fibers, addressing differential shrinkage between the aramid fiber and polyester fiber during manufacturing by yarn dying or piece dying, with yarn dying being the preferred method.

- Luggage Trade Secret 13: Use of a high-speed Rapier loom or equivalent to weave aramid fibers into a fabric for luggage.

- Luggage Trade Secret 14: Testing data relating to the development of a luggage fabric that contains aramid fibers, as shown in at least one of the documents bates-stamped as TNC001189-1240.

- Luggage Trade Secret 15: For luggage with fabric that contains aramid fibers, other methods or techniques that were developed, tested and evaluated but determined to not be optimal to manufacture a cost-effective and quality commercial product with the given deadline, which includes at least one of the following:
  ☐ Weaving aramid fiber in the warp
  ☐ Using a jet loom to weave aramid fibers into fabric
  ☐ Using a high percentage (greater than 10%) of aramid fiber in the luggage fabric
  ☐ Using an aramid scrim that is (i) coated with PU or PVC or (ii) laminated to the back of a fabric
  ☐ Using aramid fiber in high wear spots or to sew the seams
  ☐ Wrapping yarn to hide the aramid fiber with a weaver in China
  ☐ Twisting nylon fiber with an aramid fiber to hide the aramid fiber with a weaver in China

- Luggage Trade Secret 16: Plaintiffs' fabric samples that are woven with aramid fibers.

TNC also claims that it disclosed the following ideas to Defendants during the course of the

AFL project:

- Luggage Idea (a): To make fabric woven with aramid fibers for improved abrasion, tear and puncture resistance for luggage-type products.

- Luggage Idea (b): To make an Oxford fabric weave that is woven with aramid fibers only in the weft for luggage-type products, such that the aramid fibers are not visible from what will be the outside of the luggage.

- Luggage Idea (c): To make a fabric for luggage-type products having a minimal amount of aramid fiber to provide improved abrasion, tear, and puncture resistance over comparable fabrics not having aramid fibers, and a specific application of between approximately 1.7% and 10% of aramid fibers in an Oxford weave fabric, depending on cost to manufacture targets.

- Luggage Idea (d): 

Plaintiffs have since withdrawn their misappropriation claims based on alleged Luggage Trade Secrets 11–13 and 15, but "maintain that this information constitutes confidential information, Evaluation Material, and part of TNC's labor and expenditures." Dkt. No. 247 at 1.

### 4. The CloseDrier Project

Mangano developed and obtained a patent on a portable clothes-drying system, which HSN sold under the tradename "CloseDrier," prior to Plaintiffs' involvement with the project. Dkt No. 251 ¶ 10.

In approximately October 2015, IDL and TNC discussed a project to modify and improve IDL's existing CloseDrier system. Dkt. No. 248 ¶ 9. The contemplated improvements discussed by the parties included adding Forever Fragrant disks, another of Mangano's inventions, to the CloseDrier; moving the feet upon which the system stood further apart to create stability; moving the telescopic poles that permitted the system to extend to accommodate clothing from the back where they made the unit top heavy to the sides; improving the drying environment and the efficiency inside the unit by passing the incoming dry air from outside the unit over a ceramic heating element similar to that used in hair dryers; and locating a fixed touchscreen control on the top at the front of the unit. Dkt. No. 253, Ex. A ("Miranne Dep.") at 144, 166–68, Ex. B ("Mangano Dep.") at 269–74, 278–81.

From approximately December 3, 2015 to August 4, 2016, TNC presented to IDL and Mangano six design concepts for the improved CloseDrier. Dkt. No. 251 ¶ 20; Dkt. No. 212 ("Barnaba Decl.") ¶ 9. TNC also presented three working prototypes and other information relating to production, marketing, and testing of the CloseDrier. Dkt. No. 251 ¶ 38; Dkt. No. 212 ¶¶ 10–11. "[T]he parties ultimately could not agree on product specifications and commercialization terms, and discussions concerning the CloseDrier prototype ceased in approximately March 2017." Dkt. No. 148 ¶ 64, *cited in* Dkt. No. 251 ¶ 45. In March 2017,

after TNC concluded that it was not able to accommodate an IDL request to add a larger fan to the CloseDrier that would create greater wind speed, TNC wrote IDL: "[O]ur hope was that all of the other positive attributes would outweigh visual movement. If that cannot be the case, we regretfully are walking away from this project after much time, money and effort invested."  Dkt. No. 207, Ex. 41.

Thereafter, IDL enlisted a company named Global Home to make improvements on the CloseDrier.  IDL provided Global Home with a sample of the original CloseDrier.  Dkt. No. 207, Ex. 48, at 217.  It also provided both Global Home and another potential vendor with renderings of an improved CloseDrier prepared by TNC.  Dkt. No. 208, Ex. 51, 59.  IDL continued to use CAD[3] drawings from TNC in internal and marketing materials from late 2017 through 2018. Dkt. No. 207, Ex. 65–69.  Global Home was able to create a CloseDrier with the faster wind speed and better air and drying times desired by IDL.  Dkt. No. 207, Ex. 48 at 216–17.  It also placed a Forever Fragrant disc in the unit but in a different place than had been proposed by TNC.  *Id.*  Like the TNC version, the Global Home CloseDrier had poles on the sides.  *Id.*  By April 27, 2017, Global Home was ready with a prototype.  Dkt. No. 2017, Ex. 72.  The Global Home CloseDrier launched in or around March 2018.  Dkt. No. 251 ¶ 86.  On March 23, 2018, Defendant Mangano posted an advertisement on her Twitter account for the JOY CloseDrier Portable Garment Drying Unit with Forever Fragrant being sold by Defendant HSN.  SAC ¶ 65. She subsequently appeared on HSN to advertise the product.  SAC ¶ 66.

On September 23, 2016, while TNC was working on the CloseDrier but before IDL had committed to the TNC version, TNC filed for a design patent.  Dkt. No. 251 ¶ 59.  The

---

[3] CAD stands for computer-aided design.  Merriam-Webster Online Dictionary, accessible at https://www.merriam-webster.com/dictionary/cad (accessed July 14, 2021).

application listed only individuals from TNC as inventors.  *Id.*  On October 17, 2017, after the parties' negotiations fell apart and TNC walked away from the project, the United States Patent and Trademark Office ("USPTO") found Patent Application No. 29/578,758 patentable and issued the D399 Patent.  Dkt. No. 251 ¶ 60.  After the patent issued, Defendants remained in possession of prototypes of products covered by the D399 Patent but did not otherwise make, offer to sell, or sell any products covered by the D399 Patent.  Dkt. No. 251 ¶ 61.

TNC was not paid for its work on the CloseDrier.  It claims that it provided trade secrets and ideas to IDL that Defendants misappropriated in violation of common law and federal statute and that IDL's usage of this information violated the MNDA.  It claims the following trade secrets in connection with the work on the CloseDrier:

- CloseDrier Project Trade Secret 1: Design of a portable clothes drying product that included the JOY Forever Fragrant product in disc form for use in a refresh cycle, with or without heated air.

- CloseDrier Project Trade Secret 2: Design of a portable clothes drying product with two extension poles centrally located on the opposing sides of the product, fabric indents for the extension poles, and a straight connection between the extension poles and sides of the top of the product (prior to issuance of the D399 Patent).

- CloseDrier Project Trade Secret 3: Design of a portable clothes drying product with a drying efficiency of at least about 0.58kg/hr.

- CloseDrier Project Trade Secret 4: Design of a portable clothes drying product that is lightweight, weighing less than or equal to approximately 11 pounds.

- CloseDrier Project Trade Secret 5: Plaintiffs' prototypes of portable clothes drying products.

- CloseDrier Project Trade Secret 6: Plaintiffs' CAD drawings of portable clothes drying products and their component parts.

- CloseDrier Project Trade Secret 7: Testing data relating to the development of Plaintiffs' portable clothes drying product, including data showing the improvements and changes of, and comparing and contrasting, TNC's prototypes over Joy's original CloseDrier design, as shown in at least one of the documents bates-stamped as TNC001119-1188.

Plaintiffs have since withdrawn their misappropriation claims based on alleged CloseDrier Trade Secrets 1, 3, and 4, but "maintain that this information constitutes confidential information, Evaluation Material, and part of TNC's labor and expenditures." Dkt. No. 247 at 1.

### 5.    Other Projects

In addition to the AFL Project and the CloseDrier Project, TNC claims that Defendants breached their agreements with TNC and otherwise violated their rights in connection with several other projects:

### a.    The Water Filter Project

In August 2014, the parties met and discussed a project for TNC to manufacture a set of water filters and filter refills for sale on HSN (the "Water Filter Project"). IDL asked for a final price on the unit with filters and filter refills, and TNC represented that it was exploring a potential patent for the filter design. Dkt. No. 201, Ex. LLL. The parties estimated an order of 220,000 to 250,000 units and set a goal of a ship date for the following spring given the seven-month lead time necessary for testing of the product before shipment but after it was approved. *Id.*; Dkt No. 248 ¶ 78.

By November 5, 2014, TNC presented a prototype of the water filter to Mangano. Dkt. No. 208, Ex. 90; Dkt. No. 248 ¶ 78. Mangano indicated that she wanted to showcase the product for a June 28, 2015 "Today's Special" launch on HSN and to use it as a "July Birthday" key item on HSN, requiring 200,000 units ready for a May 11, 2015 ship date. Dkt. No. 248 ¶ 78. On January 6, 2015, IDL emailed TNC with a new projection of 150,000 to 200,000 units for the Today's Special launch, as well as water filter replacement sets, and asked TNC for the final Import Production Information Sheet ("IPIS") to finalize pricing and "so HSN presentation paperwork can be issued for PO." Dkt. No. 201, Ex. III; Dkt. No. 248 ¶ 78. In January, HSN signed an IPIS for 200,000 water filter sets at a cost of $12.75. Dkt. No. 255, Ex. 265; Dkt. No.

248 ¶ 78.  By March 4, 2015, HSN reduced the quantity of water filter sets it would order to "17k to 30k." Dkt. No. 252, Ex. 189; Dkt. No. 248 ¶ 78.  In the end, IDL purchased 45,000 water filter sets, and the record does not reflect that IDL ever issued a purchase order.  Dkt. No. 252, Ex. 198; Dkt. No. 248 ¶ 78.  TNC claims it had to make a large investment in order to conduct testing and obtain approval for the water filters and that IDL is obligated on the larger quantity of water filters.

### b.    Bundled Pricing Contract

Another project related to a set of pillows.  In 2014, TNC had completed a "buy-one-get-one" ("BOGO") 2-pack pillow deal with IDL.  Dkt. No. 256 ¶ 38.  IDL then asked TNC for a low price for a package of three pillows, a BOGO plus a travel pillow.  *Id.*  TNC declined to provide a quote because it could not meet IDL's cost targets.  Dkt. No. 256 ¶ 38; Dkt. No. 248 ¶ 77.  IDL asked TNC to "take another look" and to "look at the overall [Today's Special] and key items we are planning for the year."  Dkt. No. 248 ¶ 77; Dkt. No. 264, Ex. 187. The parties met again in February 2015.  Christie Miranne of IDL asked TNC to sell IDL 210,000 units of the BOGO plus travel pillow set for $17.70 per unit; TNC declined because the price was below TNC's actual cost.  Dkt. No. 264, Ex. 188; Dkt. No. 248 ¶ 77.  At a March 2015 meeting, Mangano of IDL told Beyda of TNC that "Joy [Mangano] would order more to offset the July BOGO offer."  Dkt. No. 264, Ex. 189; Dkt. No. 256 ¶ 39.  The deal the parties discussed was "simple."  Dkt. No. 256 ¶ 39.  "IDL would get the benefit of the lower pillow price it requested, and TNC would make up the margin lost on the pillow order from higher margins on the future programs, and in total realize margins across all the products, pillows included, to be able to justify it."  Dkt. No. 256 ¶ 39; Dkt. No. 248 ¶ 77.

On March 5, 2015, Miranne sent a text message to TNC which reads in part: "Joy [Mangano] WANTS pillows…  She's adamant.  So I need your confirmation that we are good on

the extended $17.90 for the two jumbo pillows and travel pillow set as we have to move tomorrow in one direction or the other! Please get back to me asap." Dkt No. 264, Ex. 190. TNC responded that the pricing on the transaction would require TNC to sell the package to IDL below TNC's cost: "We can't even be 17.90 on 2 pillows WITHOUT including the travel pillow. But based on looking at the totality of the business as you suggested we are trying are best." *Id.* It added: "If we can be 17.90 for the single pillow of 40k units and 17.90 for the pillow + 1 case TS after we get thru the 3pk TS its [sic] a scenario that stands a shot. . . . We need to cover the 3pk in other ways like you said, it's the only possibility." *Id.* On March 11, 2015, Miranne sent TNC a list of "rock bottom [product] costs" over the next year, including shows set for July, September, and October 2015 and January 2016. Dkt. No. 264, Ex. 191; Dkt. No. 248 ¶ 77. On the morning of March 13, 2015, IDL sent an updated schedule. Dkt. No. 264, Ex. 189; Dkt. No. 248. ¶ 77. TNC responded on March 13, 2015 with "the absolute best we can do on pricing," with the BOGO plus travel at $17.90. Dkt. No. 264, Ex. 193. In an email, Beyda stated: "We are looking at this as if it was one big buy, so we need your absolute commitment that everything we discussed and listed below, in fact happens." *Id.* He noted a prior example where an order did not materialize and asked for Miranne's assurance: "Please confirm that will not happen in this case." *Id.* Miranne responded on March 16, 2015 with IDL's agreement as to price on a number of the listed items, indicating that they were "CONFIRMATIONS AND UPDATES," and asked for IDL to "email back we are good to go asap so we can start issuing all of July and finally get HSN on board for this month and start looking at future orders right behind that." Dkt. No. 164, Ex. 194. Beyda did not respond with confirmation that the parties were "good to go." *Id.* The following day, IDL wrote Beyda: "Please let us know if you have had a chance to review the below from Christie [Miranne]. We would like to wrap up July as quickly as

15

possible." *Id.* Beyda responded: "Hi Christie, just left you a message. Let me know when you are available to talk. Thanks." *Id.* The record does not reflect that the two had a conversation or that Beyda ever stated that TNC was "good to go."

Ultimately, IDL issued a purchase order for and accepted delivery of the pillows at the lower price of $17.90 per set for 210,248 sets. The set was sold on HSN. IDL paid $3,763,439 for the pillows and received a savings of $1,219,438 from TNC's discount. Dkt. No. 248 ¶ 77; Dkt. No. 256 ¶ 44. According to TNC, it accepted this purchase order and fulfilled it because of what it claims was Miranne's confirmation of the parties' bundling agreement. Dkt. No. 248 ¶ 77; Dkt. No. 256 ¶ 44. Recognizing that there was no purchase order, TNC claims that it understood IDL's representation that it would purchase additional product with greater margin to be a binding agreement "[b]ased on our relationship and course of dealing through the emails and calls exchanged." *Id.*

### c.    Factory Trade Secrets

Plaintiffs further allege that Defendants knowingly and improperly retained, used, and disclosed to third parties Plaintiffs' industry contacts and factories to develop, manufacture and sell the CloseDrier and the luggage. SAC ¶¶ 164, 172, 187–88. TNC initially claimed that Defendants misappropriated the following Factory Trade Secrets:

- Factory Trade Secret 1: Wujiang Kailing Weaving Co. Ltd. ["Kailing'] as a qualified factory in China for weaving aramid fibers in luggage fabric, such as Oxford fabric.

- Factory Trade Secret 2: ███████████████████████████ as a qualified factory in China for manufacturing small cleaning products, such as mops, buckets, and brushes.

- Factory Trade Secret 3: Xiamen Easepal Enterprise Ltd. ["Easepal"] as a qualified factory in China for manufacturing pillows or massage products, such as the Flexassage.

Plaintiffs have since withdrawn their misappropriation claims based on alleged Factory

Trade Secrets 1 and 3, but "maintain that this information constitutes confidential information,

Evaluation Material, and part of TNC's labor and expenditures."  Dkt. No. 247 at 1.

Plaintiffs claim that Defendants repeatedly asked TNC for information about Kailing and

shared that information with Defendants' luggage manufacturer Trofy.  Dkt. No. 247 at 32

(citing Dkt. No. 209, Exs. 120, 121).  Plaintiffs claim that they shared ███████ identity with

Defendants in connection with a project to manufacture a mop and that Defendants then used

that information to enlist ███████ to manufacture the CloseDrier.  *Id.* (citing Dkt. No. 255, Exs.

226, 235, 236).  For Easepal, Plaintiffs claim that Defendants went directly to Easepal to

manufacture the TNC Flexassage product previously sold on HSN rather than going through

TNC.  *Id.* at 33 (citing Ex. 240, 241).

## PROCEDURAL HISTORY

Plaintiffs filed their original complaint in this action on June 27, 2018, Dkt. No. 6, and an

amended complaint on August 24, 2018, Dkt. No. 34.  Plaintiffs filed their Second Amended

Complaint on October 11, 2018.  Dkt. No. 47.[4]  The SAC alleges claims for patent infringement

under 35 U.S.C. § 271; copyright infringement under 17 U.S.C. §§ 106, 501; trade secret

misappropriation under 18 U.S.C. § 1836; and trade secret misappropriation, misappropriation of

ideas, quantum meruit, unjust enrichment, unfair competition, breach of contract and tortious

interference under New York common law.

On January 29, 2020, the Court ruled on Defendants' pending motion to dismiss.  The

Court granted the motion to dismiss the claims of copyright infringement and misappropriation

of ideas as to all Defendants and granted the motion to dismiss the claim of patent infringement

---

[4] On February 26, 2019, the Court denied Defendants' motion for claim construction.  Dkt. No. 71.

as to Defendant Mangano only.  Dkt. No. 126.  Among other things, the Court (1) held that Patent Security Agreements ("PSAs") executed by TNC with two third parties did not deprive TNC of standing as a matter of law, Dkt. No. 126, at 9–11; (2) dismissed Plaintiffs' claim that Defendants' CloseDrier infringed its copyright in the control panel on the device on the grounds that the control panel was not copyrightable, *id.* at 11–14; (3) dismissed Plaintiffs' claim for misappropriation of ideas related to the CloseDrier product as preempted by federal patent law, *id.* at 14–15; and (4) dismissed Plaintiffs' misappropriation of ideas claim as related to the AFL Project for lack of novelty, but rejected Defendants' arguments that this claim was preempted, *id.* at 16–17.  The Court dismissed the patent infringement claim as pleaded against Mangano directly but sustained the claim that she personally engaged in unfair competition.  *Id.* at 23–27. It also sustained on the pleadings Plaintiffs' claim for unjust enrichment and quantum meruit, ruling that those claims could be pleaded in the alternative to Plaintiffs' breach of contract claim and that, at the motion to dismiss stage, the Court was not in a position to "determine whether conduct that has yet to be established falls within the scope of the alleged contracts."  *Id.* at 22 n.6.

TNC moved for reconsideration.  Dkt. No. 132.  On March 2, 2020, the Court granted the motion for reconsideration.  Dkt. No. 142.  The Court held that its prior opinion had failed to consider two factors relevant to the novelty of Plaintiffs' claim of misappropriation of ideas related to the AFL Project—specificity and commercial availability.  *Id.*  The Court concluded that, based on consideration of all of the relevant factors, Plaintiffs had pleaded sufficient facts to state a claim for misappropriation of ideas.  *Id.*

After the Court's decision on the motion to dismiss, Defendants filed their answer to the SAC along with six Counterclaims on January 30, 2020.  Dkt. No. 128.  On March 16, 2020,

Defendants filed an Amended Answer and Counterclaims. Dkt. No. 148. Defendants' Counterclaims seek (1) a declaratory judgment of non-infringement as to the D399 Patent; (2) a declaratory judgment of invalidity of the D399 Patent due to incorrect ownership; (3) an order correcting inventorship to list Mangano as an owner of the D399 Patent; (4) a declaratory judgment that the D399 Patent is unenforceable due to inequitable conduct before the USPTO; (5) a declaratory judgment of no trade secret or idea misappropriation; and (6) relief on a claim that TNC breached the MNDA by disclosing Evaluation Material regarding the AFL Project to third parties. Dkt. No. 148 at 37–55.

On June 25, 2020, the undersigned, to whom the case was reassigned, entered an order on Plaintiffs' motion to dismiss certain of the Counterclaims and Affirmative Defenses. Dkt. No. 171. The Court dismissed the Counterclaim for a declaratory judgment of unenforceability. *Id.* at 11–16. The Court sustained the Counterclaim for breach of contract but reopened discovery to permit Plaintiffs to take the depositions of three third-party witnesses with fees and costs for the depositions to be paid by Defendants as a sanction for Defendants' discovery violation related to the claim. *Id.* at 16–22. The Court also sustained Counts I and V seeking declaratory judgments of, respectively, non-infringement and no trade secret or idea misappropriation. *Id.* at 29–30. The Court denied the motion to strike the Eleventh Affirmative Defense related to the limitation on damages for infringement of the D399 Patent under 35 U.S.C. § 287, *id.* at 23–24, denied the motion to strike the Twelfth Affirmative Defense of Absence of Willful Infringement of the D399 Patent, *id.* at 24, denied the motion to strike the Thirteenth Affirmative Defense of express license, *id.* at 25–27, and granted the motion to strike the Fourteenth Affirmative Defense of equitable defenses, *id.* at 27–28.

TNC is no longer asserting (1) CloseDrier Trade Secrets 1, 3–4, Luggage Trade Secrets 11–13, 15, and Factory Trade Secrets 1, 3 as trade secrets under Counts III and IV, but "maintain[s] that this information constitutes confidential information, Evaluation Material, and part of TNC's labor and expenditures." Dkt. No. 247, at 1. TNC has also withdrawn its claim of tortious interference. *Id.*

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

"[W]hen multiple parties cross-move for summary judgment, . . . 'each party's motion must be examined on its own merits and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'"  *Century Sur. Co. v. Franchise Contractors, LLC*, 2016 WL 1030134, at *3 (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## DISCUSSION

As the case currently stands, the following claims remain for trial: (1) Count I alleging Plaintiffs' claims for patent infringement of the D399 Patent against all Defendants (except for Mangano) under 35 U.S.C. § 271; (2) Count III alleging federal trade secret misappropriation against IDL and HSN for the misappropriation of trade secret information related to the CloseDrier Project, the AFL Project and other projects in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (3) Count IV alleging trade secret misappropriation under New York State common law against IDL and HSN related to the CloseDrier Project, the AFL Project; and the identity of a factory; (4) Count V alleging misappropriation of ideas under New York State common law against IDL and HSN for the misappropriation of ideas relating to the

AFL Project; (5) Counts VI and VII alleging quantum meruit and unjust enrichment under New York State common law with respect to the CloseDrier and AFL Projects and Plaintiffs' work to locate and vet factories to manufacture products for IDL and HSN; (6) Count VIII alleging unfair competition under New York State common law against all Defendants in connection with the CloseDrier and AFL; and (7) Count IX alleging New York State law breach of express and implied contracts, including but not limited to the MNDA, against IDL and HSN related to their treatment of Evaluation Material related to the CloseDrier and AFL Projects and the factories as well as purported agreements related to purported discounted bundled pricing, and water filters.

Defendants assert Counterclaims for (1) a declaratory judgment of non-infringement as to the D399 Patent; (2) a declaratory judgment of invalidity of the D399 Patent due to incorrect ownership; (3) an order correcting inventorship to list Mangano as an owner of the D399 Patent; and (4) a declaratory judgment of no trade secret or idea misappropriation.  Those claims too remain for trial.

Plaintiffs move for partial summary judgment, seeking summary judgment on the Luggage Ideas misappropriation claim (Count V), and dismissal of (a) Defendants' Second and Thirteenth Affirmative Defenses and Counterclaims II and III relating to Mangano's alleged inventorship; (b) Defendants' Eleventh Affirmative Defense relating to limitation on damages; (c) Defendants' Defense relating to prudential standing; and (d) Defendants' Seventh Defense and Counterclaim V relating to the independent development of the CloseDrier Trade Secrets, the Luggage Trade Secrets; and the Luggage Ideas.  Plaintiffs also seek summary adjudication and a holding that the CloseDrier Trade Secrets and the Luggage Trade Secrets are not generally known, were disclosed to Defendants, and were improperly used by Defendants.  Dkt. No. 204, at 9.

Defendants move for summary judgment or summary adjudication on all claims and theories, except for the portion of Count I related to infringement on or after May 25, 2018.

Both motions are granted in part and denied in part.

Plaintiffs' motions for summary judgment on the Luggage Ideas misappropriation claim, dismissal of Defendants' Second and Thirteenth Affirmative Defenses and Counterclaims II and III, dismissal of Defendants' defense related to prudential standing, and for summary adjudication and a holding that the CloseDrier Trade Secrets and the Luggage Trade Secrets are not generally known, were disclosed to Defendants, and were improperly used by Defendants are denied. Plaintiffs' motion for dismissal of Defendants' Eleventh Affirmative Defense is granted.

Defendant HSN's motion for summary judgment on the misappropriation claims is denied; their motion on Counts III and IV is granted with respect to the Luggage Trade Secrets and CloseDrier Trade Secrets, but denied with respect to Factory Trade Secret 2; their motion on Count V is granted with respect to Luggage Ideas (a), (b), and (c), but denied with respect to Luggage Idea (d); their motion on Counts VI, VII, and VIII is granted; and their motion on Count IX is granted with respect to all claims related to the MTC and the alleged Bundled Pricing, Water Filter, CloseDrier, and AFL Agreements, granted with respect to claims of breach of the MNDA that assert that information contained in Luggage Trade Secrets 5, 7, and 9, and Luggage Idea (a) were Evaluation Material, and denied with respect to all other claims of breach of the MNDA.

The Court addresses each of these in turn.

## I.    The Parties' Motions for Summary Judgment or Summary Adjudication With Respect to the Patent Law Claims

The parties raise three issues with respect to Count I alleging patent infringement: (1) whether the claims and defenses relating to Mangano's ownership of the D399 Patent should be

dismissed; (2) whether damages should be limited to those incurred in the period after May 25, 2018; and (3) whether Defendants' claim that Plaintiffs lack standing should be dismissed.  The Court considers them in turn.

### A. Mangano's Inventorship

Defendants' Second and Thirteenth Affirmative Defenses allege the D399 Patent is invalid or at least cannot be asserted against Mangano because Mangano was an undisclosed inventor and therefore had a license to use the invention.  Counterclaim II asserts that the D399 patent is invalid due to incorrect inventorship, namely, the failure to include Mangano as an investor.  Counterclaim III is a claim for correction of inventorship, to add Mangano as an inventor.  Plaintiffs seek summary judgment on these claims, arguing that no reasonable jury could find that Mangano was an inventor.

The grant of a patent pursuant to Section 101 gives rise to the presumption that the patent is "valid," including the presumption that "the named inventors are the true and only inventors." 35 U.S.C. § 282; *Bd. of Educ. ex rel. Bd. of Trs. of Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1337 (Fed. Cir. 2003).[5]  A party who seeks to show misjoinder or nonjoinder thus shoulders a "heavy" burden which she may discharge only "by clear and convincing evidence." *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997); see also *Am. Bioscience*, 333 F.3d at 1337 (same); 2 Donald S. Chisum, Chisum on Patents § 2.03[4][c] (Matthew Bender) ("After the patent issues, the patent is presumed valid, and the burden is on

---

[5] The Court applies the law of the Federal Circuit to this and all other questions of federal patent law.  *See Kickstarter, Inc. v. Fan Funded, LLC*,  2015 WL 3947178, at *4 n.6 (S.D.N.Y. June 29, 2015), *aff'd*, 654 F. App'x 481 (Fed. Cir. 2016) ("When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to non-patent issues and the law of the Federal Circuit to issues of substantive patent law.") (citing *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999)).

one attacking the validity of the patent to establish by clear and convincing evidence that the

inventorship determination is incorrect").[6]  In particular, "one who asserts 'inventor' status must

provide clear and convincing evidence of supporting facts, including corroborating evidence."

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1353 (Fed. Cir. 1998) (deposition testimony of

purported inventor that he conceived of a portion of a claim did not satisfy clear and convincing

standard when not supported by other evidence); see also *Woodland Tr. v. Flowertree Nursery,*

*Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) (holding that "uncorroborated oral testimony of

persons related to or associated with the defendant" as to prior knowledge and use of patented

invention that began thirty years before trial but ended twenty years before trial when not

supported by physical evidence was not sufficient to invalidate a patent); *Ethicon Co. v. U.S.*

*Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) ("[A]n alleged co-inventor must supply

evidence to corroborate his testimony.").  "The temptation for even honest witnesses to

reconstruct, in a manner favorable to their own position, what their state of mind may have been

years earlier, is simply too great to permit a lower standard."  *Hess*, 106 F.3d at 980  (quoting

*Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1047 (Fed. Cir. 1975) (internal quotation

marks omitted)).  "Whether the inventor's testimony has been sufficiently corroborated is

evaluated under a 'rule of reason' analysis," pursuant to which the factfinder considers "all

pertinent evidence" including "contemporaneous documents prepared by a putative inventor,"

---

[6] Section 256 of the patent law contemplates that there may be circumstances where a person is omitted as an inventor through error and provides a mechanism for such error to be corrected: "Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, upon application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error."  35 U.S.C. § 256(a).

"[c]ircumstantial evidence," and "oral testimony of someone other than the alleged inventor." *Ethicon Co.*, 135 F.3d at 1461 (internal citations, quotations, and emphasis omitted).

A person is a "joint inventor" only if she contributes to the conception of the claimed invention. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004); *C.R. Bard*, 157 F.3d at 1352. For a person to be a joint inventor, she must "demonstrate that h[er] labors were conjoined with the efforts of the named inventors. Joint inventorship under section 116 can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." *Eli Lilly*, 376 F.3d at 1359. However, there is "no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Id.* at 1358 (quoting *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) (internal quotation marks omitted)).

Patent D399 is a design patent for "[t]he ornamental design for a portable garment drying apparatus, as shown and described." Dkt. No. 47, Ex. B. It describes nine views of the portable garment drying apparatus through figures, each representing a different perspective of the apparatus either in closed or in elevation perspective. These figures show the bottom and the detachable top of the dryer as well as the locations of the LCD monitor, the feet, the telescopic poles, and the placement of the fan.

Defendants have proffered sufficient evidence to show that there is a genuine issue of fact as to whether Mangano is a co-inventor of the D399 Patent, requiring trial of the matter. Mangano herself testified at deposition that she developed the design for the new portable clothes dryer in conversations she had with Miranne before she spoke to TNC and further testified that she then worked collaboratively with TNC on the CloseDrier. Dkt. No. 253, Ex. B

at 268–81.  Miranne, who led brand development for IDL, corroborated Mangano's testimony.
Dkt. No. 253, Ex. A at 12–13, 166–68, 184–90, 202–04.  That testimony, given by a person in a
position to know of Mangano's inventorship given her role at IDL and delivered approximately
two years after the patent issued, is alone sufficient to give rise to a factual question.  *See*
*Regents of Univ. of Mich. v. Bristol-Myers Squibb Co.*, 301 F. Supp. 2d 633, 643 (E.D. Mich.
2003) (noting that corroboration need not "be proven by documentary evidence," and that
"[c]ircumstantial evidence, including oral testimony of those to whom the putative inventor
disclosed his conception may provide sufficient corroboration"); *see also Woodland Tr.*, 148
F.3d at 1371 (citing *Price v. Symsek*, 988 F.2d 1187, 1195 n.3 (Fed. Cir. 1993)) (listing among
relevant factors for a court to consider when assessing corroboration: "(1) the relationship
between the corroborating witness and the alleged prior user, (2) the time period between the
event and trial, [and] (6) the witness' familiarity with the subject matter of the patented invention
and the prior use").  TNC challenges Miranne's testimony on the grounds of her relationship
with Mangano and her "interest . . . in the subject matter in suit," *Woodland Tr.*, 148 F.3d at
1371, but "[a]ssessments of credibility and choices between conflicting versions of the evens are
matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426
F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)
(internal quotation marks omitted)).  Both Mangano's and Miranne's testimony are made more
plausible by the admitted fact that Mangano is listed as the inventor on multiple utility and
design patents and applications on multiple versions of the CloseDrier and Forever Fragrant.
Dkt. 253, Exs. H–M.  While alone not dispositive, a conclusion by the jury that the design
reflected on the D399 Patent incorporated features similar to those in the prior patents would be
corroborative of the testimony of Mangano and Miranne that Mangano made a not insignificant

contribution to the claimed invention.  As such, Defendants have demonstrated that there is a genuine dispute of material fact as to whether Mangano is a co-inventor on the D399 patent.

B. **Plaintiffs' Motion for Dismissal and Defendants' Motion for Summary Adjudication on Defendants' Eleventh Affirmative Defense Relating to Patent Damages**

Plaintiffs move for dismissal of Defendants' Eleventh Affirmative Defense relating to limitations on damages, and Defendants move for summary adjudication on the issue of alleged damages before May 25, 2018. Defendants' Eleventh Affirmative Defense is: "Any potential damages recovery is barred in whole or in part by 35 U.S.C. §§ 286, 287, and/or 288." Dkt. No. 148 at 35. [7]

The material facts are undisputed.  The D399 Patent was filed on September 23, 2016 and issued on October 17, 2017.  SAC, Ex. B.  In October 2016, after the patent application was filed but before it issued, the parties discussed Defendants purchasing the "*NEW* JOY Closedrier" from Plaintiffs, who showed Defendants a prototype of the design that was the subject of the patent application.  Dkt. No. 254, Ex. MM.  After the patent issued, Plaintiffs did not make, offer to sell, or sell any products covered by the D399 Patent but it remained in possession of prototypes covered by the D399 Patent.  Thereafter, Defendants allegedly infringed the D399 Patent.  Defendants were not informed until May 25, 2018 that Plaintiffs had applied for a patent

---

[7] Plaintiffs move to dismiss this Affirmative Defense in its entirety, effectively seeking summary adjudication that Section 286 and Section 288 do not apply.  Dkt. No. 204 at 1.  They argue that "Section 286 bars recovery of damages for infringement occurring 'more than **six years prior** to the filing of the complaint,'" *id.* at 22 (quoting 35 U.S.C. § 286), and that the SAC was filed in October 2018 and the challenged CloseDrier was first sold in March 2018, *id.*, rendering this provision inapplicable.  They further argue that "Section 288 bars recovery of costs when suing on a patent having a valid claim of a patent along with an invalidated claim that was not properly disclaimed.  Here, there is no dispute that the D399 Patent has only one claim and § 288 could never apply."  *Id.* at 23.  Defendants do not dispute either of those issues, *see* Dkt. No. 250, and they therefore will be adjudicated in favor of Plaintiffs.

or that they received the D399 Patent.  SAC ¶ 82.  Defendants assert that Plaintiffs are not

entitled to patent damages for any infringement that occurred prior to this notice.

> Section 287(a) provides:

> Patentees, and persons making, offering for sale, or selling within the United States
> any patented article for or under them, or importing any patented article into the
> United States, may give notice to the public that the same is patented . . . by fixing
> thereon the word "patent" . . . . In the event of failure so to mark, no damages shall
> be recovered by the patentee in any action for infringement, except on proof that
> the infringer was notified of the infringement and continued to infringe thereafter,
> in which event damages may be recovered only for infringement occurring after
> such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

Under the plain language of the statute and prevailing Federal Circuit precedent, the

"notice provisions of § 287" arise only after a patent has issued and do not apply "when a

patentee never makes or sells a patented article."  *Arctic Cat Inc. v. Bombardier Recreational*

*Prods. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020); *OptoLum, Inc. v. Cree, Inc.*, 2020 WL 5763611,

at *17 (M.D.N.C. Sept. 28, 2020) ("Section 287 necessarily only applies after a patent has been

issued.").[8]  It is not sufficient that the product becomes patented after all sales of it have ceased.

"[A] patentee who never makes or sells a patented article may recover damages even absent

notices to an alleged infringer."  *Arctic Cat*, 950 F.3d at 284; *see also* 7 Chisum on Patents

§ 20.03 ("Section 287 literally applies only to a patent owner's sale or authorization to sell

products after issuance of the patent. Only after issuance does the person become a 'patent'

---

[8] Defendants rely on the Third Circuit's decision in *Steinthal v. Arlington Sample Book Co.*, 94
F.2d 748, 749 (3d Cir. 1938) to argue that section 287 applies even before the patent issues.  *See*
Dkt. No. 250 at 46; Dkt. No. 316 at 27.  Although that opinion appears to support Defendants'
argument, it interprets 35 U.S.C. § 49 rather than the current patent marking statute, and this
Court has not located any decision since *Steinthal* was issued in 1938 that relies on it to require a
person bringing a patent infringement claim to demonstrate a marking before the patent was
approved, or applies this requirement to the current patent marking statute.  In any event, the
Federal Circuit's precedent, which references no such requirement, is binding on this Court.

owner and the article a 'patented' one, but it is a common practice to mark products with the notice of 'patent pending.'").[9]

This interpretation "comports with the purpose of the marking statute," which "serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented." *Arctic Cat*, 950 F.3d at 865 (quoting *Arctic Cat Inc. v. Bombardier Recreational Prods.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) (internal quotation marks omitted)). "Acts before issuance . . . do not themselves infringe the patent." 5 Chisum on Patents § 16.04. It is understandable, therefore, that this section—which is aimed at preventing against innocent infringement—would not apply until a patent has issued and infringement is possible. It is also consistent with the provision as a whole. To provide notice, the marking must contain the word "patent" or the abbreviation "pat." together with the authorized patent number. *See Lemelson v. Fisher Price Corp.*, 545 F. Supp. 973, 974 (S.D.N.Y. 1982) ("To recover damages for the alleged infringement, plaintiff must establish either (1) that he gave public notice of his patent by affixing the word 'patent' or the abbreviation 'pat.' together with the patent number on the patented articles, or failing that, (2) that the infringer was notified of the infringement and continued to infringe thereafter, in which event, damages may be recovered only for infringement occurring after such notice."). By its terms, "section 287 is not satisfied by . . . marking with the words 'patent pending' or words of similar effect." *MacPike v. Am. Honda Motor Co.*, 1993 WL 632261, at *5 (N.D. Fla. Oct. 1, 1993) (citing *Steinthal*, 94 F.2d at 749). It

---

[9] The "patent pending" marking "serves to notify defendants that the marked articles are not in the public domain and may be subject to inchoate patent rights and future protection." *Conopco, Inc. v. May Dept. Stores Co.*, 784 F. Supp. 684, 675 (E.D. Mo 1992), *rev'd in part, aff'd in part & remanded with instructions*, 46 F.3d 1556 (Fed. Cir. 1994).

follows that before the patent has issued, there is no patented product, no requirement of notice under section 287, and no legally sufficient notice to affix.

Plaintiffs argue that "TNC did not make, offer to sell, or sell any products covered by the D399 Patent after it issued." Dkt. No. 205 ¶ 61. Defendants do not provide any evidence to the contrary.[10] As such, section 287 does not apply, and this Court accordingly will not limit damages thereunder.

### C.  Plaintiffs' Motion for Summary Adjudication of Prudential Standing

Plaintiffs move for summary adjudication dismissing Defendants' claim that Plaintiffs lack prudential standing and definitively adjudicating that issue in favor of Plaintiffs. The motion is denied.

At the motion to dismiss stage, the Court held that Plaintiffs had sufficiently established prudential standing. Dkt. No. 126 at 9–11. Defendants' motion to dismiss was based on PSAs that TNC executed with two third parties. These PSAs were executed pursuant to loan agreements and provide for the grant of a security interest in IP collateral, including the patent of Plaintiffs' CloseDrier. The PSAs state that TNC provided to the third parties certain collateral, including "a Lien on and security interest in, all of its right, title and interest in, to and under," the CloseDrier patent, and "all income, royalties, proceeds, and liabilities" with respect to that patent "including all rights to sue or recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof." The PSAs further state that TNC "shall assume full and complete responsibility for the prosecution,

---

[10] In Defendants' counterstatement to Plaintiffs' Rule 56.1 statement, Defendants argue that they were in possession of prototypes of products covered by the D399 product after it issued, and that "[t]hose prototypes reflected offers to sell." Dkt. No. 251 ¶ 61. In their corrected counterstatement, however, Defendants narrow this claim, arguing only that they were in possession of these prototypes after the D399 Patent was *filed*. Dkt. No. 297 ¶ 61.

defense, enforcement or other necessary or desirable actions in connection with their Intellectual Property subject to a security interest hereunder."

In denying Defendants' motion, the Court previously held that the Collateral Parties would have rights to the "Collateral IP," including to enforcement of the D399 Patent only if the Plaintiffs defaulted on their loans.  Dkt. No. 126 at 10.  In other words, "Plaintiffs have not transferred sufficient substantial rights, including the right to sue, to the Collateral Parties to make joinder necessary, or possible, without a default by Plaintiffs."  *Id.* at 11.  It was critical to this ruling that Plaintiffs had not defaulted; if they had, a different conclusion might have followed.

That decision is law of the case, and Defendants have identified no new facts that call that conclusion into question.  *See Pepper v. United States*, 562 U.S. 476, 506 (2001) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  At the same time, however, as a matter of law, the issue of standing cannot finally and definitively be adjudicated in favor of Plaintiffs at this stage of the litigation.  As Defendants point out, the Court has an independent obligation to ascertain that it has jurisdiction at all stages of the litigation, and "if the plaintiff loses standing at any time during the pendency of the proceedings in the district court or in the appellate courts, the matter becomes moot, and the court loses jurisdiction."  *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir. 2001).  Accordingly, although the Court will not dismiss the case for lack of standing, it does not hold that Plaintiffs have standing as a matter of law.

II.     **The Parties' Motions with Respect to Trade Secret and Idea Misappropriation, Counts III–V**

Defendants argue that HSN should be granted summary judgment on Counts III–V on the ground that it did not misappropriate any trade secrets. Defendants further argue that HSN, IDL, and Mangano should be granted summary judgment on Plaintiffs' federal and state trade secret and state idea misappropriation claims on the grounds that (1) Plaintiffs did not take reasonable measures to preserve the confidentiality of the alleged trade secrets; (2) Plaintiffs do not define the alleged trade secrets with particularity and concreteness; (3) Defendants did not use or misappropriate Plaintiffs' alleged luggage trade secrets or ideas; (4) the alleged trade secrets are generally known and not novel; and (5) Defendants acquired Plaintiffs' alleged trade secrets and ideas by lawful means that did not prohibit their use or further dissemination.[11]

Plaintiffs argue that the Court should grant summary judgment in their favor on Count V, the Luggage Ideas misappropriation claim, and hold that the CloseDrier Trade Secrets and Luggage Trade Secrets are not generally known, were disclosed to Defendants, and were improperly used by Defendants.

The Court considers first whether there exists a genuine issue of fact as to whether HSN can be liable for trade secret infringement.  It then addresses, in turn, the issues of the confidentiality of the alleged trade secrets, the particularity and concreteness of the alleged trade secrets, whether Defendants used or misappropriated the alleged Luggage Trade Secrets, whether

---

[11] As noted above, Plaintiffs are no longer asserting (1) CloseDrier Trade Secrets 1, 3–4, Luggage Trade Secrets 11–13, 15, and Factory Trade Secrets 1, 3 as trade secrets under Counts III and IV.

the alleged trade secrets and ideas are generally known and not novel, and whether Defendants

acquired the alleged trade secrets and ideas by lawful means under the MNDA residuals clause.[12]

A.    **HSN's Motion for Summary Judgment on Trade Secret and Idea Misappropriation**

HSN moves for summary judgment on Plaintiffs' Counts III–V, alleging federal and state

trade secret misappropriation and state idea misappropriation on the basis that Plaintiffs have not

proffered evidence to create a genuine issue of fact that HSN misappropriated any of Plaintiffs'

trade secrets and ideas.

The DTSA defines "misappropriation" to include "acquisition of a trade secret of another

by a person who knows or has reason to know that the trade secret was acquired by improper

means" or "disclosure or use of a trade secret of another without express or implied consent" in

specified circumstances.  18 U.S.C. § 1839(5).  "Improper means" includes "theft, bribery,

misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but

excludes "reverse engineering, independent derivation, or any lawful means of acquisition."  18

U.S.C. § 1839(6).  "The DTSA, thus, 'contemplates three theories of liability: (1) acquisition,

(2) disclosure, or (3) use.'"  *AUA Priv. Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *4

---

[12] Plaintiffs assert the claims in Counts III–IV under both federal and state law.  "The requirements for showing a misappropriation of a trade secret are similar under state and federal law."  *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).  For a claim under the federal Defend Trade Secrets Act ("DTSA"), Plaintiffs must demonstrate that (1) they possessed a trade secret, and (2) Defendants misappropriated that trade secret.  18 U.S.C. § 1836(b)(1).  Similarly, under New York law, Plaintiffs must demonstrate "(1) that [they] possessed a trade secret, and (2) that defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *Free Country*, 235 F. Supp at 565.  Because of this similarity, "district courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims."  *ExpertConnect, LLC v. Fowler*, 2019 WL 3004161, at *4 n.1 (S.D.N.Y. July 10, 2019).

(S.D.N.Y. Apr. 5, 2018) (quoting *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,

2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017)).

Under New York law, to prevail on a claim of trade secret misappropriation, Plaintiffs

must prove (1) that they "possessed a trade secret," and (2) that HSN "used that trade secret in

breach of an agreement, confidential relationship or duty, or as a result of discovery by improper

means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999); *accord Faiveley*

*Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009).  "The Restatement [of

Torts] defines 'improper means' as 'fraudulent misrepresentations to induce disclosure, tapping

of telephone wires, eavesdropping or other espionage. . . . In general they are means which fall

below the generally accepted standards of commercial morality and reasonable conduct.'" *Big*

*Vision Priv. Ltd. v. E.I. DuPont de Nemours & Co.*, 1 F. Supp. 3d 224, 273 (S.D.N.Y. 2014)

(quoting Restatement (First) of Torts § 757 (1939)).

HSN asks the Court to assume that the evidence would be sufficient to support a liability

verdict for trade secret and idea misappropriation against IDL and Mangano.  It argues that, even

on that assumption, the evidence would not be sufficient to support a verdict against it.  It

highlights that each of Plaintiffs' liability experts focus exclusively on whether IDL utilized

TNC's trade secrets and do not offer opinions that HSN did so.  *See* Dkt. No. 201, Ex. M ¶ 25

(Webster Expert Report) ("I will assess and compare Defendants' fabrics and other evaluation

materials to determine whether IDL has utilized the TNC Luggage Trade Secrets."); *Id.*, Ex. N

¶¶ 10–15 (Webster Supplemental Expert Report) (opining exclusively with respect to IDL); *Id.*,

Ex. O ¶ 87 (Bjurstrom Expert Report) ("My analysis shows that IDL received significant

valuable benefits from using TNC's factories . . . . [I]t would be difficult for IDL to

independently source these three identical factories . . . in such a short time period without using

any information from TNC about its factories or the goodwill that TNC established with its factories."); *Id.*, Ex. P. ¶ 145 (Perkins Expert Report) ("It is my opinion that IDL continued to use TNC's CloseDrier Project Trade Secrets to continue development with another partner, including by providing TNC's CloseDrier Project Trade Secrets and identifying the TNC's CloseDrier Trade Secrets as the design to follow").

Plaintiffs respond that HSN is liable for trade secret and idea misappropriation by virtue of the conduct of Mangano who was a HSN employee, officer, and executive committee member and whose duties to HSN included development and making decisions on products and selling those products in person and on HSN's channels for HSN's financial benefit.  Dkt. No. 247 at 48.  It also alleges that HSN has liability through the acts of two persons, Marianna DeFreitas and William Curren, who were nominally IDL employees but who received their paychecks from HSN, Dkt. No. 252, Ex. 176 at 7, 13, Exs. 65, 68, 77, 130–31, 135, 140 (DeFreitas); *id.*, Ex. 174 at 12, Ex. 70 (Curren), and through the HSN's then–Chief Executive Officer Mindy Grossman, who received reports from Mangano on the AFL Project and made demands regarding moving the Project forward expeditiously, *id.*, Ex. 126.  Plaintiffs further claim that HSN had the right, upon request, to obtain "Confidential Information" from Mangano and that such confidential information was the "sole property" of HSN, that it received photographs of the CloseDrier when preparing for Today's Special Show, that for all products at issue it ran quality development review, that it received the products directly from the manufacturers, and that it housed the products in their warehouse until sold through HSN's home shopping network or in its stores. Finally, it points out the HSN was bound as an "affiliate" to the MNDA.

Plaintiffs' first argument is well-taken.  The Court need not consider Plaintiffs' other arguments.  HSN cites no authority for the proposition that a party making a claim for trade

secret and idea misappropriation must support its case through expert testimony.  It is sufficient that the plaintiff present evidence that the defendant used the information knowing it was acquired through improper means or that it used it in violation of an agreement or confidential relationship or duty; it need not do so through the mouth of an expert.  Plaintiffs have put forward evidence that HSN, and not just IDL, was obligated to maintain the confidences of Evaluation Material provided by TNC under the MNDA and was restricted to using that information solely for the reasons specified in the MNDA—HSN was an "Affiliate" under the MNDA.  Plaintiffs also have put forward evidence that the acts that they contend constitute trade secret and idea misappropriation were perpetrated not just by IDL but also by HSN.  Mangano was not just an employee and the President of IDL, she was also an "Executive Vice President" of HSN and reported directly to HSN's CEO.  Dkt. No. 252, Ex. 169; Ex. 171 at 110.  She received both commissions and HSN stock, *see id.*, Ex. 169, and was one of a group of roughly five to ten persons who were members of the HSN executive committee, a group that made high-level executive decisions for HSN and reviewed Today's Special programs, *see id.*, Ex. 170 at 29, Ex. 171 at 110, 232, Ex. 172 at 97–98.  A jury also reasonably could find that when Mangano was engaged in the activity that Plaintiffs contend constitutes trade secret and idea misappropriation, she did so not just in her capacity as an IDL employee but also within the scope of her employment by HSN.  *See, e.g.*, *Lundberg v. State of New York*, 255 N.E.2d 177, 179 (N.Y. 1969) (noting that a corporation is responsible for the conduct of an employee within the scope of the employment).  In particular, a jury could find she was involved with the decision to meet with other vendors for the CloseDrier and participated in the decision to send them "sample images" of the product allegedly designed by TNC.  *See* Dkt. No. 207, Ex. 37, Ex. 50 at 91; Dkt. No. 208, Ex. 51.  A jury could also find that Mangano had all of TNC's Kevlar fabric

samples shipped to her home, *see* Dkt. No. 210, Ex. 134, and that she was involved in the

decision to send TNC samples to third parties who ultimately developed their own fabric using a

generic aramid, *see* Dkt. No. 210, Ex. 135; Dkt. No. 204 at 13–14.  This conduct was not just for

IDL's benefit and within the scope of Mangano's employment by IDL; Mangano's conduct

could reasonably be interpreted as facilitating the development of products for sale by HSN, for

HSN's benefit and within the scope of her employment by HSN as well.

The case is thus distinguishable from cases in which a plaintiff sues two defendants for

misappropriation, only one of which has a relationship with the plaintiff and the other of which is

a stranger who has not undertaken any duty contractual or otherwise to the plaintiff not to misuse

the plaintiff's information.  *See, e.g.*, *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678 (1st Dep't

2015).  In *Pinterest*, a plaintiff brought a trade secret misappropriation claim against two

defendants—its former officer, whom it claimed misappropriated its confidential and proprietary

technology and business plans, and the company Pinterest, to whom the former officer provided

that information and who then exploited it to develop its own product.  The court sustained the

claim against the individual: He appropriated the confidential information while he was a

corporate officer and provided it to Pinterest despite being aware that it was to be kept

confidential.  *Id.* at 28.  At the same time, however, it dismissed the claim against Pinterest.  The

complaint did not allege that Plaintiffs entered into any agreement with Pinterest or had a

confidential relationship with it or its founders; none of the plaintiffs had "any contact

whatsoever with Pinterest," and there was no allegation that Pinterest acquired any trade secrets

by improper means.  *Id.*  Thus, no claim of trade secret misappropriation could lie against

Pinterest.  *See also Pauwels v. Deloitte LLP*, 2020 WL 818742, at *9 (S.D.N.Y. Feb. 19, 2020)

(relying on *Pinterest* and holding that a claim for trade secret misappropriation did not lie against

a corporate defendant who used alleged trade secret information in the absence of allegations that it breached a confidential relationship or acquired the information by improper means).

In this case, by contrast, HSN had a relationship with TNC. It was an affiliate of IDL and, by its terms, was bound by the MNDA. A jury reasonably could find that TNC entrusted its trade secret information to Mangano and others who received pay from HSN on the understanding that they would not use that information in violation of the MNDA, either in their personal or in their corporate capacities. Assuming that the evidence would be sufficient to establish trade secret misappropriation by Mangano, HSN too would be liable for trade secret misappropriation.

### B. Defendants' Motion for Summary Judgment on Counts III–V Because Alleged Trade Secrets and Ideas Were Not Secret

All defendants move for summary judgment on Counts III–V on the grounds that Plaintiffs failed to take reasonable measures to keep their alleged trade secrets and ideas secret.

For a plaintiff to claim entitlement to trade secret protection, "[t]he subject matter of a trade secret must be secret." *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962) (quoting Restatement of Torts, § 757) (Marshall, J.).[13] As a general matter, "where there is no genuine dispute that the party claiming misappropriation 'disclose[d] [its] trade secret to others who are under no obligation to protect the confidentiality of the information

---

[13] Restatement (First) of Torts § 757 states:

> Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business may know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy.

. . . [its] property right is extinguished' and summary judgment is warranted." *Structured Cap. Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 835 (S.D.N.Y. 2016) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)); *see also KT Grp. Ltd. v. NCR Corp.*, 2018 WL 11213091, at *13 (S.D.N.Y. Sept. 29, 2018) (citing *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009)) ("[D]isclosure of the alleged trade secrets to individuals or entities who are under no obligation to protect the confidentiality of the information extinguishes the owner's property right in the purported trade secrets."); *Nova Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 327–28 (3rd Cir. 2009) (holding that information disclosed to defendant distributor pursuant to a license "lost its trade secret status" because the license agreement did not require defendant to "maintain the secrecy of any information it had acquired from [plaintiff]").  Although "absolute secrecy is not required[,] . . . a trade secret [must] be veiled in sufficient secrecy that 'except by use of improper means, there would be difficulty in acquiring the information.'" *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 232 (S.D.N.Y. 1988) (quoting *Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 617 (S.D.N.Y. 1985)) (internal citations and quotation marks omitted); *see also A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968).  The reason for this is obvious.  If a defendant could have obtained the allegedly protected information with impunity from a third party and if that third party was at liberty to publish the trade secret to the world, including to the defendant, the law will not prevent that defendant alone from exploiting the trade secret.

Defendants argue that Plaintiffs forfeited any entitlement they had to trade secret protection with respect to the alleged Luggage Trade Secrets, Factory Trade Secrets, and CloseDrier Trade Secrets based on their disclosure of those trade secrets, without any form of confidentiality agreement, to a number of factories in China with whom they worked.  In

response, Plaintiffs argue that many of these disclosures were only partial disclosures, and that they did take reasonable measures to keep their trade secrets confidential.

There are sixteen alleged Luggage Trade Secrets.  In interrogatory responses, Plaintiffs admitted that they disclosed all sixteen of these to Trofy International Co. Ltd. ("Trofy"), that they disclosed Luggage Trade Secrets 1–15 to Earthbound Brands ("Earthbound") and Wujiang Kailing Waing Co. ("Kailing"), and that they disclosed Luggage Trade Secrets 1, 5, 7, 11, 12, 14, and 15 to Nam Liong Enterprise Co., Ltd. ("Nam Liong").  Dkt. No. 253, Ex. Q at 3.  Defendants also argue that Luggage Trade Secret 16 must have been disclosed to Kailing because Plaintiffs' fabric samples are woven with aramid fibers created at Kailing.  Dkt. No. 253, Ex. R.  There are three alleged Factory Trade Secrets.  Plaintiffs disclosed Factory Trade Secret 1 to Earthbound and Trofy, and Factory Trade Secret 2 to Edison Nation.  Dkt. No. 253, Ex. Q at 3.  There are seven alleged CloseDrier Trade Secrets.  Plaintiffs disclosed CloseDrier Trade Secrets 1–7 to Tianjun Household Electrical Appliance Company ("Tianjun") and ██████████████ ██████████████ and disclosed CloseDrier Trade Secrets 1, 2, and 6 to Gree Zuhai Small Household Electronical Appliance Company ("Gree").  *Id.*  The interrogatories were signed under oath by Beyda on behalf of TNC.

At deposition, TNC's Rule 30(b)(6) witness also testified about these disclosures.  Dkt. No. 201, Ex. J.  The witness testified that Luggage Trade Secrets 1–16 were disclosed to Trofy around February of 2015, *id.* at 113, that Luggage Trade Secrets 1–15 were disclosed to Earthbound starting in around November of 2014, *id.* at 105–06, 109, that Luggage Trade Secrets 1–15 were disclosed to Kailing on or about February 2015, *id.* at 105, 107, 109, and that Luggage Trade Secrets 1, 5, 7, 11, 12, 14, and 15 were disclosed to Nam Liong on or about December 2014, *id.* at 105–07.  The witness further testified that Factory Trade Secret 1 was

disclosed to Earthbound and Trofy in February of 2015, *id.* at 114–15, and that Factory Trade

Secret 2 was disclosed to Edison Nation, although she did not have the exact date of this

disclosure, *id.* at 119.  Finally, the witness testified that CloseDrier Trade Secrets 1–7 were

disclosed to Tianjun on or about December 2015, *id.* at 85, 92, 99–100, that CloseDrier Trade

Secrets 1–7 were disclosed to ███████ although she did not have the exact date of this

disclosure, *id.* at 90, 93, 99, and that CloseDrier Trade Secrets 1, 2, and 6 were disclosed to Gree

on or about December 2015, *id.* at 85, 99.  The responses were unambiguous.  The "trade

secrets" were disclosed, not elements that would form portions of the trade secrets.  At no point

in either their responses to the interrogatories or in their 30(b)(6) deposition did Plaintiffs attempt

to qualify these statements about their various disclosures to factories or indicate that they

disclosed only parts of their alleged trade secrets.  Defendants also claim, without dispute, that

Plaintiffs disclosed the CloseDrier Trade Secrets to Adele Zhang of Shanghai Fesco.  *See* Dkt.

No. 199 at 22 (citing Dkt. No. 201, Ex. J, at 42).

In response to Defendants' summary judgment motion, Plaintiffs attempt to walk back

some of these admissions, claiming that they disclosed many of these alleged trade secrets only

partially.  Barnaba submits a declaration stating that TNC disclosed only parts of the trade

secrets.    Dkt. No. 257 ¶¶ 32–34, 66.  Beyda declares in a summary judgment declaration that

"TNC only discussed the confidential CloseDrier Project trade secrets with four factories (two of

which were a very limited discussion) in China and the confidential Aramid Fiber Luggage

Project trade secrets with one weaver in China."  Dkt No. 256 ¶ 24.

Plaintiffs' new assertions come too late.  A party cannot defeat summary judgment by

disputing in a declaration submitted after the close of discovery and in its opposition papers a

fact to which it admitted during discovery. *See Reisner v. Gen. Motors Corp.*, 671 F.2d 91, 93

(2d Cir. 1982) (disregarding factual claims made by appellant after appellee moved for summary judgment, "where those claims contradict statements made previously by [appellant] at his deposition, in his affidavits, and in response to [appellees'] interrogatories") (citing *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45–46 (2d Cir. 1980); *Perma Rsch. & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *see also Batac v. Pavarini Constr. Co.*, 216 F. App'x 58, 60 (2d Cir. 2007) (holding the District Court properly granted summary judgment because appellant asserted testimony that contradicted his responses to written interrogatories and deposition testimony for the first time only in response to appellee's motion for summary judgment).[14]  That rule clearly applies to Beyda.  He signed the interrogatories under oath and on behalf of TNC.  Those interrogatory responses constitute admissions and are as binding at this stage as if they were made in a deposition.[15]  *Med. Educ. Servs., Inc. v. Reed Elsevier Grp., PLC*, 2008 WL 4449412, at *11 (S.D.N.Y. Sept. 30, 2008) ("[I]n this Circuit, contention inquiries are treated as judicial admissions that generally stop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses."); *see also U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*, 2019 WL 948120, at *21 (S.D.N.Y. Feb. 15, 2019) (citing *Med. Educ. Servs.* for the same proposition); *Zeigler v. Marriott Int'l, Inc*, 2005 WL 1022431, at *11 (S.D.N.Y. May 2, 2005) (holding that plaintiff's interrogatory response "constitute[s an]

---

[14] The reason given for this rule is:

> If a party . . . could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.  Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial.

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (quoting *Perma*, 410 F.2d at 578).

[15] Although these interrogatories are not captioned "contention interrogatories," they operate as such and the Court treats them as such here.

admission[] and limit[s] his potential claims"); *Guadagno v. Wallack Ader Leviathan Assocs.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997) (observing that interrogatory responses are treated as judicial admissions, and that "[a] judicial admission is conclusive, unless a court allows it to be withdrawn") (internal citations and quotation marks omitted).  The time for TNC to have corrected them would have been during discovery when a duty to correct and supplement was available and when Defendants could have followed up with appropriate additional discovery requests to test the proposition.  *See* Fed. R. Civ. P. 26(e).  Having chosen not to avail itself of that right, it is now too late for Beyda to contradict his admissions.  *See Guadagno*, 950 F. Supp. at 1261 n.4 (noting that even for deposition testimony, which is treated only as an evidentiary admission—in contrast to contention interrogatories which are treated as binding judicial admissions—"a party [cannot] avoid summary judgment by the ruse of filing a sham affidavit contradicting a specific fact of which he has personal knowledge that he has previously admitted under oath in the same case); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) ("[I]n opposing summary judgment, a party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact.").

The same is true with respect to TNC's 30(b)(6) testimony and it prevents TNC from relying on Barnaba to contradict that testimony.  Defendants Rule 30(b)(6) witness was explicitly designated as TNC's representative to provide testimony on topic No. 46, which "relate[d] to all confidentiality and/or nondisclosure agreements between plaintiffs and any third party to whom plaintiff disclosed any of the trade secrets at issue in this case."  *See* Dkt. No. 201, Ex. J at 87–88.  The service of that notice imposed on TNC and its representative a duty to educate itself with respect to all information "reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 2013 WL 1286078, at *2

(S.D.N.Y. Mar. 28, 2013) ("Once the deposing party has served a satisfactory notice, the responding party is required to 'make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters.' While the 'Rule 30(b)(6) deponents need not have personal knowledge concerning the matters set out in the deposition notice . . . the corporation is obligated to prepare them so that they may give knowledgeable answers.'") (internal citations omitted) (first quoting *Tailored Lighting Inc. v. Osram Sylvania Prods., Inc.*, 255 F.R.D. 340, 349 (W.D.N.Y. 2009), then quoting *Meyer Corp. U.S. v. Alfay Designs Inc.*, 2012 WL 3536987, at *8 (E.D.N.Y. Aug. 13, 2012)).  TNC discharged that responsibility when Beyda and Barnaba prepared TNC's 30(b)(6) witness extensively for deposition.  *See* Dkt. No. 201, Ex. J (including indications throughout that the witness's testimony about disclosures to the factories, the dates of these disclosures, and confidentiality agreements with those factories was based, in large part, on information directly from Beyda and Barnaba, and that the witness consulted with them during breaks to obtain additional information).  The 30(b)(6) answers imposed on TNC the same obligation to correct or supplement "in a timely manner" as if the answers were given on its behalf though the mouth of Beyda or Barnaba through a deposition given by them personally.  It would defeat the entire purpose of Rule 30(b)(6) if a party's representative could admit to a fact during a deposition only to have that party contradict the fact later, and after its adversary's opportunity to challenge it pretrial had expired, through a summary judgment declaration by one of its officers.  *See Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("Some deponents will . . . try to abuse Rule 30(b)(6) by intentionally offering misleading or incomplete responses, then seeking to 'correct' them by offering new evidence after discovery. Appropriate

remedies are available for such situations. For instance, . . . the 'sham-affidavit rule' prevents a party from manufacturing an issue of fact 'by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.") (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014)).

The Court thus turns to whether the disclosure of the alleged trade secrets at issue effected a forfeiture of trade secret protection.  Plaintiffs argue that they took general measures to reasonably protect their information.  They argue it was not necessary for them to obtain NDAs from the factories to which they disclosed their alleged trade secrets because NDAs are not routine in China and vetting factories and building trusting relationships are the best ways to protect confidential information in China.  In particular, they rely on the generalized testimony from their expert with respect to all types of agreements that "[f]ace to face oral discussions and agreements hold up better than signing a piece of paper. Sometimes, these agreements are communicated in writing through meeting recaps and/or on production orders explaining details of the exclusivity."  Dkt. No. 252, Ex. 207 at 22.  The expert also opines that "the measures taken by TNC . . . are reasonable and in line with what I have done in the past to protect confidential and trade secret information on my projects and what I consider to be conventional business practice," and that "exclusivity agreements are common in China and often offer more protection than a written contract, such as an NDA."  *Id.* at 28.

Plaintiffs also purport to offer evidence of specific understandings with particular factories to whom the trade secrets were disclosed.  Tellingly, they do not argue that they took steps other than the conversations to which they refer that would have made it practically

difficult for the third parties to disclose Plaintiffs' alleged trade secrets to others, such as

encoding the information or providing it in a form where it could not easily be retransmitted.

Some of Plaintiffs' evidence (identified below) is hearsay and is not sufficient to forestall

summary judgment.  *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (noting that

"principles governing admissibility of evidence do not change on a motion for summary

judgment," and that "[o]nly admissible evidence need be considered by the trial court in ruling

on a motion for summary judgment") (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 56 (2d Cir.

1997) and *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir.

2009) (internal quotation marks omitted)).  Other pieces of documentary evidence (also

identified below) were not disclosed in discovery, and therefore the Court will not consider them

on summary judgment.  *See Unicorn Crowdfunding v. New Street Enter., Inc.*, 507 F. Supp. 3d

547, 572 (S.D.N.Y. 2020) ("Unicorn has not offered any explanation for why it did not produce

those documents during discovery, or why they were considered 'irrelevant' to Socialfix's

request for documents . . . . The Court thus disregards these invoices.").  The remaining evidence

is sufficient to establish the existence of a non-disclosure agreement with respect to Kailing, but

it does not establish the existence of a confidentiality agreement or any other measures

reasonably taken to protect TNC's information with any of the other third parties and thus is not

sufficient to entitle TNC to trade secret protection.

An owner of a trade secret may disclose it to "others pledged to secrecy" without

effecting a forfeiture of trade secret protection.  *Speedry Chem.*, 306 F.2d at 331 (2d Cir. 1962)

(quoting Restatement (First) of Torts § 757) (internal quotation marks omitted).  The pledge need

not necessarily taken written form.  A person may still enjoy trade secret protection by entering

into an oral agreement or taking other measures to protect the disclosed information from

dissemination.  *See, e.g.*, *Pauwels*, 2020 WL 818742, at *6 ("[W]hile a formal [confidentiality]

agreement is not necessary to establish secrecy, Plaintiff does not even allege that he ever sought

to establish any particular limitations on who within or outside of BNYM could see the

spreadsheets."); *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 961 (S.D.N.Y.

1996) ("Plaintiff must show that it took substantial measures to protect the secret nature of its

information."); *Big Vision*, 1 F. Supp. at 267–68 ("There is virtually no contemporaneous

documentary or testimonial evidence . . . indicating that Big Vision took *any steps* to ensure the

confidentiality of the information it disclosed to third parties."); *id.* at 268–69 (distinguishing

*Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993), wherein "plaintiff had

taken reasonable measures to safeguard its secret where it had 'licensed only two complete

versions of [the trade secret] and extracted promises from both recipients that they would neither

copy nor transfer the program, nor use the program for any purpose other than their own

construction or engineering projects,' and had implemented a password program to restrict

unauthorized use").

        In this case, however—with the exception of disclosures to Kailing, Trofy, and Edison

Nation—the evidence does not establish that Plaintiffs took any measures to ensure that the other

factories and third persons to whom information was disclosed would not disclose that

information to others.  Plaintiffs disclosed the information that they now claims to be a secret to

a number of third parties who were at liberty to further publish the information and without

identifying that information as confidential, securing any commitment, written or verbal, on the

part of those third parties to limit the disclosure of the information and not to disclose it to

others, or taking any other reasonable measures to protect the confidentiality of its asserted trade

secrets.  *See Paulwels v. Deloitte LLP*, 2020 WL 818742 (S.D.N.Y. Feb. 19, 2020); *Big Vision*, 1

F. Supp. 3d  at 268 (rejecting argument that plaintiff took sufficient measures to protect its information based on the "universal understanding of confidentiality in the manufacturing business and that he had verbal 'communications to ensure confidentiality' with numerous third-party manufacturers" where it was based only on *ipse dixit* and where Plaintiff admitted disclosing the trade secret "to at least one manufacturer without any prior communications to 'ensure confidentiality'").  In these circumstances, where TNC would have no legitimate claim against the third parties for their use or disclosure of TNC's information, it also can have no legitimate claim against Defendants for their doing the same.

### 1.   Evidence Regarding the Luggage Trade Secrets

With respect to the Luggage Trade Secrets, Plaintiffs offer Barnaba's statement that "[i]t was TNC's understanding that all parties involved considered the Aramid Fiber Luggage Project to be a confidential development project," but that generalized statement cannot defeat summary judgment. Dkt. No. 257 ¶ 30.   Barnaba's unilateral understanding is irrelevant.  The relevant question is whether the other parties involved understood they were obliged to keep TNC's information confidential, specifically the information at issue in this case.  Thus, even assuming that TNC believed that the third parties would treat its information as confidential, that "does not mean that [the factories] had a corresponding obligation."  *Paulwels*, 2020 WL 818742, at *7. To the extent that the statement is intended to convey the understanding of a third party, it also is hearsay.  Barnaba offers no basis for the Court to find that she is a percipient witness with respect to the understandings of all parties.  Plaintiffs also cite no "formal agreement, marking [the Luggage Trade Secrets] as confidential, or anything else signaling [to the factories] that [TNC was conveying] proprietary information."  *Id.* at *6.  Nor does this statement contain any "identification of who it is that Plaintiff[s] spoke with and when" to secure an agreement for confidentiality.  *Id.*

TNC has not offered any competent admissible evidence that Earthbound or Nam Liong agreed to confidentiality or that it took any other measures to prevent those two from disclosing its information.  With respect to Earthbound, all that TNC has offered is the declaration of Beyda that "TNC has an 18-year business relationship with Earthbound . . . . TNC and Earthbound have always had an understanding of confidentiality and treated each other's information as confidential."  Dkt. No. 256 ¶ 64.  As with Barnaba's statement, TNC's one-sided understanding is not sufficient to establish that Earthbound shared that understanding and agreed to that obligation.[16]  *Paulwels*, 2020 WL 818742 at *7; *Jinno Int'l Co. v. Premier Fabrics, Inc.*, 2013 WL 4780049, at *5 (S.D.N.Y. May 24, 2013) (holding that allegations that a business relationship between two parties "was clearly confidential in nature" and that a party receiving information "agreed to maintain the confidentiality of [the disclosing party's] trade secret information" were insufficient to establish that the disclosing party took reasonable measures to protect its information in the absence of any allegations "how it was clear that the information was confidential, or how and when [the receiving party] agreed to maintain confidentiality").  Beyda does not purport to have witnessed Earthbound agree to keep TNC's information, and the information at issue in this case, confidential.  Whatever he might have heard from other persons regarding Earthbound's purported understanding is hearsay coming from Beyda's mouth.

As to Nam Liong, Barnaba states that because Earthbound provided TNC with Nam Liong's contact information, "TNC understood this to mean that we were all working under the

---

[16] Plaintiffs assert that Earthbound "only work[ed] on Kevlar development after a non-disclosure agreement was in place due to its proprietary nature."  Dkt. No. 247 at 22.  As evidence of this proposition, they point to deposition testimony by Abe Cohen and Susan McKenna.  Notably, the alleged NDA is absent from the record.  As discussed *infra* with regard to asserted confidentiality agreements with Shanghai FESCO, Plaintiffs cannot rely on assertions that a written document exists and would apply here without producing the document itself.  As such, the Court disregards these assertions.

same understanding of confidentiality." Dkt. No. 257 ¶ 32.  Here too, TNC's unilateral understanding, founded on nothing more than the source of its introduction, is not a reasonable step to ensure confidentiality. *Paulwels*, 2020 WL 818742, at *7.  Barnaba goes on to state that "TNC . . . reiterate[d] verbally that this [AFL] project was highly confidential and that any work TNC created could not be shared with other customers," and that "Nam Liong agreed to keep TNC's information confidential," but he does not state that Nam Liong made that agreement in his presence or that he has any personal knowledge of it.  Dkt. No. 257 ¶ 32.  As such, these statements are inadmissible and are not sufficient to defeat summary judgment. *Porter*, 722 F.3d at 97.

Barnaba's statements about these factories are in striking contrast to her statement about Kailing.  She states with respect to Kailing, "I remember Jeff Beyda and I discussing exclusivity and confidentiality with Kailing at the very first in-person meeting with the factory owner.  Kailing agreed to keep TNC's information confidential." Dkt. No. 257 ¶ 33.  She thus asserts that she was a witness to a statement made by Kailing in her presence that Kailing would keep TNC's information confidential.  She is not relying on hearsay.  That statement is sufficient to establish the existence of a nondisclosure agreement with respect to Kailing.

Plaintiffs' disclosures to Trofy also stand on different ground than their disclosures to Earthbound and Nam Liong.  Trofy was Defendants' luggage manufacturer and therefore was covered as IDL's affiliate under the MNDA. *See* Dkt. No. 257 ¶ 34; Dkt. No. 247 at 20.

The MNDA recognizes that, "[i]n order [for the parties] to pursue the mutual business purpose of a possible transaction involving IDL and [TNC] and/or their respective affiliates . . . , both IDL and [TNC] recognize that there is a need to disclose to one another certain information

51

in respect of itself and/or its affiliates.  Dkt. No. 47, Ex. A.  It further defines as Evaluation

Material:

> [a]ll such information, delivered by or on behalf of one party (the "Disclosing
> Party") and/or its Representatives (as defined below) to the other party (the
> "receiving Party") and/or its Representatives, whether furnished before or after the
> date of this Agreement and regardless of the manner in which it is furnished,
> together with all analyses, compilations, studies or other documents or records
> prepared by the Receiving party and/or its Representatives, to the extent such
> analyses, compilations, studies, documents or records contain, otherwise reflect, or
> are generated from such information."

*Id.*  The MNDA provides that "Evaluation Material will be used by the Receiving Party solely

for the purpose of evaluating the Transaction."  *Id.*  It also requires the Receiving Party to keep

Evaluation Material "strictly confidential . . . , except that Evaluation Material or any portion

thereof may be disclosed to [Representatives] of the Receiving Party who need to know such

Evaluation Material for the purpose of evaluating the Transaction and who agree to treat such

Evaluation Material in accordance with the terms of this Agreement."  *Id.*  Therefore, disclosures

to Trofy by either TNC or IDL would be confidential under the MNDA and would not strip the

disclosed information of trade secret status.

Plaintiffs' disclosure of the Luggage Trade Secrets to Earthbound and Nam Liong

without evidence of any written or verbal agreement or understanding by the third parties not to

disclose the trade secrets deprives Plaintiffs of any trade secret protection under federal or state

law.  Plaintiffs disclosed Luggage Trade Secrets 1, 5, 7, 11, 12, 14 and 15 to at least two

factories (Earthbound and Nam Liong) without any assurances that the factories would keep the

information disclosed secret and disclosed Luggage Trade Secrets 2–4, 6, 8–10, and 13 to one

factory (Earthbound) without an assurance of confidentiality.  Plaintiffs disclosed the remaining

secret—Luggage Trade Secret 16, the fabric sample—to Trofy and Kailing only.  There is no

evidence that Luggage Trade Secret 16 embodies secrets that were not already disclosed in any

of Luggage Trade Secrets 1–15.  As such, all sixteen of the Luggage Trade Secrets were

disclosed to third parties who were not obligated to keep them confidential; therefore, none are

entitled to trade secret protection under federal or state law.[17]

### 2.   Evidence Regarding the CloseDrier Trade Secrets

Plaintiffs also have not proffered evidence from which a reasonable jury could find that

they took appropriate steps to protect its alleged CloseDrier Trade Secrets.  Barnaba has sworn

that she "recall[s] explaining during initial meanings with each of these [four] factories that the

ideas TNC would be presenting were confidential and were not to be shared," and that "[t]he

---

[17] Defendants' brief in support of their motion for summary judgment assumes—and Plaintiffs
do not dispute—that this secrecy requirement applies to idea misappropriation as well.  If this
were the case, the same facts would lead to summary judgment for Defendants with respect to
the Luggage Ideas would fail for the same reason.  It is undisputed that Luggage Idea (a) is
subsumed within Luggage Trade Secrets 1–12 and thus it was disclosed to Earthbound and Nam
Liong, with whom Plaintiffs had no confidentiality agreement.  Luggage Ideas (b), (c), and (d)
are subsumed within Luggage Trade Secrets 6, 2, and 3, respectively, and thus were disclosed to
Earthbound with whom Plaintiffs had no confidentiality agreement.  However, the Restatement
provision and case law imposing a secrecy requirement is specific to trade secret
misappropriation; there is no parallel secrecy requirement in New York idea misappropriation
law.  *See Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 450 F. Supp. 2d 175, 182–83 (D. Conn.
2006) ("FP continues to press its theory . . . that a successful misappropriation claim must prove
that the idea allegedly misappropriated was 'secret,' a position that neither resonates in New
York misappropriation law nor reflects the realities of the toy industry."); *see also id.* ("FP
argues that 'New York's common law of misappropriation has developed in harmony with'
intellectual property law principles. . . . A requirement that the idea be 'secret,' however, does
not appear in New York misappropriation law. The requirements of novelty, concreteness, and
confidential relationship ensure that an obligation is not wrongly imposed on a defendant for
either a non-protectible idea or an idea which the defendant had no duty not to use without
compensation, but the secrecy requirement urged by defendant is inapplicable.").  This
requirement does appear in idea misappropriation claims in other states, but is absent in New
York.  *Compare Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir. 2000)
(listing factors relevant to a determination of novelty in idea misappropriation cases under New
York law, but not listing secrecy as a relevant consideration), *with Vent v. Mars Snackfood US,
LLC*, 611 F. Supp. 2d 333, 336 (S.D.N.Y. 2009) (applying New Jersey idea misappropriation
law, and listing the same factors as *Nadel* but adding, inter alia, an additional factor: "(6) the
idea's secrecy (did an otherwise novel idea lose its novelty status because of inadequate steps
taken to maintain the idea's secrecy?)").

factories agreed at those meetings to keep our information confidential." Dkt. No. 257 ¶ 21.

This general statement, however, is "too conclusory to create a genuine issue of fact."

*Structured Cap. Sols.*, 177 F. Supp. 3d at 834 (citing *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d

206, 222 (2d Cir. 2004)).  "[A] party cannot create a triable issue of fact merely by stating in an

affidavit the very proposition they are trying to prove." *Hicks*, 593 F.3d at 167; *see also Ying*

*Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (noting that a party opposing

summary judgment "may not rely simply on conclusory statements").  Barnaba's statement

constitutes little more than a "label" and a "formulaic recitation" of what might be sufficient for

trade secret protection. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (applying Rule

12(b)(6) standard).  It does not contain any details from which a factfinder could determine what

was considered to be TNC information that the factories were to keep confidential, what it meant

to keep the information confidential, and with whom the information could be shared without the

factory violating its purported agreement to keep information confidential. *See Paulwels*, 2020

WL 818742 at *6 (considering limitation of persons to whom information can be disclosed and

measures taken to identify information as confidential as relevant factors in determining whether

the plaintiff took measures to protect its information).  It further does not contain any details

regarding whether this purported agreement was intended to last in perpetuity or for some limited

duration. *See Structured Cap. Sols.*, 177 F. Supp. 3d at 835–36 (noting that agreements to keep

such information confidential for a limited time period are inconsistent with trade secret

protection).  Without any such information, TNC would be asking the jury to rely on faith rather

than on fact in determining that it took reasonable measures to keep each of its alleged trade

secrets confidential.

Besides this general and insufficient statement, TNC offers no admissible evidence that it asked any of the four factories to keep the CloseDrier Trade Secrets confidential or that it secured an agreement from any of them that they would do so.  With respect to Gree and Tianjun, Barnaba declares that the two companies "were sourced and vetted by Adele Zhang from TNC's Shanghai Office prior to TNC disclosing any information to them," that TNC shared only "general concepts of the CloseDrier Project" with the companies upon Zhang's determination of their suitability, and that TNC discussed the CloseDrier Project with them in more detail "[a]fter at least an oral agreement relating to confidentiality was in place."  Dkt. No. 257 ¶ 18.  However, Barnaba does not offer any details relating to such oral agreements and provides no basis to believe that she has personal knowledge of the purported agreements.  The statement does nothing more than the Barnaba's general statement discussed above; it does not reflect what the confidentiality agreement was, whether it covered the information for which TNC now seeks trade secret protection, what protection it accorded that information, or how it was enforceable.  Absent any information with respect to the details of the purported oral agreement, there would be no basis for a reasonable jury to conclude that TNC took the necessary steps to protect its information.

Barnaba asserts with respect to ██████ that "TNC had a well-established, pre-existing confidential relationship with ██████ as ██████ manufactured the mop product that TNC sold to IDL," and that "TNC had both verbal and written confidentiality agreements with ██████ Dkt. No. 257 ¶ 20.  However, this case does not concern the mop products.  As pertains to ██████ it concerns the CloseDrier.  The Barnaba declaration is conspicuous for the absence of any reference to a confidential relationship with respect to the CloseDrier or to an agreement that ██████ would treat the information regarding the CloseDrier that TNC shared with it as

confidential.  Strikingly, the only written confidentiality agreement Plaintiffs have produced with

███████ *see* Dkt. No. 257 ¶ 20, citing Dkt. No. 255, Ex. 221, dated January 5, 2015, relates to a

project for "radio frequency safes," and defines "Trade Secrets" covered under the agreement as

specifically "information relating to the Project."  It does not relate to the CloseDrier.

Although the question is somewhat closer, TNC also has not put forth evidence from

which a reasonable jury could find that it took sufficient measures to protect its information

against disclosure by Zhang and Shanghai FESCO.  Plaintiffs have offered the declaration of

Beyda that Shanghai Foreign Service Group Co. Ltd. is TNC's office in Shanghai, structured in

the form of a Foreign Enterprise Service Company in order to satisfy legal requirements in

China. Dkt. No. 256 ¶ 17.  Beyda asserts that Shanghai FESCO "provides HR services to foreign

companies like TNC that are doing business in China, and handles compliance, employee

contracts, payroll processing and other administrative activities. . . . TNC refers to this operation

as its 'Shanghai Office' or 'SHO.'"  *Id.*  He further asserts that "[a]ll of the employees in SHO

report to TNC's New York Office, hold TNC titles/business cards/email addresses, and work

exclusively for TNC," and that "[t]hese individuals are salaried employees . . . [who] are hired,

promoted, and terminated at the discretion of TNC."  *Id.*  He does not allege that the employees

directly owe fiduciary or other duties of confidentiality to TNC.  However, according to Beyda,

"TNC . . . has binding contracts with Shanghai Foreign Service Group and its Shanghai

employees that have confidentiality provisions."  *Id.*

TNC has not produced evidence of any such confidentiality agreement that it could

present to a jury.  Rather, it offers a form Labor Contract, pursuant to which an unidentified

third-party company (referred to as the "Accepting Party") requests Shanghai FESCO (referred

to as "Party A") to recruit an employee (referred to as "Party B"), and Party B agrees to maintain

the trade secrets both of the Accepting Party and of Party A.  Dkt. No. 252, Ex. 211.  The document was not produced in response to Defendants' document requests and therefore is not properly considered on summary judgment for that reason alone.  *See Unicorn Crowdfunding*, 507 F. Supp. 3d at 572 ("Unicorn has not offered any explanation for why it did not produce those documents during discovery, or why they were considered "irrelevant" to Socialfix's request for documents related to damages. The Court thus disregards these invoices."); *see also Richmond v. General Nutrition Ctrs. Inc.*, 2012 WL 762307, at *8 (S.D.N.Y. Mar. 9, 2012) ("[P]laintiffs have offered no explanation or excuse for their failure to produce this information. The Court, accordingly, will preclude plaintiffs at trial from offering any damages evidence not produced in discovery or any damage calculation not based on documents produced in discovery."); *Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co.*, 726 F. Supp. 2d 339, 348–49 (S.D.N.Y. 2010) (same, but on a motion for summary judgment); *Douglas v. Victor Cap. Grp.*, 1997 WL 716912, at *2 (S.D.N.Y. Nov. 17, 1997) ("Accordingly, since the document was requested but not produced in discovery, plaintiff is precluded from using [it] on the summary judgment motion or at trial.").

Moreover, even had the document been produced in discovery, it would not be sufficient to create a genuine issue of fact.  The document reflects that it was printed by Shanghai FESCO on January 1, 2008 and bears the date 2008.  It is otherwise blank.  It does not contain a signature from anyone from Shanghai FESCO.  More significantly, it does not contain any information about Party B.  The lines for the name, address, ID Card No., "Registered Location of Hukou," and signatory for Party B are all blank.  It is not signed and does not identify any party to whom Shanghai FESCO owes any duties, much less create rights in TNC.

Beyda asserts that the form Labor Contract is "an example of one of these agreements" with Shanghai FESCO.  Dkt. No. 256 ¶ 17.  TNC's argument thus rests on Beyda's oral assertion that TNC had a Labor Contract with Shanghai FESCO similar to the form Labor Contract.  In the absence of an original or copied Labor Contract with TNC signed by Shanghai FESCO or any explanation why such a document could not have been produced, Beyda's oral assertion itself would not be admissible at trial to establish the existence of such a writing and therefore cannot at the summary judgment stage secure for TNC a right to present its evidence to a jury.  Federal Rule of Evidence 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  There are exceptions to this rule, but "'[t]he party seeking to prove the contents of the writing must establish' that one such exception applies."  *Unicorn Crowdfunding*, 507 F. Supp. 3d at 571 (quoting *Elliott v. Cartagena*, 2020 WL 4432450, at *4 (S.D.N.Y. July 31, 2020)); *A.F.L. Falck, S.p.A. v. E.A. Karay Co., Inc.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) ("The party seeking to prove the contents of the writing must establish a proper excusive for the non-production of the document and that the original did exist") (citing *Dependable Lists, Inc. v. Malek*, 469 N.Y.S.2d 754, 755 (1st Dep't 1983)).  Here, TNC has not produced the written confidentiality agreement it references or a duplicate thereof.  Nor has it shown that that an exception to the Rule applies.  "Accordingly, the Court cannot rely on the testimony from [TNC] personnel as to the content of that agreement."  *Unicorn Crowdfunding*, 507 F. Supp. 3d at 571 (citing *Cutler v. Stop & Shop Supermarket Co.*, 513 F. App'x 81, 83 (2d Cir. 2013) (summary order)).  The mere conclusory assertion that there exists such a document, in the absence of any evidence of the signed agreement or any agreement with TNC's name, is not sufficient to create a genuine issue of fact or to forestall summary judgment.  *See Sterling Fin. Servs. Co. v. Franklin*, 259 F. App'x 367,

369–70 (2d Cir. 2008) (holding that the "District Court properly granted summary judgment" and properly gave one declaration no weight because it "was conclusory with no original documentary corroboration" and another declaration no weight because the documentation "contained no signature by the purported buyer").

TNC's disclosure of the CloseDrier Trade Secrets to four factories and Shanghai FESCO without evidence of any written or verbal confidentiality agreements deprives them of any trade secret protection under federal or state law.

### 3. Evidence Regarding the Factory Trade Secrets[18]

TNC disclosed Factory Trade Secret 2, the only remaining asserted Factory Trade Secret, to Edison Nation.  Dkt. No. 257 ¶ 39.  Regarding Edison Nation, TNC asserts that they "understood Edison Nation to be a 'Representative' of IDL under the MNDA."  *Id.*  As was the case with Trofy, disclosure to a factory that TNC understood to be bound by their MNDA with IDL as IDL's Representative does not strip this of trade secret status.

### 4. Evidence Regarding Other Measures TNC Undertook to Protect its Trade Secrets

Finally, TNC argues that it is entitled to trade secret protection because of other measures it took to protect the secrecy of its information.  TNC points to its extensive office building security measures, and the fact that "all sensitive development work, such as the work [TNC] did on the CloseDrier and Aramid Fiber Luggage Project, was further limited to just 2 rooms: (i) [Beyda's] locked private office and (ii) the product development office, which belonged to the 5 people who worked on innovative product development projects."  Dkt. No. 256 ¶ 70.  TNC's emails, electronic documents, and prototypes all were protected from theft from within.  *Id.*

---

[18] As noted above, Plaintiffs have withdrawn their misappropriation claims based on alleged Factory Trade Secrets 1 and 3.

However, the test for trade secret protection is not satisfied by evidence that the plaintiff wanted its information to remain secret or that it took measures to protect it against disclosure by those to whom it disclosed the information internally.  The plaintiff must also show that it also took measures to protect its information from those to whom it disclosed that information externally and that would make it difficult for a third party to obtain the information "except by use of improper means." *Telerate Sys.*, 689 F. Supp. at 232 (S.D.N.Y. 1988) (quoting *Q-Co*, 625 F. Supp. at 617) (internal quotation marks omitted).  It thus cannot be enough that Plaintiffs protected their physical premises from intruders who might use their access to steal Plaintiffs' information if they simultaneously voluntarily gave that same information to third parties who were at liberty to share that information with the world.

### C.  Defendants' Motion for Summary Judgment on Counts III–V for Plaintiffs' Failure to Establish Particularity and Concreteness

Defendants also move for summary judgment on Plaintiffs' Counts III–V for Plaintiffs' failure to describe their alleged trade secrets and ideas with particularity and concreteness. Defendants argue that Luggage Trade Secrets 1–4 and 9–10 and CloseDrier Trade Secret 3 are not reasonably particular and that Luggage Ideas (a), (c), and (d) are not concrete.  Dkt. No. 199 at 16.

In order to prevail on a claim of trade secret misappropriation under the DTSA and New York state common law, a plaintiff must "describe[] the alleged trade secret with adequate specificity to inform the defendants what it is alleged to have appropriated."  *Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008).  "Specificity is required at the moment of divulging [an alleged trade secret] so that the party to whom the secret is revealed understands the contours of the secret information and does not inadvertently or purposefully transgress its boundaries.  Similarly, specificity is required before the court so that

the defendant can defend himself adequately against claims of trade secret misappropriation and can divine the line between secret and non-secret information, and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation." *Id.*; *see also Next Commc'ns, Inc. v. Viber Media, Inc.*, 2017 WL 4402540, at *4 (S.D.N.Y. Sept. 30, 2017) ("In order to survive summary judgment . . . the plaintiff must describe the secrets with greater precision; 'vague and indefinite' illustrations will not suffice.") (internal citations and quotations omitted); *Big Vision*, 1 F. Supp. 3d at 257 (noting that the plaintiff must describe "its trade secret with sufficient particularity, both at the time of disclosure and throughout the litigation").

This requirement is essential to trade secret law. In the absence of any identification by the plaintiff of the specific information for which it claims trade secret protection, the plaintiff asserts nothing more than that it disclosed some sort of information to a defendant and that some of that information was entitled to protection.  The defendant has no way to know—short of guessing—exactly what information is claimed as a trade secret, and thus has no way of arguing that such information was publicly available or not entitled to trade secret protection.  Nor can the Court ensure that only true trade secrets obtain protection, rather than general information or information not developed by the plaintiff.  *See Big Vision*, 1 F. Supp. 3d at 257 ("The requirement of particularity exists for the simple reason that a defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon that trade secret and so that the defendant can defend itself . . . .").  In short, without this requirement, neither the Court at summary judgment nor the jury at trial would be able to distinguish information which is protectable as a trade secret from that which does not give rise to a claim of trade secret misappropriation, either because it is "vague and indefinite," *Heyman v. AR. Winarick*, 325 F.2d

584, 590 (2d Cir. 1963), or because it is "not particular enough to [be separate] from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade," *Dow Chem. Can., Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012) (cited in *Big Vision*, 1 F. Supp. 3d. at 258), or that does not give rise to a claim because it is not substantially similar to the information that has been used by the defendant.

Several of Plaintiffs' alleged Luggage Trade Secrets are too vague and indefinite to satisfy these standards. Luggage Trade Secrets 1–3 and 9 each encompass a broad range of allegedly protectable information with no concrete parameters to give that range meaning or definition. For example, Luggage Trade Secret 1 is: "Utilization of a relatively low percentage (less than approximately 10%) of aramid fibers in a fabric for luggage. A minimum specification to be sufficiently abrasion, tear and puncture resistant is 98.3% polyester and 1.7% aramid fiber." Plaintiffs concede that the use of aramid fibers themselves in fabric for luggage is not protectable as a trade secret. Dkt. No. 204 at 39. But Luggage Trade Secret 1 gives Plaintiffs' alleged trade secret little more concreteness or definition than the unprotectable concept of using aramid fibers in luggage itself. It covers a broad range of fibers from close to 0% to 10%, without any indication in the record that that range of 0% to 10% is at all meaningful. Although the Trade Secret, as defined by Plaintiffs, uses the qualifier "relatively low percentage," that language adds no greater specificity to the definition. It does not specify with respect to what comparator the fibers are to be "relatively low" and thus provides no concrete limit on the broad range of 0% to 10%. The language "sufficiently abrasion, tear and puncture resistant" is similarly unavailing; to the reader, there is no way to determine what it means to be "sufficiently abrasion, tear and puncture resistant." That is in the eye of the beholder. All it discloses is that the fabric is sufficiently abrasion, tear and puncture resistant to someone but to whom and based on what

measure is left entirely unclear and undefined, subject to change to meet the proof.  *See Big Vision*, 1 F. Supp. 3d. at 265.  Plaintiffs offer no logic for the range of 0% to 10%, save perhaps the expedient one that it would cover both the swatch provided by Plaintiffs to TNC and also the fabrics developed and sold by TNC, and thus—by definition, and perhaps by design—would eliminate the "substantial similarity" inquiry.  By proof that Plaintiffs had a trade secret somewhere in the range of 0% to 10%, they would—by definition—claim secrets at every point within that full range and thus eliminate any real inquiry whether the use by Defendants of a fabric within a percentage at the high end of that range was substantially similar.  On that logic, Plaintiffs could have claimed a trade secret of a range of 0% to 50% or 0% to 75%.  That might suffice if Plaintiffs claimed aramid fibers themselves as a trade secret but, in the absence of any such claim, the range gives the asserted trade secret no meaning and thus no definition.

The same can be said for alleged Luggage Trade Secret 2, which adds the qualifier "Oxford fabric weave" to the broad trade secret claimed in Luggage Trade Secret 1: "Utilization of relatively low percentage (less than approximately 10%) of aramid fibers in an Oxford fabric weave for luggage. A minimum specification to be sufficiently abrasion, tear and puncture resistant is 98.3% polyester and 1.7% aramid fiber."  As discussed in more detail *infra*, the qualifier "Oxford fabric weave," as used and defined by Plaintiffs, may be too vacuous, broad, and insufficiently concrete to warrant trade secret protection.  Moreover, it certainly does nothing to remedy the problem with Luggage Trade Secret 1; the claimed range of almost 0% to 10% is too broad and undefined to be protectable as a trade secret.

Luggage Trade Secrets 3 and 9 share the same defect, albeit on a different metric. Luggage Trade Secret 3 would define the trade secret by the maximum weave in the weft[19]— "For luggage with fabric that contains aramid fibers, weaving an aramid fiber in the weft at a maximum of approximately every ½ inches so that the resulting fabric is sufficiently abrasion, tear and puncture resistant." It thus claims a range of anywhere up to ½ inches. As with Luggage Trade Secrets 1 and 2, the qualifier "sufficiently abrasion, tear and puncture resistant" is itself not concrete and therefore does not help render Luggage Trade Secret 3 protectable. Luggage Trade Secret 9 would define the trade secret by the maximum weight—"For luggage with fabric that contains aramid fibers, utilizing a fabric that is a maximum of approximately 360 +/- 5% grams per square meter (GSM) before application of any coating." Anywhere up to that maximum is claimed. Plaintiffs fail to elucidate the meaning of the range and why the information that would be entitled to trade secret protection at one point in the broad range would also encompass and give trade secret protection to information at a different point in that range. The qualifier that the fabric be "a maximum of approximately 360 +/- 5% grams per square meter (GSM)" does not meaningfully define, limit, or add to the otherwise unprotectable notion of aramid in luggage; as such, it does not provide a meaningful way for the Court or a jury to determine whether the asserted trade secret was disclosed, is novel, or is substantially similar to Defendants' products. Because 360 GSM + 5% is 378 GSM, this alleged trade secret would cover every fabric weight from 0 to at least 378 GSM—an enormous range.

---

[19] Merriam-Webster offers the following technical definition for weft: "the threads that run from side to side on a loom or in a woven fabric." Merriam-Webster Online Dictionary, accessible at https://www.merriam-webster.com/dictionary/weft (accessed August 2, 2021). In contrast, warp is "a series of yarns extended lengthwise in a loom and crossed by the weft." Merriam-Webster Online Dictionary, accessible at https://www.merriam-webster.com/dictionary/warp (accessed August 2, 2021).

Luggage Trade Secrets 4 and 10 stand on different footing.  Each of those define the alleged trade secret not by a range but at a point within the larger range covered by the other trade secrets.  Luggage Trade Secret 4 is: "For luggage with fabric that contains aramid fibers, weaving an aramid fiber in the weft in an Oxford fabric weave at approximately every 1/2 inches so that the resulting fabric is sufficiently abrasion, tear and puncture resistant."  Luggage Trade Secret 10 is: "For luggage with fabric that contains aramid fibers, utilizing a fabric that is approximately 75 +/- 2 threads per inch in the warp and weft, and preferably with a 75 x 76 per inch thread count."  These definitions provide sufficient concreteness and specificity for the Court and Defendants to know what Plaintiffs are claiming and for Defendants to be able to defend against the claim.  Luggage Trade Secret 4 requires aramid fibers, weaved only in the weft, only in an Oxford fabric weave, only at approximately every ½ inch.  The weave can be a little bit greater than ½ inch or it can be a little bit less than ½ inch, but a jury presumably can discern (and, if not, the Court can discern) the difference between a weave that is ½ inch and would be encompassed by the trade secret and one that is ¼ inch or 1 inch that would not be covered.  Similarly, Luggage Trade Secret 10 requires a fabric containing aramid fibers, at approximately 75 +/- 2 threads per inch in the weft and the warp; although this is approximate, once again the jury—or the Court—has a basis upon which to distinguish between a fabric that would be covered and a fabric that would not be covered.

CloseDrier Trade Secret 3 is insufficiently concrete to be protectable as a trade secret.  It reads: "Design of a portable clothes drying product with a drying efficiency of at least about 0.58kg/hr."  Defendants' challenge to this trade secret is well-taken.  The range covered by this trade secret of everything from 0.58kg/hr to "infinity" is "enormous."  *Big Vision*, 1 F. Supp.3d at 265.  It places no discernible limits on what is claimed by Plaintiffs.  Nor, indeed, is "drying

efficiency" itself a trade secret.  Clothes dryers dry.  That is their essential function.  The

specification of a particular drying efficiency does not convey anything about how that

efficiency is to be obtained, but only that it is to be obtained.  It thus imparts nothing more of a

trade secret notion than saying a toaster oven that efficiently toasts.

Concreteness is also critical to a claim for misappropriation of ideas; concreteness is one

of the elements required to make an idea protectable property.  *See Pinterest*, 17 N.Y.S.3d at 692

("The complaint also states a claim . . . for misappropriation of ideas.  This cause of action

requires proof of two elements: (1) a legal relationship between the parties . . . ; and (2) an idea

that is novel and concrete.") (citing *Turner v. Temptu Inc.*, 586 F. App'x 718, 722 (2d Cir.

2014)); *see also Educ. Sales Programs, Inc. v. Dreyfus Corp.*, 317 N.Y.S.2d 840, 845 (N.Y. Sup.

Ct. 1970) ("Clearly [the idea] was quite malleable and not in such fixed and concrete form as to

indicate a protectible idea.").

Alleged Luggage Idea (a) is: "To make a fabric woven with aramid fibers for improved

abrasion, tear and puncture resistance for luggage type products."  Once again, the qualifier

"improved abrasion, tear and puncture resistance" adds no element of concreteness to the

otherwise unprotectable concept of using aramid in fabric.  The use of aramid fibers will make

the product more resistant to abrasions, tears, and punctures rather than less resistant.

Presumably, no one would add aramid fibers to luggage for purposes of making it less resistant

to tears.  But the assertion that aramid fibers will be used in quantities to make the luggage more

tear resistant says nothing more than that aramid fibers will be used.  It does not say what

quantity is necessary to make the luggage more resistant to abrasions, tears and punctures.

Alleged Luggage Idea (c) references the same range of "between approximately 1.7% and 10%

of aramid fibers" as Luggage Trade Secrets 1 and 2, and thus is similarly too broad and not

concrete.  In contrast, alleged Luggage Idea (d) references ███████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████    Here too, that definition is sufficiently concrete.

### D. The Parties' Motions for Summary Judgment on Counts III–V Regarding Whether the Asserted Trade Secrets and Ideas Are Generally Known and Not Novel

Defendants argue that they are entitled to summary judgment on Plaintiffs' trade secret and idea misappropriation claims because Plaintiffs' alleged trade secrets and ideas are generally known and not novel.  Of the trade secrets that Plaintiffs still assert under Counts III-V, Defendants argue that Luggage Trade Secrets 5, 7, and 9, CloseDrier Trade Secret 2, and Factory Trade Secret 2 are not protectable trade secrets for this reason; they also argue that Luggage Idea (a) is not novel.  In their cross-motion for summary judgment, Plaintiffs ask the Court to hold that the Luggage Trade Secrets and CloseDrier Trade Secrets are not generally known.[20]  They further seek summary judgment on their Luggage Ideas misappropriation claim, arguing, *inter alia*, that the Luggage Ideas are novel.

Under the DTSA, a trade secret must "derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B).  Under the New York common law of trade secrets, a trade secret must not be "publicly available and well-known in the industry."  *Sit-Up Ltd.*, 2008 WL 463884, at *12; *see also Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020).  Generally, "[t]he existence of a trade secret is a question of fact."  *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 237838, at *3 (S.D.N.Y. Feb 19, 2002) (quoting *Integrated Cash Mgmt.*

---

[20] In their response to that motion, Defendants argue only that that Luggage Trade Secrets 5, 7, 9, and 12, and CloseDrier Trade Secret 2 were well-known in the industry.

*Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)).  As such, where both parties have proffered evidence as to whether an alleged trade secret is well-known in the industry, a genuine issue of fact exists and summary judgment for either party is not warranted. *See, e.g.*, *Editions Play Bac, S.A. v. Western Publ'g Co., Inc.*, 1993 WL 541219, at *6 (S.D.N.Y. Dec. 28, 1993) ("The Court is not permitted on a motion for summary judgment to assess the weight or credibility of the evidence presented. Plaintiffs have submitted more than enough evidence, which when construed in the light most favorable to plaintiffs, establishes a genuine material issue of fact on the question of whether Play Bac's question-writing techniques were generally known in the industry."); *see also ScentSational Tech., LLC v. PepsiCo, Inc.*, 2017 WL 4403308, at *12 (S.D.N.Y. Oct. 2, 2017) (noting that, where "there exists a dispute between the Parties' experts on whether Plaintiff's trade secrets are generally known, . . . the limited evidence Plaintiff has proffered is sufficient to create genuine disputes of material fact").

Luggage Trade Secret 5 is: "For luggage with fabric that contains aramid fibers, weaving an aramid fiber only in the weft so that the aramid fiber is not visible from what will be the outside of the luggage."  Luggage Trade Secret 7 is: "For luggage with fabric that contains aramid fibers, weaving the aramid fiber in the fabric and using a backing on the fabric."  The relevant question with respect to each of these asserted trade secrets is whether, after stripping out the otherwise unprotectable notion of luggage with aramid, the remaining elements are generally known.  In Luggage Trade Secret 5, this element is the use of "aramid fiber *only in the weft*."[21]  The notion of "luggage with fabric that contains aramid fibers" is not protected.  In

---

[21] As Defendants point out, "so that" indicates that the aramid fiber not being visible from the outside of the luggage is "the result of this . . . fabric," not a separate element.  Dkt. No. 199 at 35.

Luggage Trade Secret 7, this is "using a *backing on the fabric*."  The notion of "weaving the

aramid fiber in the fabric" is not protected.

To support their argument that each of these alleged trade secrets are generally known,

Defendants point to a 1999 patent for "composite fabric, in particular for hand luggage or

clothes," which, when describing one layer of the composite fabric, notes that "[t]he warp

threads . . . may be different from the weft threads, the warp threads being of polyester, for

example, while the weft threads are of aramid."  Dkt. No. 202, Ex. CCC; Dkt. No. 199, at 35–36.

The same patent references "an inner flexible layer" of the composite fabric, "together with

waterproof lining," which Defendants compare to the "backing" in asserted Luggage Trade

Secret 7.  Dkt. No. 202, Ex. CCC; Dkt. No. 199, at 36.

The publication of an idea in an issued patent "destroys the trade secret because patents

are intended to be widely disclosed—that is the quid for the quo of the patentee's exclusive right

to make and sell the patented device." *BondPro Corp. v. Siemens Power Generation Inc.*, 463

F.3d 702, 706–07 (7th Cir. 2006); *see also Big Vision*, 1 F. Supp. 3d at 269 (citing *BondPro* for

this proposition).  This is equally true where the claim to trade secret protection is asserted by a

third party as it is when the claim is made by the patent holder herself.  The notion is that

publication of the patent provides notice and information to the world and makes the information

widely disclosed.  *See On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed.

Cir. 2004) ("After a patent has issued, the information contained within it is ordinarily regarded

as public and not subject to protection as a trade secret."); *Attia v. Google LLC*, 983 F.3d 420,

425–26 (9th Cir. 2020) (holding that Google's patent applications extinguished Attia's claims

under the DTSA because "it appears to us to be well-settled that publication of information in a

patent application eliminates any trade secrecy") (citing *Rototron Corp. v. Lake Short Burial*

*Vault Co.*, 712 F.2s 1214, 1215 (7th Cir. 1983), *aff'd* 113 F.3d 1258 (Fed. Cir. 1997) for the proposition that "the disclosure of a trade secret in a patent places the information comprising the secret into the public domain," and "once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished"). Loss of trade secret protection for the patent holders and others is not consideration that is exchanged by the patent holder in return for the issuance of the patent; it is a consequence of the issuance of the patent.

Those propositions defeat Plaintiffs' claim to trade secret protection in Luggage Trade Secret 5 and Luggage Trade Secret 7. The patent discloses a composite fabric for hand luggage in which only the weft thread would be of aramid. The warp threads would be different from the weft threads. This encompasses the allegedly unique element of Luggage Trade Secret 5—use of aramid fiber *only in the weft*—in context of woven fabric used for luggage. There is nothing novel in Trade Secret 5 that was not generally available through the 1999 patent. The 1999 patent also generally disclosed the idea of an "inner flexible layer" "with waterproof lining". This encompasses the allegedly unique aspect of Luggage Trade Secret 7—applying a *backing* to fabric with aramid, in the same context. Here, Defendants present evidence of a patent that covers the key elements of each of these asserted trade secrets—utilizing aramid fibers "only in the weft," as articulated in Trade Secret 5, and utilizing "a backing" on fabric woven with aramid fibers, as articulated in Trade Secret 7. Because patents covering alleged trade secrets renders them generally known as a matter of law, Luggage Trade Secrets 5 and 7 are generally known.

Luggage Trade Secret 9 is: "For luggage with fabric that contains aramid fibers, utilizing a fabric that is a maximum of approximately 360 +/- 5% grams per square meter (GSM) before application of any coating." Defendants argue that this, too, is generally known; to support their argument, they point to "[a] polyester aramid-blend having a weight of 170 GSM" that "was

70

offered for sale before the beginning of the Aramid-Fiber Luggage Project" and to "uncoated awning fabrics" which are "similar to luggage fabrics" and "weigh between 313.68 and 373.02 GSM." Dkt. No. 199 at 36. Plaintiffs dispute whether these examples are representative of the trade secret. Tellingly, with regard to the fabric with a weight of 170 GSM, they argue that "the evidence . . . does not show a GSM near 360, as required by Luggage Trade Secret 9." Dkt. No. 247 at 30. But the claimed trade secret does not refer to "a GSM *near* 360"; rather, it purports to cover any fabric "that is a *maximum* of approximately 360 +/- 5% grams per square meter." i.e., a range anywhere from 0 to at least 378 GSM. Having claimed that the secret is anything that is up to 378 GSM, Plaintiffs cannot argue that the trade secret covers the full range but not any particular point in the range. That notion would defeat the very point of the trade secret – that it covers not just the range (products are not made based on a range itself) but all points within the range. If Plaintiffs had wanted to claim as a trade secret fabric with a GSM near 360, it could have so claimed—although that might have created a challenge to Plaintiffs' proof of substantial similarity. What they cannot do is claim a broad range and then, when it turns out that points within that range are generally known, reverse course to avoid the "generally known" inquiry and argue that the trade secret is something far different.

CloseDrier Trade Secret 2 is: "Design of a portable clothes drying product with two extension poles centrally located on the opposing sides of the product, fabric indents for the extension poles, and a straight connection between the extension poles and sides of the top of the product (prior to issuance of the D399 Patent)." Defendants argue that this alleged trade secret is not novel, and merely entails adjusting the design of the original CloseDrier so that the poles are on the sides rather than on the back in order to correct a tipping problem with the original design. Dkt. No. 199 at 31. They highlight the testimony of Plaintiffs' expert that coming up with this

71

idea to solve that problem would take "probably 15 minutes."  Dkt. No. 201, Ex. QQ at 191:9–23 (cited in Dkt. No. 199 at 31).  Plaintiffs respond that this argument is flawed because it addresses "only the pole location and not the unique combination of elements."  Dkt. No. 247 at 25.  Furthermore, they point out that Jennifer McVeigh of IDL, who was in charge of the CloseDrier project, testified in connection with Global Homes' version of the CloseDrier that "I guess you could say that" "moving the poles to the sides" was "unique."  Dkt. No. 207, Ex. 48 at 216:24–217:4.  Defendants counter that Plaintiffs do not "dispute that the pole placement is not itself novel," but instead rely on the fact that "this alleged trade secret comprises a 'unique combination of all elements.'" Dkt. No. 316 at 21.  Defendants argue that these elements "are so intuitive that they would have been obvious to combine."  *Id* (citing Delman's Rebuttal Expert Report, Dkt. No. 201, Ex. Z at 77–80, wherein Delman argues that placing the poles on the sides was obvious but does not reference the combination of elements).  Plaintiffs are correct that "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectible secret."  *Integrated Cash Mgmt. Servs.*, 920 F.2d at 174 (quoting *Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1990)); *see also Dickerman Assocs., Inc. v. Tiverton Bottled Gas Co.*, 594 F. Supp. 30, 35 (D. Mass. 1984) ( "The particular combination of procedures used in plaintiff's [computer] system, and the particular features within the system . . . are neither obvious nor easily duplicated," and thus "constitute a trade secret.").  Defendants make no compelling argument that the *combination* of elements is "obvious" and "easily duplicated."  As noted above, where they assert this in their reply brief, they cite only to Delman's expert report, which addresses the obviousness of moving the poles to the sides but not the combination of

elements.  As in *Architectronics, Inc. v. Control Sys., Inc.*, Defendants' "submissions do not adequately address [Plaintiffs'] claim to trade secret protection in the *combination* of all the cited features," and therefore "do not permit summary judgment here."  *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 438 (S.D.N.Y. 1996).[22]

Factory Trade Secret 2, the only Factory Trade Secret Plaintiffs still assert under Counts III–IV, is: "█████████████████████. as a qualified factory in China for manufacturing small cleaning products, such as mops, buckets, and brushes."  Defendants argue that there is nothing novel or not generally known about this statement; they claim that █████ name and the fact that it manufactures small cleaning products including mops, buckets, and brushes is public knowledge that can be gleaned, for example, from basic internet searches.  Dkt. No. 199 at 28–29.  Plaintiffs argue this trade secret encompasses both "the factory identity" and "confirmation that the factory was 'qualified' by TNC for this specific purpose."  Dkt. No. 247 at 31.  They say that "find[ing] the factory that you want and know is qualified for specific products [is] challenging."  *Id.* at 32 (emphasis omitted).  And they emphasize that it was not public knowledge that "█████ manufactured the mop and was a qualified TNC factory."  *Id.*

*KT Group Ltd. v. NCR Corp.* addresses a similar question.  2018 WL 11213091, at *15 (S.D.N.Y. Sept. 29, 2018).  In *KT Group*, the plaintiffs asserted the identity of their manufacturer as a trade secret; the court found that this was not a trade secret because "it [was] undisputed that [Defendant] was aware of [the manufacturer] for many years, because [the manufacturer] had solicited [Defendant's] business," so the manufacturer's "identity as a manufacturer in the industry was not a secret, either as to [Defendant] or to the public at large."  *Id.*  The court also

---

[22] But here too, "[P]laintiff[s] still [have] the burden of proof on the trade secret claims," and "must show that there actually is some novelty in the way the [CloseDrier] combined known elements."  *Architectronics*, 935 F. Supp. at 438.

emphasized that "Plaintiff has not presented any evidence that it 'expended' a significant amount of money or effort in finding [the manufacturer], or that it took measures to keep [the manufacturer's] identify as its manufacturer secret." *Id.* (quoting *Faiveley*, 555 F.3d at 117).

Here, in contrast, there is no evidence that Defendants were aware of ███████ prior to hearing about it from TNC.  Indeed, Plaintiffs point to evidence indicating that Defendants were only aware of this factory and chose to use it because of TNC's disclosures.  Dkt. No. 247 at 32. Plaintiffs also offer Beyda's declaration as evidence of the "extensive investment in sourcing and vetting" to ascertain whether factories were "qualified."  *Id.* at 31 (citing Dkt. No. 256 ¶ 22). Beyda's declaration also indicates that TNC took measures to keep the identities of their factories secret "because [they] understood the value of [their] factory relationships."  Dkt. No. 256 ¶ 61.  Defendants do not offer evidence that contradicts any of these propositions.  Instead, they respond that the fact that ██████ was qualified by TNC and that ██████ manufactured the mop designed for IDL is irrelevant, as the asserted trade secret does not reference the knowledge that ██████ was qualified by or utilized specifically by TNC, but merely "that ██████ manufactures 'small cleaning products' in general" and "that ██████ was qualified in general." Dkt. No. 316 at 20 (emphasis omitted).

*Health Alliance Network, Inc. v. Continental Cas. Co* is also instructive.  354 F. Supp. 2d 411, 422 (S.D.N.Y. 2005).  There, the court considered, on cross-motions for summary judgment, whether an asserted trade secret covering "lists of network providers and discounts" was entitled to protection; Defendants argued that this information is publicly available.  The court reasoned:

> Although plaintiffs concede that all of the doctors' contact information may be widely available, they insist that the contact information is not the information for which they are seeking trade secret protection.  Rather, they insist, what is confidential is the doctors' willingness to participate in Plaintiffs' workers

> compensation network. Plaintiffs have pointed to testimony that it is more costly
> and difficult to recruit providers willing to treat workers compensation patients . . . .
> In light of this evidentiary record, Plaintiffs' fourth cause of action should not be
> dismissed.

*Id.* As discussed above, Plaintiffs point to evidence regarding the difficulty and expense of

identifying, vetting, and building relationships with qualified factories for specific purposes, and

assert that this information is what is confidential, not the names of the factories. As in *Health*

*Alliance*, this is sufficient to create a genuine dispute of material fact as to both what exactly the

asserted trade secret encompasses and whether this trade secret is generally known.

Regarding the Luggage Ideas, under the New York common law of idea

misappropriation, a protectable idea must be "novel." *Pinterest*, 17 N.Y.S.3d at 692; *LinkCo*,

230 F. Supp. 2d at 501; *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir.

2000). "The determination of whether an idea is original or novel depends upon several factors,

including, *inter alia*, the idea's specificity or generality (is it a generic concept or one of specific

application?), its commonality (how many people know of this idea?), its uniqueness (how

different is this idea from generally known ideas?), and its commercial availability (how

widespread is the idea's use in the industry?)." *Nadel*, 208 F.3d at 378. "[A] plaintiff may not

claim that an idea is novel if the idea was already in use in the industry at the time of plaintiff's

submission or if the defendant had already used that idea. The test for novelty is rather stringent,

the idea must show true invention and not a mere adaptation of existing knowledge." *Broughel*

*v. Battery Conservancy*, 2010 WL 1028171, at *4 (S.D.N.Y. Mar. 16, 2010); *see also AEB &*

*Assocs. Design Grp., Inc. v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994) ("[A] plaintiff

may not claim that an idea is original if it was already in use in the industry at the time of

submission."). "The question of whether an idea is sufficiently novel or original to merit

protection under New York Law is amenable to summary disposition," and "the plaintiff, who

bears the burden of coming forward with proof of novelty, cannot rest on mere assertions of

novelty and originality, but must instead demonstrate some basis in fact for those claims." *Paul*

*v. Haley*, 588 N.Y.S.2d 897, 903 (2nd Dep't 1992).

Luggage Idea (a) is: "To make a fabric woven with aramid fibers for improved abrasion,

tear and puncture resistance for luggage-type products." Defendants point to several patents that

involve the use of aramid in luggage-type products, including a 2001 patent that describes a

"lightweight, impenetrable, bag made of puncture resistant and/or tear resistant fabric," and later

specifically references the use of Kevlar to weave the fabric, Dkt. No. 202, Ex. UU, a patent for

"travel bags [that] are typically made of tough polymeric fiber or sheet goods, such as . . .

Kevlar," Dkt. No. 202, Ex. ZZ, and the patent described above, for "composite fabric, in

particular for hand luggage or clothes," in which "[t]he warp threads . . . may be different from

the weft threads, the warp threads being of polyester, for example, while the weft threads are of

aramid." Dkt. No. 202, Ex. CCC. Plaintiffs attempt to distinguish these examples from their

asserted idea, arguing that Luggage Idea (a) is "limited to the concept of a . . . blend that does not

use a high amount of para-aramid." But unlike Luggage Ideas (c) and (d), which explicitly

reference "having a minimal amount of aramid fiber," Luggage Idea (a) refers only to the use of

aramid fibers in luggage-type products generally. That idea is generally known and not novel.

Plaintiffs argue that to assess whether an idea is novel, each *Nadel* factor must be

"separately analyzed." Such an analysis indicates that Luggage Idea (a) is not novel. The first

*Nadel* factor is specificity; in their opposition to Defendants' motion for summary judgment,

Plaintiffs cite statements from their expert, Dr. Webster, that "a generic concept might be

'luggage with aramid,' which does not identify the material (soft vs. hard luggage), the location

of the aramid (in the entire fabric vs. in the specific areas) or any performance/technical

specifications." Dkt. No. 201-4 at 39.  Although Plaintiffs attempt to distinguish Luggage Idea (a) from the admittedly generic concept of "luggage with aramid," much of this logic has already been rejected above, in holding that Luggage Idea (a) is not sufficiently concrete.  The qualifier of "improved abrasion, tear and puncture resistance" is not a quantifiable or otherwise specific "performance/technical specification"; it is merely a well-known result of using aramid fibers. And Plaintiffs place far too much emphasis on the word choice "*with* aramid" as opposed to "*of* aramid," disregarding the fact that their expert testified that "luggage *with* aramid" is a generic concept.  Luggage Idea (a) adds nothing meaningful to that generic concept, and as such is itself overly generic.  The second *Nadel* factor looks at the commonality of the idea; in order to argue that the Luggage Ideas are not common, Plaintiffs point to the testimony of their expert that "each Idea was not common because aramid is not known to be abrasion resistant and thus using it in the way described in these Ideas 'would have been counter-intuitive.'" Dkt. No. 204 at 42. But the patents Defendants point to specifically reference abrasion, tear, and puncture resistance. *See, e.g.*, Dkt. No. 201, Ex. UU (referencing "puncture resistant and/or tear resistant fabric"). Rather, these patents indicate that the idea of using aramid to make fabric stronger and more abrasion, tear, and puncture resistant was common.  The third *Nadel* factor considers whether the idea is unique; as with commonality, Plaintiffs' argument that Luggage Idea (a) was unique rests largely on the unsupported proposition that the concept of using aramid to increase abrasion, tear, and puncture resistance was unique.  As with commonality, this argument is unpersuasive. Lastly, the fourth *Nadel* factor considers commercial availability.  Here, Plaintiffs argue that there was no "off-the-shelf" product like the "fabric woven with aramid" referenced in Luggage Idea (a).  Defendants counter by pointing to one example, which Plaintiffs argue is inadmissible. Even crediting Plaintiffs' arguments that this example is inadmissible and that there was no such

fabric available "off-the-shelf," a finding that no similar fabric woven with aramid was commercially available does not defeat the three previous factors.  Commercial availability connotes widespread use, and certainly would help indicate that the idea is not novel.  But specificity, commonality, and uniqueness consider the nature of the idea itself.  In the absence of some inherently novel concept that makes an idea marketable in the hands of the alleged owner of that idea, the fact that no other entity has devoted the resources to produce it cannot alone convert an idea that is generic, common, and not unique—but not executed upon—into a novel concept.  *Cf. Sit-Up Ltd.*, 2008 WL 463884, at *21 (applying the *Nadel* factors and holding that the first was dispositive).  Were it otherwise, the first mover in a marketplace would become the only mover in the marketplace entitled to idea misappropriation protection simply because it was first and not because it was inventive.  As such, Luggage Idea (a) is not novel.

### E.  The Parties' Motions for Summary Judgment on Counts III–V Regarding Use or Misappropriation of the Luggage Trade Secrets and Ideas

Defendants argue that they are entitled to summary judgment with respect to many of the alleged Luggage Trade Secrets and Ideas that remain in the case on the grounds that they did not use or misappropriate the secrets or ideas.  Specifically, they challenge Luggage Trade Secrets 1–4, 6, 8, 10–11, and 13–16, in addition to Luggage Ideas (a)–(d).  Dkt. No. 199 at 21.  The essence of Defendants' argument is that their TuffTech fabric used in their luggage does not resemble the fabric swatch created by Plaintiffs or the secrets or ideas reflected in their Luggage Trade Secrets and Ideas.  In their cross-motion, Plaintiffs move the Court to grant summary judgment with respect to the Luggage Ideas misappropriation claim and hold that the Luggage Trade Secrets were improperly used by Defendants.  Dkt. No. 204 at 1.

Misappropriation under New York law can be established "by showing that a defendant 'used the trade secrets in breach of an agreement' between the parties."  *Broker Genius, Inc. v.*

*Zalta*, 280 F. Supp. 3d 495, 512 (S.D.N.Y. 2017) (quoting *Pinterest*, 17 N.Y.S.3d at 691).  In

trade secret misappropriation cases where Defendants created products allegedly utilizing the

trade secrets, "copying can be establishing by showing that a defendant had 'access' to the

alleged trade secrets and that there is a 'substantial similarity' between the original product

which embodied those trade secrets and the alleged copy created by the defendant."  *Id.* at 512

(quoting *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, 1996 WL 531873, at *9 (S.D.N.Y. Sept. 19,

1996)).  Misappropriation can also be shown by unconsented disclosure of the trade secrets.  *See*

*Free Country*, 235 F. Supp. 3d at 565 ("[U]nder the DTSA, a party must show *an unconsented*

*disclosure or use* of a trade secret.") (quoting *Syntel Sterling Best Shores Mauritius Ltd. v.*

*Trizetto Grp., Inc.*, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016)); *see also id.* (drawing a

parallel between New York misappropriation law and the DTSA in this context, and highlighting

that under New York law, a party must demonstrate that "defendants used that trade secret *in*

*breach of an agreement*") (emphasis added).

Defendants make various arguments to support their contention that their TuffTech fabric

does not use the asserted trade secrets and ideas.  They argue that Luggage Trade Secrets 2, 4, 6,

and 8, as well as Luggage Ideas (b) and (c) all refer to "Oxford fabric weave," which

Defendants' fabric does not use; that Luggage Trade Secrets 1 and 2, as well as Luggage Ideas

(a) and (c) all refer to fabric with a ratio of 1.7% aramid fiber and 98.3% polyester, that despite

the fact that the asserted trade secrets and ideas purport to cover the entire range of "less than

approximately 10%," this was the only ratio ever disclosed to Defendants, and that Defendants'

fabric utilizes 6–7% aramid – not 1.7%; that Luggage Trade Secrets 3, 4, and 16, and Luggage

Idea (a) refer to one aramid fiber in the weft "approximately" every half inch, while Defendants'

fabric has one aramid fiber in the weft at every quarter inch; that alleged Luggage Trade Secret

10 requires a thread count of "approximately 75 +/- 2 threads per inch," while Defendants' fabric

falls outside of that range; that the testing data in Luggage Trade Secret 14 was never used, and

Plaintiffs have not carried their burden to demonstrate that it was; and that the methods in

Luggage Trade Secret 16 were not used, and Plaintiffs have not carried their burden to

demonstrate that they were.  Dkt. No. 199 at 21–26.

Plaintiffs respond that the meaning of "Oxford fabric weave" is at most a genuine dispute

of material fact.  Dkt. No. 247 at 45–46.  They argue that with respect to the differences in

percentage of aramid fiber, spacing of aramid fibers, and thread count, non-technical fabrics "do

not have the precision requirements of other fields," that their trade secrets are not limited to the

exact specifications they disclosed to Defendants, and that Defendants were able to "reduce[]

their costs by cutting TNC out of the deal and using TNC's idea of generic aramid," and

therefore "were able to build on these trade secrets and add more aramid into their final fabric."

*Id.* at 46.  They further argue—without any pointing to any meaningful evidence—that

Defendants improperly used TNC's testing details.  *Id.* at 47.

The question whether Defendants have misappropriated the trade secrets and ideas that

use the term "Oxford fabric weave," depends on what this term means, and is interrelated with

the question of whether the trade secrets that use this term are reasonably particular and the ideas

sufficiently concrete.  Defendants have proffered compelling evidence that "Oxford fabric

weave" traditionally refers to a very specific weave, with only minor variations, that Defendants'

TuffTech fabric undisputedly does not use.  Dkt. No. 199 at 21–23 (citing Dkt. No. 201, Ex. BB,

CC).  And Plaintiffs have not identified any evidence that suggests that the term "Oxford weave"

refers to the weave utilized in Defendants' TuffTech fabric.  Plaintiffs' expert argues that the

TuffTech fabric utilizes a "modified Oxford weave," but her report makes it clear that even this

is her own terminology.  Except in the expert's vernacular for this case, there is no such thing as a "modified Oxford weave"—the expert does not refer to any source that uses that term or any meaning that it has other than her claim that it covers Defendants' product.  She does not dispute that Defendants' weave pattern is nontraditional and unique.  *See* Dkt. No. 201, Ex. N ¶¶ 195, 199 ("TuffTech fabrics can be classified as a type of Oxford weave, *which I term* a modified Oxford weave," and "Dr. Adanur and I do agree that this weave is unique in its particular weave pattern.") (emphasis added).  At the same time, her report also states that Defendants' "TuffTech fabric uses an indistinguishable weave as the one in the TNC Swatches"  and that "the weave pattern and repeat of the TNC Swatch is indistinguishable from the wave repeat and pattern in the polyester TuffTech luggage fabrics [she has] reviewed, with the exception of color and spacing of the aramid fibers." *Id.* ¶¶ 148, 211; *see also id.* ¶¶ 191, 212–213.  She classifies the "weaves of both the TNC Swatch and the TuffTech samples as the same modified Oxford pattern." *Id.* ¶ 298.  Defendants do not affirmatively argue otherwise; rather, they rely on the argument that their weave is not an Oxford weave.  Dkt. No. 201, Ex. CC ¶¶ 113, 141–143.

The trade secrets and ideas that use the phrase "Oxford fabric weave" thus run into one of two problems: either they were not misappropriated, or they are insufficiently particular and concrete.  If the phrase "Oxford fabric weave" in these trade secrets and ideas means what it says, i.e. an Oxford fabric weave as that term is understood throughout the industry and not a modified Oxford weave, the term made up by Plaintiffs' expert, then the trade secrets and ideas are particular—but Defendants have not misappropriated them, because their fabric undisputedly does not use an Oxford weave.  If can be understood to encompasses the "modified Oxford weave" the expert claims that Defendants' fabric uses, there would be a genuine issue of fact whether the two fabrics are substantially similar, but the term "Oxford weave" would lose all

meaning.  Plaintiffs' definition of their trade secret—their claim as to what elements of their product are entitled to trade secret protection—would drop away, and all that would remain is the expert's opinion that the products are similar, regardless whether what makes them similar is generally known or was kept secret.  In other words, accepting Plaintiffs' argument would render the particularity requirement meaningless.  Confronted with a defendants' argument that its product does not incorporate the claimed trade secret, the plaintiff could always and at any time by mere assertion argue that the words it used to define its trade secret should be understood not to mean what they ordinarily are understood to mean but also to encompass anything that their expert later says is misappropriated.  Faced with such a moving target, a defendant would never be able to defend itself against a claim of trade secret misappropriation.[23]  In either case, these trade secrets and ideas—Luggage Trade Secrets 2, 4, 6, and 8, as well as Luggage Ideas (b) and (c)—cannot give rise to a successful claim of trade secret or idea misappropriation.

Plaintiffs' other arguments are without merit.  Above, the Court rejected the Luggage Trade Secrets that reference "a relatively low percentage (less than approximately 10%) of aramid fibers" as not sufficiently particular.  The Luggage Trade Secret appears to have been defined not to describe the bounds of the information provided but to meet the proof regarding

---

[23] This very case illustrates the point.  The term "modified Oxford weave" was introduced to the case in Plaintiffs' supplemental expert report filed on June 15, 2020.  Dkt. No. 201-12.  By that point, fact discovery—which had already been extended several times—was long since over, Dkt. No. 119 (setting December 6, 2019 as close of fact discovery), and Defendants had defended themselves against a claim that they had misappropriated an "Oxford fabric weave." If Plaintiffs had wanted to change the definition of the trade secret they claimed and alleged in their complaint, the proper means of doing so would have been to have moved to amend it— during discovery, at which point they would have been forced to give it definition and meaning and Defendants could have defended themselves against it.  By waiting until after fact discovery was closed and by attempting to do so through an expert's assertion in a supplemental brief rather than through an amended pleading, they have prejudiced the ability of the defendants to defend themselves.

the Defendants' use of aramid fibers.  Plaintiffs claim that Defendants' fabric falls within the

broad range of 0–10%, but that is only because the range seemingly was chosen to capture

Defendants' fabric and not to describe anything that meaningfully is confined to Plaintiffs'

secret.  Defendants' fabric undisputedly uses a far higher percentage of aramid fibers than the

only percentage actually disclosed by Plaintiffs.  The percentage of Plaintiffs' original product

was 1.7%; in contrast, Defendants' fabric undisputedly uses 6–7% aramid.  Dkt. No. 199 at 24

(citing both parties' experts).

Next, spacing of one fiber per quarter inch is not substantially similar to spacing of one

fiber per half inch.  Plaintiffs argue that this is because Defendants were able to build off of

Plaintiffs' ideas and work, and in doing so reduce costs such that they were able to utilize more

aramid.  But Plaintiffs have no evidence to prove that this is actually what happened.  This is the

precise function of the substantial similarity test: "In the context of trade secret misappropriation

cases—where it is well recognized that misuse can rarely be proved by convincing direct

evidence . . . copying can be established by showing that a defendant had access to the alleged

trade secrets and that there is a substantial similarity between the original product which

embodied those trade secrets and the alleged copy created by the defendant."  *Broker Genius*,

280 F. Supp. 3d at 512.  Here, Plaintiffs attempt to simultaneously prove misuse through this

comparative analysis while explaining away the *lack* of similarity by hypothesizing misuse,

without pointing to any evidence of that misuse.  The same arguments can be no more successful

with regard to the thread count trade secrets; there too, Defendants' fabric undisputedly does not

utilize anything within the range of thread counts specified in Plaintiffs' trade secrets or utilized

in Plaintiffs' fabric swatches, and as such cannot be deemed "substantially similar" to those.

Because Luggage Trade Secrets 14 and 15 relate not to characteristics of Plaintiffs'

product, but rather to testing information and methods that Plaintiffs assert Defendants used to

develop their luggage, Plaintiffs cannot simply point to substantial similarity to demonstrate

misuse—particularly where, as here, the final product alleged to be a copy is *not* substantially

similar in many respects.  Plaintiffs have not pointed to other evidence demonstrating that

Defendants actually used the testing details or methods of Luggage Trade Secrets 14 and 15 to

develop their TuffTech luggage.

Even if Defendants' fabric is not substantially similar to Plaintiffs' fabric, Plaintiffs could

still establish misappropriation if they demonstrate unconsented use or disclosure of their trade

secrets and ideas.  *See Medidata Sols., Inc. v. Veeva Sys. Inc.*, 2018 WL 6173349, at *4

(S.D.N.Y. Nov. 26, 2018) ("[T]he defendant misappropriates a trade secret [under the DTSA] (1)

when it acquires a trade secret by improper means, or (2) *discloses or uses* the trade secret

without consent.") (emphasis added); *see also Free Country*, 235 F. Supp. 3d at 565 (drawing a

parallel between New York misappropriation law and the DTSA in this context, and highlighting

that under New York law, a party must demonstrate that "defendants used that trade secret *in

breach of an agreement*"); *Broker Genius*, 280 F. Supp. at 510–11 (noting that "[o]ne of the

ways in which a plaintiff may establish that trade secrets were misappropriated under New York

law is by showing that a defendant used the trade secrets in breach of an agreement between the

parties," and holding that where evidence showed that defendant had distributed trade secrets in

violation of his contractual obligation not to "distribute" or "disseminate" it, "plaintiff is likely to

succeed in showing that [he] made use of the alleged trade secrets . . . by disclosing them to a

third party").

The parties' MNDA provides "Evaluation Material will be used by the Receiving Party solely for the purpose of evaluating the Transaction."  Dkt. No. 247, Ex. A.  It also requires the Receiving Party to keep Evaluation Material "strictly confidential . . . , except that Evaluation Material or any portion thereof may be disclosed to [Representatives] of the Receiving Party who need to know such Evaluation Material for the purpose of evaluating the Transaction and who agree to treat such Evaluation Material in accordance with the terms of this Agreement."  *Id.*

In Plaintiffs' 56.1 statement, they assert that "Ian Whiton, then IDL's Director of Quality Assurance, testified that on a December 2015 sourcing trip to China, he compared the characteristics of potential fabric samples to a TNC swatch."  Dkt. No. 248 ¶ 117.  Defendants admit in their counterstatement that he compared fabric samples to a swatch Defendants had received from TNC," but deny "that they compared any specific 'characteristics' of the sample or swatch."  Dkt. No.  251 ¶ 117.  Thus, with regard at least to Luggage Trade Secret 16, which claims the swatch, there is a genuine issue of fact as to whether Defendants misappropriated it by using it beyond the scope of what was permitted by the MNDA,[24] rendering summary judgment for either party unwarranted.

### F.  Defendants' Motion for Summary Judgment on Counts III–V on the Ground that They Acquired the Trade Secrets and Ideas Lawfully Under the MNDA's Residuals Clause

Finally, Defendants move for summary judgment on the grounds that they acquired and used each piece of information that is alleged to be a trade secret or idea lawfully under the Residuals Clause of the MNDA.  The argument lacks merit.  Section 11 of the MNDA provides:

> This Agreement shall not be construed to limit the Disclosing Party's, the Receiving Party's, or any of their respective Representatives' right to independently develop or acquire products, services, or technology without use of the other party's Evaluation Material.  <u>Further, the Receiving Party shall be free to use for any</u>

---

[24] As discussed *infra*, Defendants' arguments that tangible items cannot be "Evaluation Material" and that this use was permitted under the Residuals Clause of the MNDA are unavailing.

<u>purpose any residuals resulting from consideration of the Disclosing Party's Evaluation Material, provided that the Receiving Party shall not disclose the Disclosing Party's Evaluation Material except as expressly permitted pursuant to the terms of this Agreement.  The term 'residuals' means information in intangible form, which is retained in memory by persons who have had access to Evaluation Material, including ideas, concepts, known-how or techniques contained herein.</u>  Neither the Receiving Party nor any of its Representatives shall have any obligation to limit or restrict the assignment of such persons or to pay royalties for any work resulting from the use of residuals.  However, this paragraph shall not be deemed to grant to the Receiving Party a license under the Disclosing Party's copyrights or patents.

Dkt. No. 47, Ex. B.  The Court construes the MNDA applying familiar principles of New York contract law, which govern the interpretation of the MNDA pursuant to the agreement's choice of law provision.  *Id.* at § 13.  The Court interprets the agreement as a whole, applying plain meaning to all of its language, attempting to effectuate the commercial understanding of the parties, and avoiding interpretations that would render language surplusage or the promises contained in the agreement illusory.  *See Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) ("A reading of a contract should not render any portion meaningless.  Further, every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.") (internal citations and quotation marks omitted); *Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless."); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *Givati v. Air Techs., Inc.*, 906 N.Y.S.2d 196, 198 (2d Dep't 2013) (A "court should not read a contract so as to render any terms, phrase, or provision meaningless or superfluous."); *In re Leasing Consultants, Inc.*, 2 B.R.

165, 169 (Bankr. E.D.N.Y. 1980) ("It is axiomatic that a contract will not be construed so as to reject any words as surplusage if they reasonably can be given meaning.").

Applying those principles, the Court concludes that the Residuals Clause protects the Receiving Party from a claim of breach of contract or misappropriation for the use of information that an employee of the Receiving Party previously received in connection with the consideration of a transaction under the MNDA and that such employee still has in his or her memory. It does not permit an employee of the Receiving Party to access the Disclosing Party's Evaluation Material for the purpose of refreshing his or her recollection in connection with a transaction other than one contemplated by the MNDA—i.e., a transaction with a party other than the Disclosing Party—and then to use that refreshed recollection either to develop its own products or to retain a vendor to develop products for it.

The Court reaches that conclusion for several reasons. First, under the plain language of Section 11 itself, the only material derived from Evaluation Material that is protected for "use for any purpose" is that information which is characterized as "residuals" and which is "in intangible form . . . retained in memory by persons who have had access to Evaluation Material." The Court must give meaning to each of those terms. "Residual" means "[a] leftover quantity; a remainder." *Residual*, Black's Law Dictionary (11th ed. 2019). It connotes something that is left over after the Evaluation Material is used for its primary purpose. Next, the information must be in "intangible form." It cannot be in tangible, material form. Finally, and importantly, the residuals must be both "retained in memory" and retained in memory "by persons who *have had* access to Evaluation Material." Each of those words is telling. The "intangible" information that is protected for use "for any purpose" is only that which is left over in the memory of a person who—in the past—had access to the Evaluation Material for the purpose for

which it was intended and who, after that access, still retains information, ideas, concepts, know-how, or techniques from that Material in his or her memory.

That interpretation is consistent with the MNDA as a whole.  The MNDA balances two competing interests.  First, as reflected in its prefatory paragraph, the MNDA is intended to promote "the mutual business purpose of a possible transaction involving IDL and [TNC]," by recognizing that each side may have to disclose to the other side information which it believes is confidential and by permitting it to transmit such information secure in the knowledge that the information will be used "solely for the purpose of evaluating the Transaction."  Dkt. No. 47, Ex. B.  Second, the MNDA recognizes that each of the parties to the Agreement "may currently or in the future be developing information, knowledge or technology internally, or obtaining information, knowledge or technology from other persons, that may be similar to information, knowledge or technology contained or reflected in the Disclosing Party's Evaluation Material," and permits them to do so free from any covenant not to compete and with limited relief from the risk that by agreeing to receive Evaluation Material they will be subjecting themselves to a lawsuit for the development of a competitive product.  *Id.*  The Residuals Clause is best understood as the parties' mechanism to balance those competing interests.  It permits the Disclosing Party to share Evaluation Material secure in the knowledge that the Evaluation Material will be used only to consider a potential transaction, while at the same time permitting the Receiving Party to receive the information secure in the knowledge that if it decides not to pursue the transaction, it will be permitted to develop competitive products without fear that its development of those competitive products will be challenged on the basis that the employee engaged in the development had access to Evaluation Material and retained the information he or she learned in memory.

Moreover, any contrary conclusion would render much, if not all, of the MNDA illusory. The thrust of the MNDA is in its first paragraph: "Evaluation Material will be used by the Receiving Party solely for the purpose of evaluating the Transaction."  Dkt. No. 47, Ex. B, § 1. This language reflects the parties' agreement and mutual understanding that the Receiving Party will not take Evaluation Material—whether tangible or intangible—and use that material for its own competitive purposes.  If the Receiving Party could take information it previously received in connection with the consideration of a transaction and then use that information to refresh its recollection and engage in a transaction with another party after it decided not to engage in a transaction contemplated by the MNDA, the purpose of the MNDA would be defeated.  A party could misappropriate another's trade secrets and confidential information by the expedient of taking it for the ostensible purpose of considering a transaction and then, after rejecting that transaction, using it for any purpose it desired without consideration of the limiting language of the MNDA.

The foregoing interpretation answers Defendants' argument.  That argument is predicated on the notion that "[m]any of Plaintiffs' alleged trade secrets and ideas are residuals because they are basic facts, such as factory names, or visible or easily remembered features of clothes-drying or luggage products, such as the use of two poles on a clothes drying product or the use of backing on a luggage fabric."  Dkt. No. 316 at 24.  From that premise, Defendants argue that "[t]he only reasonable inference is that these facts and features were retained in memory."  *Id.*  In so arguing, Defendants read important language out of the MNDA, in violation of basic contract principles.  The qualification of Information as a "residual" under the MNDA does not turn on the quality of that information and whether it is "basic" or "easily remembered."  "[I]deas" and "concepts" may form part of Evaluation Material under the MNDA; sometimes the most

original, innovative, and valuable idea may be sufficiently novel that it is difficult to put out of one's mind.  That does not make it a residual.  Rather, whether the use of information is permitted under the Residual Clause protected turns on a factual question: Was the use of the Evaluation Material based solely on information that remained in the memory of the employee as a vestige of his or her receipt of it in connection with the consideration of a transaction under the MNDA?  Defendants offer no evidence that their use of TNC's Evaluation Material was based solely on information retained in the memory of employees who viewed that information in connection with considering a transaction with TNC.  To the contrary, Plaintiffs offer evidence of Defendants consulting the actual Evaluation Material and not just their memory in connection with transactions with other vendors.  That alone defeats Defendants' summary judgment argument.

Finally, Defendants receive no succor from their argument that the MNDA does not add the qualifier "unaided" to the reference to "retained in memory" such that the term residuals would be defined to be information in intangible form "retained in unaided memory by persons who have had access to Evaluation Material."  Dkt. No. 316 at 25.  Defendants argue that the absence of a reference to "unaided" memory—which is used in contracts of companies other than TNC and IDL—should be construed to reflect the positive agreement of both TNC and IDL that residuals can include information contained in the mind of a Receiving Party employee as a result of his or her consulting Evaluation Material (even in tangible form) to refresh recollection. That argument reflects a misunderstanding of principles of contract interpretation.  A court can infer that the decision of two parties to omit from one provision of a contract qualifying language (such as "material" or "willful") that they include in another was knowing and reflects the parties' intent that the former provision be unqualified.  But there is no principle of contract law

that permits a court to infer from the omission of language contained in other unrelated agreements among other unrelated persons that the parties to the agreement before the Court did not intend to accomplish the identical goal achieved by the language, albeit by other means. Such is the case here.  The MNDA refers to "retained in memory."  It does not refer to information in memory or in memory as refreshed.  The implication is plain.  The information must remain in memory from its use in connection with consideration of a transaction and not as refreshed by a more current review of the Evaluation Material.

III.    **Defendants' Motion for Summary Judgment on Counts VI–VIII for Quantum Meruit, Unjust Enrichment, and Unfair Competition**

Defendants also move for summary judgment on Plaintiffs' Counts VI–VIII (the "Equitable Claims").  Count VI alleges a claim for quantum meruit.  Count VII alleges a claim for unjust enrichment.  Count VIII alleges a claim for unfair competition.  In each count, Plaintiffs allege that they dedicated "time, labor, skill, expenditures, research and development, and capital" to the CloseDrier Project, the AFL Project, and relationships with factories, and that Defendants improperly "benefit[ed]" from Plaintiffs' alleged efforts through the sale of CloseDrier and AFL products.  Dkt. No. 47 ¶¶ 205, 209, 212, 217, 220, 229.  Defendants argue that the claims for quantum meruit and unjust enrichment are duplicative of one another— "quantum meruit and unjust enrichment are not separate causes of action." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).  Defendants also argue that each of the three counts duplicate the claim for misappropriation of trade secrets and that, if the claim for misappropriation of trade secrets fails, so too must Counts VI through VIII fail.  Dkt. No. 199 at 50–51.

Plaintiffs offer four responses: (1) these arguments "were already fully litigated in Defendants' Motion to Dismiss, and . . . should not be reprised here"; (2) submission of the

Equitable Claims to the jury is appropriate because Defendants deny the validity of certain

contracts such as the Bundling Agreement, the Water Filter Agreement, the CloseDrier

Agreement, the AFL Project Agreement, and the Factory Agreement; (3) information that does

not qualify as a protectible trade secret and is not Evaluation Material can still be protectable

under the law of unfair competition, *see LinkCo*, 230 F. Supp. 2d at 500–02; and (4) the

Equitable Claims are not limited to the subject matter of the trade secrets because they cover

other information and TNC's labor and expenditures, such as providing advertising slogans and

taglines and suggesting using generic aramid.  Dkt. No. 247 at 60–61.

First, the Court's denial of these arguments at the motion to dismiss stage was based on

the pleadings and because it believed that "there remains a factual dispute as to the existence of

valid contracts governing some of the subject matter of the unjust enrichment and quantum

meruit claims."  Dkt. No. 126, at 22.  The case is now in a significantly different procedural

posture; the Court now has before it the MTC and MNDA as well as undisputed facts regarding

Defendants' alleged misuse of Plaintiffs' information.  *See Nobel Ins. Co. v. City of New York*,

2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("The law of the case doctrine . . . does not

preclude this Court from reconsidering issues on summary judgment that have initially been

raised in the context of a motion to dismiss."); *Golden Pac. Bancorp. v. FDIC*, 2003 WL

21496842, at *5 n.14 (S.D.N.Y. June 27, 2003) (noting that a decision on a motion to dismiss

does not dictate the law of the case on a subsequent motion for summary judgment after

discovery).  The undisputed facts at this stage demonstrate that Plaintiffs' Equitable Claims fall

within the scope of the subject of the MTC and MNDA.

"Unjust enrichment claims are available 'only in unusual situations when, though the

defendant has not breached a contract nor committed a recognized tort, circumstances create an

equitable obligation running from the defendant to the plaintiff,' such as when 'the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.'" *In re Columbia Tuition Refund Action*, 2021 WL 790638, at *9 (S.D.N.Y. Feb. 26, 2021) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)).  Existence of a valid contract precludes a claim for unjust enrichment.  *See Aniero Concrete Co. v. N.Y.C. Constr. Auth.*, 308 F. Supp. 2d 164, 179 (S.D.N.Y. 2003) (holding that a claim for unjust enrichment is a "non-contractual, equitable remed[y] that [is] inapplicable if there is an enforceable contract governing the subject matter") (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997)); *Valley Juice Ltd., Inc. v. Evian Waters of Fr., Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (holding that the existence of an enforceable contract governing a particular subject matter "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter").  "Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) (plaintiff could not use unjust enrichment claim to recover fee paid because it arose from services governed by engagement letter); *see also Quintanilla v. WW Int'l, Inc.*, 2021 WL 2077935, at *14 (S.D.N.Y. May 24, 2021) ("Under New York law, a plaintiff may not recover under quasi-contract claims such as unjust enrichment or money had and received where an enforceable contract governs the same subject matter").

There is no genuine dispute that two separate sets of valid contracts exist between Plaintiffs and Defendants addressing the subject matter of the relationship between the parties. The MTC set forth the terms and conditions under which IDL would purchase "all goods" from TNC.  It, and the documents referred to in it, constitute "the entire agreement" between IDL and

TNC.  Dkt. No. 201, Ex. F ¶ 11.  The MTC clearly establishes that "[a]ny communications

between [TNC] and IDL, whether verbal, written, or otherwise (including, but not limited to, in-

person or telephonic meetings, letters, e-mails, text messages and any other form of

communication), which are not evidenced by a validly issued PO," are understood not to create

"a binding commitment on either party."  *Id.*  The MNDA is the agreement that addresses

disclosure of information between TNC and IDL for the purpose of developing products.  It

specifies what information is confidential and what is not, and the limits on how each party can

use confidential information.

      The parties dispute whether, under the MTC or the MNDA, binding obligations were

created that Defendants violated.  Plaintiffs argue that there were understandings reached

between the parties with respect to, for example, the bundled project that were enforceable under

the MTC; Defendants dispute that.  But no party disputes that the MTC and MNDA were

themselves enforceable agreements supported by consideration.  If Plaintiffs cannot recover

under them, that is because the written terms of the agreements reflect the understanding that

Plaintiffs should not recover.  Plaintiffs cannot circumvent those written terms by relying on the

theory of unjust enrichment.  *See UETA Latinamerica, Inc. v. Zafir*, 10 N.Y.S.3d 566, 568 (2d

Dep't 2015) (claim for unjust enrichment "only applies in the absence of an express agreement,

and is not really a contract at all, but rather an equitable obligation imposed in order to prevent a

party's unjust enrichment"); *Christian Broad. Network, Inc. v. Busch*, 2006 WL 2850624, at *8

(E.D. Va. Oct. 3, 2006) ("Unjust enrichment claims arise 'when there is no contractual

relationship.'") (quoting *Aerotek, Inc. v. Tyonek Native Corp.*, 2005 WL 3372872, at *3 (E.D.

Va. Dec. 8, 2005)); *see also Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4

(S.D.N.Y. 2004) ("If a valid, enforceable contract existed between the parties, then [plaintiff]

cannot recover under a theory of unjust enrichment. However, if no valid contract was in place regarding the sale of the goods, [plaintiff] has failed to state a claim for relief under the theory of unjust enrichment because, absent a contract, the benefit that [defendant] garnered from selling the merchandise was not at [plaintiff]'s expense.").

Plaintiffs argue that the MNDA and the law of trade secrets does not define the limit of their protection against the use by Defendants of Plaintiffs' information. Plaintiffs claim that they enjoy protection from the law of unfair competition against the use by Defendants of their ideas and information even if those ideas and information are not protectible trade secrets or ideas under New York law and do not constitute Evaluation Material under the MNDA. They rely on the District Court decision in *LinkCo*. There, the court held that the plaintiff presented a triable claim of unfair competition where the defendant misappropriated its information in bad faith and used it for its own benefit, where that information "did not fall within either trade secret or idea misappropriation." *Id.* at 501. The court found that the plaintiff had a property right in the information, because it had invested its "labor, skill, expenditure, name and reputation" in it, *id.* at 502 (quoting *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492 (N.Y. Sup. Ct. 1950) (internal quotation marks omitted)), and ruled that the law of unfair competition "proscribes all forms of commercial immorality, the confines of which are marked only by the 'conscience, justice and equity of common-law judges,'" *id.* at 501 (quoting *Demetriades v. Kaufmann*, 698 F. Supp. 521, 525 (S.D.N.Y. 1988)).

Neither *LinkCo* nor the New York law of unfair competition extends here to protect against Defendants' use of information that is not protected by the MNDA or the law of trade secrets. "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another" through "some element of bad

faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980); *see also*

*Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) ("The essence of an

unfair competition claim under New York law is that the defendant misappropriated the fruit of

plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through

fraud or deception, or an abuse of a fiduciary or confidential relationship."). *LinkCo* based its

analysis on *Demetriades* and *Robotic Vision Sys., Inc. v. General Scanning, Inc.*, 1997 WL

1068696, at *6 (E.D.N.Y. 1997). In the latter, the court held that a claim of unfair competition

was stated when the defendant procured the plaintiff's confidential bidding strategy by fraud and

then used that information to compete against the plaintiff. The court concluded that because the

defendant misappropriated the information by "fraudulently inducing" the plaintiff to part with it

and then used the information for its own benefit, a claim for unfair competition was stated under

New York law. *Id.* at *6. In the former, the court held that plaintiffs had made out a claim to a

property interest in the interior features of a house plaintiffs had designed, and that the defendant

had misappropriated that property by taking photographs of the features without permission and

then using the photographs for their own benefit. *Demetriades*, 698 F. Supp. at 527. In so

holding, however, the court expressed caution at "expanding a doctrine that already has grown to

formidable proportions." *Id.* at 526. Plaintiffs possessed a property right in the designs until the

time title passed to the home and they lost the "ability to control who is invited into the house,

who sees its features, and who takes note of pertinent designs with an eye toward copying"; once

title passed, "property rights are forfeited." *Id.* at 527. "To hold otherwise would be to award

residential developers a quasi-patent or copyright in the home's features, a back-door result via

the law of unfair competition we previously characterized as both pernicious and mischievous."

*Id.*

*Demetriades* demonstrates why Plaintiffs cannot pursue an independent claim of unfair competition here.  Plaintiffs do not present any facts creating a triable issue that defendants engaged in trademark infringement, trade name infringement, palming off, or false labeling or advertising.  *See LinkCo*, 230 F. Supp. 2d at 500 (identifying forms of unfair competition other than trade secrets and misappropriation).  Nor do they argue or identify facts that would support a finding that Defendants obtained their information by fraud or by any "illicit means" or "fraudulently inducing" Plaintiffs to part with it.  *Demetriades*, 698 F. Supp. at 527; *Robotic Vision Sys.*, 1997 WL 1068696, at *6.  Defendants were given Plaintiffs' information by Plaintiffs openly during the course of their relationship.  If, nonetheless, that information constituted Evaluation Material or trade secrets, and was used by Defendants beyond the scope permitted by the MNDA, then Defendants may be liable for breach of contract and for misappropriation of a trade secret.  What Plaintiffs may not do, however, is use the law of unfair competition to expand the restrictions on Defendants beyond what they and Defendants agreed at the time of contracting and to hold Defendants liable in unfair competition for what would not be wrongful under the MNDA or the law of trade secrets.   "New York law in this area is indeed flexible, but it is not that flexible."  *Saratoga Vichy*, 625 F.2d at 1044.

## IV. Defendants' Motion for Summary Judgment on Plaintiffs' Contract and Tortious Interference Claims

Defendants move for summary judgment on Count IX alleging breach of the MNDA as well as breach of various purported contracts regarding bundled pricing, water filters, the CloseDrier project, the AFL project, and factory information, as well as on Count X alleging tortious interference against HSN.  Plaintiffs have subsequently dropped their tortious interference claims.  Dkt. No. 247 at 1.

The alleged breaches of contract include (1) breaches of various alleged contracts, including a Water Filter Contract, a Bundled Pricing Contract, a CloseDrier Contract, an Aramid-Fiber Luggage Contract, and a Factory Contract, and (2) using and disclosing Plaintiffs' Evaluation Material with respect to the CloseDrier and AFL Projects and factories in violation of the MNDA.

Plaintiffs' allegations implicate both the MTC and the MNDA, the first of which is governed by Florida law and the second of which is governed by New York law.  The elements of a claim of breach of contract, however, are substantially identical under both bodies of law.  In Florida, "[t]o state a valid cause of action for breach of contract, a plaintiff must establish three elements: '(1) a valid contract; (2) a material breach; and (3) damages.'"  *Everglades Ecolodge at Big Cypress, LLC v. Seminole Tribe of Fla.*, 836 F. Supp. 2d 1296, 1302 (S.D. Fla. 2011) (quoting *Beck v. Lazard Freres & Co.*, 175 F.3d 913, 914 (11th Cir. 1999)).  Under New York law, "there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

### A.  Alleged Breaches of the MTC

Defendants have demonstrated the absence of a genuine issue of fact with respect to the claims that they were obligated to purchase Plaintiffs' water filters and the "bundled" products and thus are entitled to summary judgment on those allegations.  As noted above, the MTC committed Defendants to purchase Goods from TNC only if a purchase order was issued through an authorized agent of IDL.  Dkt. No. 201, Ex. F ¶ 11 ("[TNC] acknowledge[s] that a duly issued PO by an authorized agent of IDL is the only binding evidence of a commitment to purchase

Goods as between [TNC] and IDL.").  Until that time, the costs and risks for product

development remained with TNC.  The MTC explicitly provides "[a]ny costs incurred by either

party . . . prior to the receipt and acceptance of a PO will be at the incurring party's risk, and IDL

shall have no obligation to pay for any unavoidable, out-of-pocket costs incurred by [TNC]."  *Id.*

It is undisputed that IDL did not issue a purchase order in connection with the collapsible

water filter products and replacement filters.  Plaintiffs' evidence of the alleged Water Filter

Contract consists of a set of documents where the number of units Defendants would purchase

ranged from 200,000 to 250,000 units, which do not reflect any ultimate agreement on quantity.

Dkt. No. 248 ¶ 78; Dkt. No. 201, Exs. LLL, MMM.  There also is no genuine dispute that no

purchase order was submitted for the so-called "bundled" products.  Beyda did not respond to

Miranne's email.

Plaintiffs' response is unavailing.  First, Plaintiffs rely on what they claim is a "course of

conduct" pursuant to which Plaintiffs would occasionally begin to manufacture or deliver

product without a purchase order and IDL would pay even though there was no prior purchase

order.[25]  They thus claim that the absence of a purchase order is not fatal to their claim for breach

of contract related to the water filters and the bundled products.  For example, Plaintiffs argue

that Defendants were bound to purchase water filters because of what they contend is a "course

of conduct" that resulted in "a separate agreement for sale of Water Filter products."  Dkt. No.

248 ¶ 78.  TNC relies on a "timeline" and a set of correspondence rather than a PO to assert that

Defendants had an obligation with respect to the bunded products.  Dkt. No. 28 ¶ 77.

---

[25] Plaintiffs' argument that such a "course of conduct" exists is overstated.  Plaintiffs point only
to two instances of such interactions, which do not represent any consistent course of dealing.
*See* Dkt. No. 247 at 13.

Plaintiffs' argument, however, runs headlong into both legal and factual obstacles.  The

MTC contained an integration clause.  That clause provided in part:

> 11.   ENTIRE  AGREEMENT;  AMENDMENT;  MISCELLANEOUS.   These
> T&Cs, the POs), and any other documents referred to herein or in the PO(s)
> constitute the entire agreement (collectively, the 'Agreement') between You and
> IDL.   The Agreement will be effective for all POs issued by IDL, and You
> acknowledge that a duly issued PO by an authorized agent of IDL is the only
> binding evidence of a commitment to purchase Goods as between You and IDL.
> Any communications between You and IDL, whether verbal, written, or otherwise
> (including, but not limited to, in-person or telephonic meetings, letters, e-mails, text
> messages and any other form of communication), which are not evidenced by a
> validly issued PO shall be considered only in-progress negotiation of terms of
> purchases and shall not be construed as a binding commitment on either party. …
> No waiver by IDL of any term of condition contained in the Agreement will
> constitute a waiver of any other term or condition of the Agreement, or a waiver of
> the same or any other term or condition with regard to subsequent events or
> circumstances."

Dkt. No. 201, Ex. F ¶ 11.

Under Florida law, which is applicable here, "[t]he purpose of a merger clause is 'to

affirm the parties' intent to have the parol evidence rule applied to their contracts.'"  *Duval*

*Motors Co. v. Rogers*, 73 So. 3d 261, 265 (Fla. Dist. Ct. App. 2011) (quoting *Centennial Mortg.,*

*Inc. v. SG/SC, Ltd.*, 772 So. 2d 564, 565 (Fla. Dist. Ct. App. 2000)).  The parol evidence rule

excludes all evidence "extrinsic to a fully integrated contract."  *Id.*  It "prevents the terms of a

valid written contract . . . from being varied 'by a verbal agreement or other extrinsic evidence

where such agreement was made before or at the time of the instrument in question.'"  *Farrey's*

*Wholesale Hardware Co. v. Coltin Elec. Servs., LLC*, 263 So. 3d 168, 176 (Fla. Dist. Ct. App.

2018) (quoting *J. M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 485 (Fla.

1957)).

Although a merger clause's existence "does not *per se* establish that the integration of the

agreement is total," it is "a highly persuasive statement that the parties intended the agreement to

be totally integrated and generally works to prevent a party from introducing parol evidence to

vary or contradict the written terms." *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. Dist. Ct. App. 2005); *see also Env't Servs. v. Carter*, 9 So. 3d 1258, 1265 (Fla. Dist. Ct. App. 2009) (citing the same proposition from *Jenkins*, 913 So. 2d at 53, and finding that because a non-compete clause was "clear and complete," a merger clause precluded consideration of other documents to vary the terms of the agreement); *United States ex rel. GLF Constr. Corp. v. Fedcon Joint Venture*, 2019 WL 5295329, at *53 (M.D. Fla. Oct. 18, 2019) (citing *Jenkins* for the same proposition and finding merger clauses in subcontract agreements as highly persuasive for the parties' intent the agreement be totally integrated, then declining to rely on evidence such as pre-contractual conversations to interpret the agreements).  Thus, while "[i]t is true that Florida law 'has clearly established that a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification,'" *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1340 (S.D. Fla. 2004) (quoting *Beach Higher Power Corp. v. Granados*, 717 So. 2d 563, 565 (Fla. Dist. Ct. App. 1998)), "when a course of dealing and the terms of the contract appear to conflict, the parties' practice and the written agreement must be construed as consistent with each other if it is reasonable to do so.  If no reasonable consistent construction can be drawn, however, *the express terms of the agreement must control*." *Id.* (emphasis added) (citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1096 (Fla. Dist. Ct. App. 1999)).

Plaintiffs cannot rely on email correspondence to create an agreement by IDL to purchase product in the absence of a validly issued purchase order from IDL for the same reason that TNC would not be obligated to manufacture or sell product in the absence of such a purchase order. The MTC clearly and unambiguously provides that only a validly issued purchase order creates such obligations.  Any communications which were not evidenced by a validly issued purchase

order were to be considered by the parties "only in-progress negotiation of the terms of purchase." Dkt. No. 204, Ex. F ¶ 11. The fact that TNC may have offered product to IDL without a purchase order on isolated occasions in the past and IDL may have paid for such product would not help IDL here. Even if IDL had a right not to pay for such product (and thus not to accept delivery of it) without a purchase order, the Agreement clearly and unambiguously provides that "[n]o waiver by IDL of any term or condition contained in the Agreement will constitute . . . a waiver of the same or any other term or condition with regard to subsequent events or circumstances." *Id.*; *see also Dunkin' Donuts Franchised Restaurants LLC v. KEV Enters., Inc.*, 634 F. Supp. 2d 1324, 1334 (M.D. Fla. 2009) (noting a virtually identical contract term and holding that because of this term, inter alia, "acceptance of late payments from Defendants does not establish Plaintiffs' waiver").

Moreover, as a factual matter, even if email correspondence between the parties could create a binding obligation in the face of the integration clause of the MTC, it could do so only if that email correspondence reflected an agreement between the parties on all of the material terms of a transaction. In the absence of agreement on material terms, there is no contract. *Prince of Peace Enters., Inc. v. Top Quality Food Market, LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) ("Mutual assent requires . . . 'a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract.' Indeed, '[i]f the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract.'") (quoting *Benicorp Inc. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006)). "The essential terms of a contract for the sale of goods are 'quantity, price, and time and manner of delivery.'" *Green v. McClendon*, 2010 WL 3701333, at *5 (S.D.N.Y. Sept. 20, 2010) (quoting *Lomaglio Assocs. Inc.*

*v. LBK Mktg. Corp.*, 1999 WL 705208, at \*6 (S.D.N.Y. Sept. 10, 1999)); *see also Judal Indus., Inc. v. Welsbach Elec. Corp.*, 526 N.Y.S.2d 154, 156 (2d Dep't 1988) ("In a contract for the sale of goods, the essential terms are quantity, price, and time and manner of delivery.").

The email correspondence between the parties on the bundled goods reflects no such agreement on all of the material terms.  Plaintiffs argue that the email correspondence at Dkt. No. 252, Exs. 187–196 demonstrates a March 16, 2015 final agreement reached on specific terms.  Dkt. No. 247 at 10–12.  However, Exhibit 194 indicates that on March 16, IDL sought confirmation that "we are good to go asap" on a list including new modifications to the prices and quantities that TNC had proposed, that IDL subsequently followed up later that day asking that Beyda of TNC "let us know if you have had a chance to review the below" because IDL wanted "to wrap up July as quickly as possible," and that Beyda asked Christie to "let [him] know when [she is] available to talk" on March 17.  Dkt. No. 252, Ex. 194.  The documentary and testimonial evidence does not reflect that the two actually did talk or that Beyda agreed on the list.  These interactions thus do not reflect that an agreement was reached and similarly reflect no agreement between the parties as to specific price terms that were still being negotiated.  Exhibit 195 is similarly unavailing—an internal IDL email on March 16 indicating that "[i]t's a final deal from us" does not indicate mutual assent between the two parties as to final and specific terms.  Dkt. No. 252, Ex. 195.

Next, Plaintiffs argue that the provisions of the MTC are unconscionable because they were presented to TNC as take it or leave it, and IDL and HSN—much bigger companies than TNC—stated that they would not do business with TNC other than under the MTC.  Under Florida law, "[i]n order to establish that a contract is unconscionable, a party opposing its enforcement must show that the contract is both substantively and procedurally unconscionable."

*Lambert v. Signature Healthcare, LLC*, 2019 WL 11664180, at *2 (S.D. Fla. May 1, 2019)

(citing *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1158 (Fla. 2014)); *see also Ross v. Chisholm*,

2006 WL 8432311, at *6 (S.D. Fla. Apr. 28, 2006) (citing *Fonte v. AT&T Wireless Servs., Inc.*,

903 So. 2d 1019, 1025 (Fla. Dist. Ct. App. 2005)).  Further, "a contract is unconscionable only if

both procedural and substantive unconscionability exist, 'although not in equal amounts.'"

*Maldonado v. Mattress Firm, Inc.*, 2013 WL 1760272, at *3 (M.D. Fla. Apr. 24, 2013) (quoting

*VoiceStream Wireless Corp. v. U.S. Commc'ns, Inc.*, 912 So. 2d 34, 39 (Fla. Dist. Ct. App.

2005)).  Rather, courts employ a balancing approach allowing one to outweigh the other,

"provided that there is at least a modicum of the weaker prong."  *Id.* (internal quotation marks

omitted).

        Procedural unconscionability concerns "the manner in which the contract was entered,"

and "involves consideration of such issues as the relative bargaining power of the parties and

their ability to know and understand the disputed contract terms."  *Lambert*, 2019 WL 11664180,

at *3 (internal quotation marks omitted) (quoting *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574

(Fla. Dist. Ct. App. 1999)); *see also VoiceStream*, 912 So. 2d at 39 ("The procedural component

of unconscionability relates to the manner in which the contract was entered and it involves

consideration of such issues as the relative bargaining power of the parties and their ability to

know and understand the disputed contract terms.") (internal quotation marks omitted) (quoting

*Powertel*, 743 So. 2d at 574).  A "hallmark[] of procedural unconscionability is the absence of

any meaningful choice."  *Lambert*, 2019 WL 11664180, at *3; *see also Ross*, 2006 WL 8432311,

at *6 ("[P]rocedural unconscionability . . . concerns the relative bargaining power of the parties,

the manner in which the contract was entered, and the ability of the party asserting

unconscionability to know and understand the challenged contractual terms. Courts typically

examine whether a contracting party was vulnerable because of a lack of sophistication or a *lack of realistic choice* in not entering the contract.") (internal quotations and citations omitted) (quoting *Fonte*, 903 So. 2d at 1035).  These considerations are summarized in four factors Florida courts consider when determining whether a contract is procedurally unconscionable:

> (1) the manner in which the contract was entered into;
>
> (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into;
>
> (3) whether the terms were merely presented on a "take-it-or-leave-it" basis; and
>
> (4) the complaining party's ability and opportunity to understand the disputed terms of the contract.

*Shelton v. 11usa Grp.*, 2020 WL 7327948, at *6 (S.D. Fla. Nov. 20, 2020) (internal quotation marks omitted) (citing *Dorward v. Macy's Inc.*, 2011 WL 2893118, at *5 (M.D. Fla. July 20, 2011); *see also Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1135 (11th Cir. 2010) (stating the same four factors); *Rodriguez v. JPay, Inc.*, 2019 WL 11623936, at *4 (S.D. Fla. Oct. 17, 2019) (finding a contract's terms of service procedurally unconscionable after analyzing them against the four factors).

However, "courts applying Florida law uniformly hold that a disparity in bargaining power reflected by a 'take it or leave it' agreement [alone] is nowhere near enough to render a contract procedurally unconscionable."  *Lazo v. W. Coast Trucking Corp.*, 2017 WL 9324346, at *3 (S.D. Fla. June 12, 2017); *see also Bhim v. Rent-A-Ctr., Inc.*, 655 F. Supp. 2d 1307, 1315 (S.D. Fla. 2009) (finding the fact an agreement was presented on a "take it or leave it basis" insufficient for procedural unconscionability absent a showing that an employee lacked alternatives in the event she chose to "leave it"); *McAdoo v. New Line Transp., LLC*, 2017 WL 942114, at *2 (M.D. Fla. Mar. 9, 2017) ("There must be an aspect of the agreements, other than their take-it-or-leave-it character, that renders them procedurally unconscionable.");

*VoiceStream*, 912 So. 2d 34, 39–40 (Fla. Dist. Ct. App. 2005) (holding that while presenting a contract on a "take it or leave it" basis strongly suggests "an absence of meaningful choice," it does not alone require a finding of procedural unconscionability).  Rather, "[t]he *'central question' is 'whether the consumer has an absence of meaningful choice* in whether to accept the contract terms.'"  *Shelton*, 2020 WL 7327948, at *6 (emphasis added) (quoting *Pendergast*, 592 F.3d at 1135).

Here, neither Plaintiffs' claim that the contract was presented as a "take it or leave it" agreement nor the fact that Plaintiffs did not have an in-house legal department to review the agreement renders the agreement procedurally unconscionable.  A company can take on a contract presented as "take it or leave it" (and assure its counterparty that the contract reflects enforceable obligations) without needing to have an in-house legal department or a lawyer at all. *See, e.g.*, *Lazo*, 2017 WL 9324346, at *9-10 (upholding a mediation clause that waived plaintiff's right to jury trial even though plaintiff was not represented by counsel when he signed the waiver because the waiver was worded sufficiently clearly that an unsophisticated person could understand he waived his right to jury trial); *see also Collins v. Countrywide Home Loans, Inc.*, 680 F. Supp. 2d 1287, 1296 (M.D. Fla. 2010) (finding a provision "not unenforceable even though one party . . . is a large corporation represented by counsel and the other party is an individual not represented by counsel").  If it could not, commerce would ground to a halt.

Further, while the alleged relative disparity in size and bargaining power between the parties may be relevant in some circumstances, Florida courts have upheld agreements with much greater disparities in bargaining power.  *See, e.g.*, *Bhim*, 655 F. Supp. 2d at 1315 ("Undeniably, as in many employer-employee relationships, there was a disparity in bargaining power between Bhim, an individual, and Rent-A-Center, a corporation which admittedly requires

all its employees to sign arbitration agreements.  That disparity militates toward a finding of
procedural unconscionability. Without more, however, '[m]ere inequality in bargaining
power . . . is not a sufficient reason to hold that arbitration agreements are [unenforceable].'")
(alteration in original) (citations omitted) (quoting *Caley v. Gulfstream Aero. Corp.*, 428 F.3d
1359, 1377–78 (11th Cir. 2005)).  Were it otherwise, HSN and IDL—both presumably large
companies—would never be able to enter contracts with their smaller vendors.  Even the
combination of a "take it or leave it" agreement with severely unequal bargaining power was
insufficient to find unconscionability in *Bhim*.  *See id.*  In the absence of evidence that TNC
lacked "meaningful choice"—that it not only was confronted by a take it or leave it contract but
it was required to enter that contract—TNC has not substantiated its claim of procedural
unconscionability.

   TNC also has not established substantive unconscionability.  Substantive
unconscionability looks "to the terms of the contract, itself," and asks "whether they are so
outrageously unfair as to shock the judicial conscience."  *Rivera v. AT&T Corp.*, 420 F. Supp. 2d
1312, 1321 (S.D. Fla. 2006); *see also Ross*, 2006 WL 8432311, at *18 ("[S]ubstantive
unconscionability looks to whether the contractual terms are unreasonable and unfair.").  A
substantively unconscionable contract is "one that no man in his senses and not under delusion
would make on one hand, and [that] no honest and fair man would accept on the other."
*Maldonado*, 2013 WL 1760272, at *3 (alteration in original) (internal quotation marks omitted)
(quoting *Pilitz v. Bluegreen Corp.*, 2011 WL 3359641, at *3 (M.D. Fla. Aug. 4, 2011)).  Finally,
in determining whether a provision is substantively unconscionable, "courts consider whether the
disputed terms limit available remedies, exclude punitive damages, prevent equitable relief,
impose substantial costs, or lack mutuality of obligation with respect to the arbitration of

disputes." *EEOC v. Taco Bell of Am., Inc.*, 2007 WL 809660, at *1 (M.D. Fla. Mar. 15, 2007)

(citing *Palm Beach Motor Cars Ltd., Inc. v. Jeffries*, 885 So. 2d 990, 992 (Fla. Dist. Ct. App.

2004)).

TNC makes no arguments regarding substantive unconscionability here.  Nor could it.

The provision that would preclude it from obtaining contract damages here with respect to the

water filters and the bundled products (even if there were an agreement on terms) is not

substantively unconscionable.  That same provision also would operate to protect TNC in the

context where IDL has asked it to design and manufacture products and it has discussed doing

so, at a below-market price, but absent a purchase order.  The provision defines the parties'

obligations and ensures certainty in contracting.  Just as TNC is not obligated to deliver in the

absence of a purchase order so too IDL is not obligated to purchase.

All of the same reasons also require dismissal of Plaintiffs' breach of contract claims to

the extent that such claims rest upon a purported obligation on the part of Defendants to purchase

aramid-fiber luggage or the revised CloseDrier from Plaintiffs.  Defendants did not issue a

purchase order for either the AFL Project or the CloseDrier Project, and with the CloseDrier,

TNC never succeeded in creating a product to Defendants' specifications.

Plaintiffs also allege the existence of an Aramid Fiber Luggage agreement wherein

"Defendants agreed to pay Plaintiffs a 10% markup on the costs of goods in exchange for

Plaintiffs' facilitating the licensing deal with Dupont and Defendants using Plaintiffs' fabric."

Dkt. No. 201, Ex. HHH.  They further allege that "[a]s a second agreement, the parties agreed

that Defendants could contract directly with Dupont and use Plaintiffs' fabric specifications and

weaver in exchange for payment of Plaintiffs' development costs and a reasonable royalty on all

product sales."  *Id.*  But Plaintiffs have not proffered evidence that demonstrates that valid

contracts were formed for either of these alleged "agreements."   The parties did not agree on a royalty rate—TNC refused to sell product to IDL at the rate that IDL demanded.   *See* Dkt. No. 230, Ex. L; Dkt. No. 201, Exs. OOO, PPP, QQQ.   To demonstrate a contract formed at 10%, Plaintiffs point to Mangano's May 10, 2015 email stating "Ok we must move ahead," in response to Beyda's statement that he was waiting to hear back on various terms, including the 10%, before signing the Kevlar license; however, Mangano's email continues: "Christie do you have anything to add???"  Dkt. No. 201, Ex. MMM.   "Ok we must move ahead" in this context does not represent acceptance, but rather an indefinite intention to agree to the terms, subject to Christie's input.   Nor is there any evidence of the second alleged agreement.   As a preliminary matter, there can be no obligation on Defendants' part to pay royalties for the use of a Kevlar license because there was no Kevlar license.   *See* Dkt. No. 252, Ex. 203 ("Unfortunately Christie failed to close the deal direct with Kevlar.").   And there is similarly no contemporaneous evidence that Defendants agreed to pay TNC for development costs.   The evidence reflects only Beyda referencing this alleged agreement much later, *see* Dkt. No. 252, Ex. 203 (including an email from Beyda stating that "we gave joy [sic] permission to sign direct with Kevlar (and cut us out) . . . [s]he agreed to reimburse us for expenses up to that point"), and Mangano claiming that no such agreement existed, also well after the agreement was supposedly reached, *see* Dkt. No. 201, Ex. OOO (including an email from Mangano, upon receipt of a bill for development costs, responding to the question "Joy did we say we would pay for this?" by saying "No…why do you think I would agree to this??? Crazy he is!! I told him I would give him a %...and I was thinking1% ..maybe").   Beyda's allegations that this contract existed are devoid of any citations to the record.  Dkt. No. 256 ¶ 50.   As such, Plaintiffs have not established existence or breach of a contracts related to the AFL project.

Plaintiffs also have not established existence or breach of a factory contract. Plaintiffs allege that Defendants breached a contract wherein "in exchange for Plaintiffs' curating and qualifying factories, Defendants would order all products from these factories through Plaintiffs" and "should not go direct to their factories." Dkt. No. 201, Ex. HHH. No emails support Beyda's allegations of a contract. *See* Dkt. No. 256 ¶ 33 ("IDL offered to pay a royalty to go direct to TNC's factories, because TNC had developed and vetted those factories, but TNC rejected those offers."); Dkt. No. 256 ¶¶ 59–63; Dkt. No. 252, Exs. 203, 204; Dkt. No. 255, Ex. 253. To the extent that Plaintiffs' argument for breach of contract rests on the premise that the factories were "disclosed to Defendants under the MNDA" and "knew the factory information was confidential under the MNDA," Dkt. No. 247 at 64–65, these are only allegations that Defendants breached the MNDA, not that a separate factory contract existed. There is no evidence in the record of a separate factory agreement. The evidence Plaintiffs point to indicates only that Defendants offered on various instances to work directly with these factories and pay royalties to Defendants is not evidence that they were contractually bound to do so, and the record is devoid of any evidence of offer and agreement, discussion, or documentation of such a contract.

## B. Alleged Breaches of the MNDA

Plaintiffs also bring claims against Defendants for alleged breaches of the MNDA. The MNDA covers "Evaluation Material," which is defined as:

> [a]ll such information, delivered by or on behalf of one party (the "Disclosing Party") and/or its Representatives (as defined below) to the other party (the "receiving Party") and/or its Representatives, whether furnished before or after the date of this Agreement and regardless of the manner in which it is furnished, together with all analyses, compilations, studies or other documents or records prepared by the Receiving party and/or its Representatives, to the extent such analyses, compilations, studies, documents or records contain, otherwise reflect, or are generated from such information."

Dkt. No. 47, Ex. A. It exempts from the category of Evaluation Material:

> information which (i) is or becomes generally available to the public other than as a result of the breach of the terms of this Agreement by the Receiving Party and/or any of its Representatives, (ii) is or has been independently acquired or developed by the Receiving Party and/or any of its Representatives without violating any of the terms of this Agreement.

*Id.* The MNDA provides that "Evaluation Material will be used by the Receiving Party solely for the purpose of evaluating the Transaction." *Id.* It also requires the Receiving Party to keep Evaluation Material "strictly confidential . . . , except that Evaluation Material or any portion thereof may be disclosed to [Representatives] of the Receiving Party who need to know such Evaluation Material for the purpose of evaluating the Transaction and who agree to treat such Evaluation Material in accordance with the terms of this Agreement." *Id.*

Plaintiffs claim that three categories of information they disclosed to Defendants constitute Evaluation Material under the MNDA: (1) "information Plaintiffs disclosed to Defendants during and in connection with the CloseDrier and Aramid Fiber Luggage Projects, including but not limited to the ideas and trade secrets, test data, and discussion of research and development efforts"; (2) "[t]he identity, location, and capabilities of factories vetted by Plaintiffs for projects and products to be developed or manufactured for Defendants"; and (3) "analyses, compilations, studies, or other documents or records prepared by Defendants to the extent they contain, otherwise reflect, or are generated from information provided by Plaintiffs." Dkt. No. 47 ¶¶ 236–238. Defendants violated this agreement, they allege, when they "utilized and/or disclosed Plaintiffs' confidential information and Evaluation Material to third parties, including but not limited to Defendants' partner factories and the factories that Plaintiffs vetted for Defendants' products, to commercialize the JOY CloseDrier with FF and TuffTech products without compensation to, or the consent of, Plaintiffs." *Id.* ¶ 239.

111

Defendants move for summary judgment on this claim, making three arguments: (1) the MNDA is the only relevant confidentiality agreement between the parties; (2) Defendants did not use or disclose confidential information or Evaluation Material in violation of the MNDA because the "alleged confidential information or Evaluation Material was not kept confidential, was not used or disclosed by Defendants, was generally known, or was residual information that Defendants were allowed to use or disclose under the MNDA residual clause"; and (3) Plaintiffs' assertion that Defendants "utilized Plaintiffs' Evaluation Material in tangible form," Ex. HHH, Resp. to Interrog. No. 19, fails because Evaluation Material is composed of only "information," not tangible material.  Dkt. No. 199 at 45–46.  Plaintiffs do not contest the first of these arguments, and there is no dispute that the MNDA is "binding and controlling."  Dkt. No. 247 at 58.  Except with regard to specific pieces of information that, as established above, were generally known, Defendants are not entitled to summary judgment on this claim.

Defendants' second argument reprises the greatest hits of their arguments on the trade secret and idea misappropriation counts.  As in that context, Defendants' contention that the alleged confidential information or Evaluation Material was residual information that they were permitted to use under the MNDA fails here, for the reasons stated above.  Defendants' contention that the alleged confidential information or Evaluation Material was not kept confidential is also unavailing.  Although trade secret law requires that the party asserting a trade secret take reasonable steps to keep that trade secret confidential, as discussed above, the MNDA imposes no such requirement.  *See KT Grp.*, 2018 WL 11213091, at *17 ("[C]orporate entities . . . are free to contract as they wish with respect to the use and disclosure of information that will be exchanged in their business relationship, and the fact that the information so restricted is not a trade secret is irrelevant."); *Sit-Up Ltd.*, 2008 WL 463884, at *4 ("[D]efendants contend

that they have not breached the NDA because 'a non-disclosure agreement is unenforceable unless the challenged disclosure is a *bona fide* confidence, protected under the common law of trade secrets.' This argument is untenable, and defendants have not cited any precedential authority to support it. Parties are free to contract for mutual protection beyond what the common law allows, and this contract is unambiguous in its definition of covered materials.").

The MNDA does, however, exclude from Evaluation Material any information which "is or becomes generally available to the public other than as a result of the breach of the terms of this Agreement by the Receiving Party and/or any of its Representatives."  Dkt. No. 47, Ex. A ¶ 2.  In this aspect, it does explicitly overlap with trade secret law.  As discussed at length above, some of the asserted trade secrets and ideas were generally known;[26] as such, the information contained in these trade secrets and ideas cannot be considered Evaluation Material under the MNDA.

Defendants' argument that the claimed Evaluation Material was not used or disclosed in violation of the MNDA does not warrant summary judgment.  Defendants' argument is entirely derivative of their trade secret and idea misappropriation arguments: "As detailed above, Plaintiffs' alleged confidential information or 'Evaluation Material' . . .  was not used or disclosed by Defendants."  Dkt. No. 199 at 46.  Defendants cite no evidence to support an argument that there is no genuine dispute of material fact on this point.  And Defendants' arguments in the trade secret misappropriation context relate only to whether the Luggage Trade Secrets are substantially similar to their TuffTech luggage.  They do not address the other asserted categories of Evaluation Material at all, and similarly do not address whether the Luggage Trade Secrets were used or disclosed at all, only whether they bear substantial

---

[26] Specifically, Luggage Trade Secrets 5, 7, 9 and Luggage Idea (a).

similarity to Defendants' final product.  And as discussed above, it is clear that Defendants did utilize TNC's fabric swatch in violation of the MNDA.

Defendants' third argument—the tangible information cannot be Evaluation Material, and therefore that any use of product samples and prototypes cannot violate the MNDA—is without merit.  Defendants argue that "[t]he MNDA limits 'Evaluation Material' to 'information' and "analyses, compilations, studies or other documents or records' containing 'information.' Tangible product samples and prototypes are not 'information,' and thus are not 'Evaluation Material.'"  Dkt. No. 199 at 46 (quoting Dkt. No. 47, Ex. A).  They offer no support for this narrow interpretation of the word "information," and point to no evidence indicating that this is how the parties understood the word.  Moreover, Defendants' citation to *Yates v. United States* is unhelpful; in *Yates*, the petitioner was convicting of violating a statute prohibiting destruction of "any record, document, or tangible object."  574 U.S. 528, 531 (2015).  The Supreme Court held that "tangible object" in this context did not encompass "all objects in the physical world," but rather only those "one can use to record or preserve information."  *Id.* at 537.  If anything, this case suggests that "tangible objects" can contain "information" such as that protected under the MNDA.  Under Defendants' narrow interpretation, drawings or CAD renderings of a prototype would be Evaluation Material, but a prototype itself—which would seem to at minimum encompass the same information as renderings of a prototype—would not be Evaluation Material.  This nonsensical result is not supported by the language of the MNDA, evidence of the parties' understandings, or case law.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Clerk of Court is directed to close the motions for summary judgment at Dkt. Nos.

114

198 and 203, and the motions to strike at Dkt. Nos. 238 and 240.




        SO ORDERED.


Dated: August 23, 2021                    _____
       New York, New York                          LEWIS J. LIMAN
                                           United States District Judge