UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                :
TOWN & COUNTRY LINEN CORP. and                                  :
TOWN & COUNTRY HOLDINGS, INC.,                                  :
                                                                :
                    Plaintiffs,                                 :        18-cv-5075 (LJL)
                                                                :
         -v-                                                    :        OPINION AND ORDER
                                                                :
INGENIOUS DESIGNS LLC, JOY MANGANO, and                         :
HSN, INC.,                                                      :
                                                                :
                    Defendants.                                 :
                                                                :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

As the Court has recounted in many prior opinions, *see* Dkt. Nos. 126, 142, 171, 331,

396, 416, this case involves a variety of disputes between plaintiffs Town & Country Linen

Corp. ("TCL") and Town & Country Holdings, Inc. ("TCH," and collectively with TCL, "TNC"

or "Plaintiffs") and defendants Ingenious Designs LLC ("IDL"), Joy Mangano, and HSN, Inc.

("HSN," and collectively with IDL and Mangano, "Defendants") arising out of the many years of

interactions and collaborations between the parties.  The case is set for trial on August 1, 2022;

as set forth in the Court's opinion at Dkt. No. 416, the case will be tried to the bench.  With that

in mind, the Court now turns to the parties' pending *Daubert* motions at Dkt. Nos. 348, 350, and

352.

For the following reasons, the *Daubert* motions are granted in part and denied in part.

## BACKGROUND

The relevant facts of this case are set forth in the Court's prior opinions granting in part

and denying in part Defendants' motion to dismiss the complaint, Dkt. No. 126; granting

Plaintiffs' motion for reconsideration, Dkt. No. 142; granting in part and denying in part

Plaintiffs' motion to dismiss certain counterclaims and affirmative defenses, Dkt. No. 171; granting in part and denying in part the parties' cross-motions for summary judgment, Dkt. No. 331; denying the parties' cross-motions for reconsideration, Dkt. No. 396; and striking the jury demand, Dkt. No. 416.  Familiarity with those opinions is assumed.  In short, Plaintiffs and Defendants had a relationship beginning in 2012 in which they collaborated to design and develop products.  Defendants would propose ideas and present specifications for certain products they wanted developed, and Plaintiffs would engage in development work, provide renderings, and arrange for the sourcing and manufacture of those products.  At some point, the relationship between the parties broke down.  Plaintiffs allege that, after that breakdown, Defendants misappropriated their ideas, trade secrets, intellectual property, and information conveyed subject to a non-disclosure agreement, in particular as related to two projects—the "Aramid Fiber Luggage" project and the "CloseDrier" project.

## PROCEDURAL HISTORY

The lengthy procedural history of this case is recounted in full in the Court's summary judgment opinion.  Dkt. No. 331.  As relevant here, the Court issued its opinion granting in part and denying in part the parties' cross-motions for summary judgment—thus preserving several claims for trial—on August 5, 2021, *id.*, and issued its opinion denying the parties' cross-motions for reconsideration on October 19, 2021, Dkt. No. 396.

Following the summary judgment ruling, the parties filed various *Daubert* motions to preclude several experts from testifying at trial.  Both parties filed their motions on September 7, 2021.  Dkt. Nos. 350, 352.  The parties filed oppositions to the motions on October 5, 2021, Dkt. Nos. 380, 383, and replies on October 26, 2021, Dkt. Nos. 399, 401.

On March 4, 2022, Defendants filed a motion to strike the jury demand.  Dkt. No. 409. On May 13, 2022, the Court granted the motion, converting the trial on the remaining claims from a jury trial to a bench trial.  Dkt. No. 414.

On June 9, 2022, the Court held a hearing on the still-pending *Daubert* motions.  The Court now addresses those motions, considering them in light of the fact that this case is now to be tried to the bench, rather than to a jury.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).  That rule requires the proponent to establish and the trial judge to find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  This "gatekeeping obligation" applies "to all expert testimony."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

"The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

Relevancy is determined by whether the proffered evidence "has any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or

less probable."  *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002).  Reliability is

determined by considering if (1) "the testimony is based on sufficient facts or data"; (2) "the

testimony is the product of reliable principles and methods"; and (3) "the expert has reliably

applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also*

*Amorgianos*, 303 F.3d at 266 (citing this standard).

> *Daubert* motions function somewhat differently in context of bench trials:
>
> [T]he court's gatekeeper role is necessarily different during a bench trial.  In a bench trial, the judge acts as both gatekeeper and factfinder.  The judge must determine both whether expert evidence is admissible under Rule 702 and whether it is credible.  When the gatekeeper and the trier of fact are the same, the court may admit evidence subject to the ability later to exclude it or disregard it, if the evidence turns out not to meet the standard of reliability under Rule 702.

4 Weinstein's Federal Evidence § 702.02; *see also In re Salem*, 465 F.3d 767, 777 (7th Cir.

2006) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in

admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to

meet the standard of reliability established by Rule 702.").

"[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is

generally less efficient than simply hearing the evidence."  *Victoria's Secret Stores Brand*

*Management, Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8,

2009).  Although a court has general discretion to hear expert testimony and reserve on a

*Daubert* motion until the conclusion of a bench trial, it still must perform a Rule 702 and

*Daubert* analysis before it relies upon expert testimony.  *See, e.g.*, *Joseph S. v. Hogan*, 2011 WL

2848330, at *3 (E.D.N.Y. July 15, 2011) (noting that "[t]he dynamic" for *Daubert* motions "is

slightly altered in a bench trial," but that, nonetheless, reliability determinations still must be made in a bench trial and that courts should not "shirk [their] responsibility of performing a full *Daubert* analysis").

Despite this, in the interests of efficiency, the Court wishes to avoid experts presenting at trial evidence and testimony that does not "fit" the facts of the case. *See Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'  This condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.  The consideration has been aptly described by Judge Becker as one of 'fit.'" (internal citations and quotation marks omitted)).  Under this principle, both parties' experts will be precluded from offering at trial opinions and testimony that simply state the experts' understandings of the law and the parties' factual narratives.  The case is being tried to the bench; such testimony will not be helpful.  Additionally, testimony that relates only to issues that are no longer in the case after the Court's summary judgment ruling—such as testimony relating to the CloseDrier and Luggage Trade Secrets and testimony relating to whether the fabric Defendants utilized was substantially similar to Plaintiffs' Luggage Idea (d)—will be excluded as no longer relevant to any issue in the case.

The *Daubert* motions—particularly those pertaining to Plaintiffs' damages expert— present several questions related to damages that raise legal questions that may shape the way the parties present their cases.  The Court here sets forth, as a matter of law, what measures of damages are available for the remaining claims in the case, as well as how this bears on the relevance of the damages experts' proffered opinions and testimony.  The remaining *Daubert* motions are denied without prejudice to renewal at trial.  *See 3DT Holdings LLC v. Bard Access*

*Systems Inc.*, 2022 WL 2037853, at *1 (S.D.N.Y. May 10, 2022) (denying *Daubert* motions without prejudice to their renewal during trial where the case was to be tried to the bench).

## DISCUSSION

On summary judgment, the Court granted Defendants' motion on Plaintiffs' claim that Plaintiffs' trade secrets in the Aramid Fiber Luggage project and the CloseDrier project were misappropriated by Defendants in violation of both federal law and New York law.  It denied the motion only with respect to Factory Trade Secret 2—the identity of a specific factory in China which could manufacture small cleaning products, such as the CloseDrier.  The Court also granted Defendants' motion for summary judgment with respect to the luggage ideas other than Luggage Idea (d) and dismissed the claims that Defendants had protectible ideas in anything except for Luggage Idea (d), which addresses the spacing in the weave of the fabric used for the luggage.  It also granted in part Defendants' motion for summary judgment on Plaintiffs' claim that Defendants had breached various contracts between the parties, dismissing all claims related to the MTC and the alleged Bundled Pricing, Water Filter, CloseDrier, and Aramid Fiber Luggage Agreements as well as all claims with respect to claims of breach of the Mutual Non-Disclosure Agreement ("MNDA") that assert that information contained in Luggage Trade Secrets 5, 7, and 9, and Luggage Idea (a) were Evaluation Material, and leaving just the remaining claims for breach of the MNDA.  Finally, the Court granted Defendants' motion for summary judgment on Plaintiffs' quantum meruit, unjust enrichment, and unfair competition claims.

Plaintiffs' claims remaining for trial, therefore, are: (i) a breach of contract claim with respect to the MNDA; (ii) a claim for misappropriation of Factory Trade Secret 2 under federal law and New York law; (iii) a claim for misappropriation of Luggage Idea (d) under New York law; and (iv) a patent infringement claim.

Plaintiffs' damages expert asserts, in his reports, that Plaintiffs are entitled under the remaining claims to many of the same types of relief to which Plaintiffs would have been entitled had it prevailed on the dismissed claims.  He opines that, assuming Plaintiffs prevail, they are entitled to recover: (i) on the breach of contract claim, actual damages of the profits they would have earned on the transactions that Defendants would have been obliged to enter had Defendants entered into a further agreement with Plaintiffs for Defendants to purchase the CloseDrier units from them—amounting to $212,000 in lost profits—and on the Aramid Fiber Luggage project, for Plaintiffs to have licensed their ideas to Defendants—amounting to $1,250,915 in lost royalty payments; (ii) on the remaining claim for misappropriation of TNC's alleged trade secret in the name of the factory, Defendants' profits of $227,000 realized from the sale of its products manufactured at that location; (iii) on their claim that Defendants misappropriated Luggage Idea (d), either Defendants' alleged unjust enrichment through the use of the idea of $14,286,325 for HSN and $5.3 million for IDL or TNC's lost profits in the form of a reasonable royalty they would have received for the use of their idea; and (iv) on the patent infringement claim, either design patent damages under Section 289 of the patent statute or damages in the form of TNC's lost profits under Section 284 of the patent statute in the amount of $214,710.

## I.    Breach of Contract Damages

The first—and broadest—claim remaining for trial is a claim for breach of contract. Plaintiffs allege that Defendants breached the MNDA, Dkt. No. 47-2, which governed the mutual exchange of information between the parties.  This case, broadly, concerns Defendants' alleged use of information conveyed to them by Plaintiffs under this agreement.  Although, as set forth above, the Court has already held that the record did not support finding that the information conveyed with regard to the Aramid Fiber Luggage project and the CloseDrier project, with the

exception of Factory Trade Secret 2, could constitute protectible trade secrets, and that only one

of their ideas with regard to the Aramid Fiber Luggage project could constitute a protectible idea,

Plaintiffs still argue that all of the information they provided with respect to both projects was

protected as Evaluation Material under the MNDA and that they are therefore entitled to recover

for breach of the MNDA certain of the remedies they might have received under trade secret law

or idea misappropriation law if they had protectible trade secrets and ideas.  As set forth in

greater detail in the Court's prior opinions, the MNDA recognizes that, "[i]n order [for the

parties] to pursue the mutual business purpose of a possible transaction involving IDL and

[TNC] and/or their respective affiliates . . . , both IDL and [TNC] recognize that there is a need

to disclose to one another certain information in respect of itself and/or its affiliates."  *Id.* at 1.

The MNDA's defined term of Evaluation Material reaches more broadly than the law of trade

secrets and idea misappropriation.  It includes:

> [a]ll such information, delivered by or on behalf of one party (the "Disclosing
> Party") and/or its Representatives (as defined below) to the other party (the
> "Receiving Party") and/or its Representatives, whether furnished before or after the
> date of this Agreement and regardless of the manner in which it is furnished,
> together with all analyses, compilations, studies or other documents or records
> prepared by the Receiving Party and/or its Representatives, to the extent such
> analyses, compilations, studies, documents or records contain, otherwise reflect, or
> are generated from such information.[1]

---

[1] The MNDA contains several exceptions from this definition.  It states that:
> The term "Evaluation Material" does not include information which (i) is or
> becomes generally available to the public other than as a result of the breach of the
> terms of this Agreement by the Receiving Party and/or any of its Representatives,
> (ii) is or has been independently acquired or developed by the Receiving Party
> and/or any of its Representatives without violating any of the terms of this
> Agreement, (iii) was within the Receiving Party's and/or any of its Representatives'
> possession prior to it being furnished to the Receiving Party and/or any of its
> Representatives by or on behalf of the Disclosing Party pursuant to the terms hereof
> or (iv) is received from a source other than the Disclosing Party and/or any of its
> Representatives; provided that, in the case of (iii) and (iv) above, the source of such
> information was not known by the Receiving Party to be bound by a confidentiality

*Id.* ¶ 1.  The MNDA requires the Receiving Party to keep Evaluation Material "strictly confidential . . . , except that Evaluation Material or any portion thereof may be disclosed to [Representatives] of the Receiving Party who need to know such Evaluation Material for the purpose of evaluating the Transaction and who agree to treat such Evaluation Material in accordance with the terms of this Agreement."  *Id.*  It also provides that "Evaluation Material will be used by the Receiving Party solely for the purpose of evaluating the Transaction."  *Id.* Thus, notwithstanding the confidentiality obligation, a party has the right—but not the obligation—to consider Evaluation Material in evaluating a transaction.  The agreement thus is reciprocal.  TNC takes on the same obligations with respect to IDL's information that IDL takes on with respect to TNC's information subject to the same limitations.

The MNDA contains no non-competition provision.  In fact, it explicitly contemplates that each party may do business with others and permits each party to do so:

> The Disclosing Party understands and acknowledges that the Receiving Party and/or its Representatives may currently or in the future be developing information, knowledge or technology internally, or obtaining information, knowledge or technology from other persons, that may be similar to information, knowledge or technology contained or reflected in the Disclosing Party's Evaluation Material.  In addition, the Disclosing Party understands and acknowledges that the Receiving Party and/or its Representatives may have, or in the future may enter into, relationships with other persons having pre-existing relationships with the Disclosing Party and/or its Representatives.  Provided that each party complies with its obligations contained herein, and except as otherwise expressly precluded herein, this Agreement shall not in any way limit, restrict, or preclude either party from pursuing any of its present or future business activities or interests or from entering into any agreement or transaction with any person, regardless of whether such business activities or interests are competitive with the business activities or interests of the other party and regardless of whether the subject matter of any such agreement or transaction is in any way similar to the Transaction and/or any Evaluation Material.

---

obligation to the Disclosing Party or any other party with respect to such information.
Dkt. No. 47-2 ¶ 2.

*Id.* ¶ 12.  Each party can use "ideas, concepts, know-how, or techniques" contained in the other's Evaluation Material "for any purpose" including doing business with third parties so long as the information is "in intangible form, . . . retained in memory by persons who have had access to Evaluation Material."  *Id.* ¶ 11.

Plaintiffs allege that Defendants breached the MNDA by using Evaluation Material related to two of their joint endeavors—the CloseDrier project and the Aramid Fiber Luggage project—beyond the scope permitted by the MNDA, namely, to develop and sell those products on their own or with suppliers other than TNC but using TNC's information that was conveyed under the MNDA only for the purpose of a possible business transaction with TNC.

Plaintiffs' proffered damages expert, Kevin McElroy, outlines a theory of damages based on the presumption that but for the breach of the MNDA, IDL would have paid Plaintiffs for the use of their Evaluation Material and that accordingly TNC is entitled to the profits it would have earned on the transactions that Defendants would have been obliged to enter had it desired to use the Evaluation Material.  With regard to the CloseDrier project, McElroy posits that "the appropriate compensation for TNC would restore it to the position it would have been in had IDL performed on its contract."  Dkt. No. 354-3 ("McElroy Expert Report, Jan. 27, 2020") ¶ 141.  In his view, "IDL would, broadly, have had two options to avoid breaching the MNDA.  The first would be to source CloseDrier products from TNC, the second would be to use Global Home or another third party as a supplier without using the Evaluation Materials."  *Id.*  Because "Defendants may likely have decided that its best option to avoid breaching the MNDA was to purchase the CloseDrier from TNC," *id.*, the appropriate measure of damages is "TNC's lost revenue, incremental costs, and lost profit associated with such sales," which is "calculated in the same manner as for design patent damages calculated above," for a total of "approximately

$215,000." *Id.* ¶ 142.  With regard to the Aramid Fiber Luggage project, he opines that the appropriate measure of damages is a reasonable royalty of ten percent which, in his view, is the royalty TNC would have earned had Defendants chosen to pursue the Aramid Fiber Luggage Project with it and paid fair consideration.  *Id.* ¶¶ 148–154.

These theories are not supported by the MNDA and New York contract law.  Under New York common law, a party asserting a claim for breach of contract ordinarily is limited to "recover[ing] general damages which are the natural and probable consequence of the breach." *Kenford Co. v. County of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989).  "In order to impose on the defaulting party a further liability than for damages which naturally and directly flow from the breach, *i.e.*, in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."  *Id.* (internal quotation marks omitted and alterations adopted) (first quoting *Chapman v. Fargo*, 119 N.E. 76, 77 (N.Y. 1918); and then citing, *inter alia*, *Hadley v. Baxendale*, 156 Eng. Rep. 145 (Ex. 1854)); *see also Spang Industries, Inc. Fort Pitt Bridge Division v. Aetna Casualty & Insurance Co.*, 512 F.2d 365, 368 (2d Cir. 1975) ("While it is evident that the function of the award of damages for a breach of contract is to put the plaintiff in the same position he would have been in had there been no breach, *Hadley v. Baxendale* limits the recovery to those injuries which the parties could reasonably have anticipated at the time the contract was entered into. . . .  There can be no question but that *Hadley v. Baxendale* represents the law in New York and in the United States generally.").  "In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have

warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'"

*Kenford*, 537 N.E.2d at 179 (internal citations omitted) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544 (1903)).  "Another way of phrasing breach of contract damages is that, under New York law, plaintiffs are entitled to compensatory damages necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract."  *Document Securities Systems, Inc. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 495 (W.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Premier Florida Auto Sales and Leasing, LLC v. Mercedes-Benz of Massapequa, LLC*, 2013 WL 2177785, at *4 (E.D.N.Y. May 20, 2013)).

Those principles apply to non-disclosure agreements just as they apply to any other agreement.  Plaintiffs are entitled to recovery for damages that are the natural and probable consequence of the breach and "which the parties could reasonably have anticipated at the time the contract was entered into."  *Spang Industries*, 512 F.2d at 368.

In *Document Securities*, for example, the plaintiff was a corporation who provided anti-counterfeiting technology; the defendant produced digital and printed coupons.  55 F. Supp. 3d at 486.  The parties had a pre-existing business relationship in which the plaintiff sold the defendant "safety paper" to print coupons, but the plaintiff "was also interested in selling Defendant certain anti-counterfeiting technology."  *Id.*  In the interests of pursuing that possible sale, the parties entered into a non-disclosure agreement pursuant to which the plaintiff would disclose confidential information to the defendant "for the following purpose:  'To evaluate a *potential* business relationship regarding technology and trade secrets of Plaintiff related to document printing security features.'"  *Id.* at 486–87 (alterations adopted) (quoting the contract before the *Document Securities* court).  The contract at issue was strikingly similar to the MNDA

here.  It stated, as the MNDA before this Court does, that the purpose of the NDA was to pursue a "*potential* business relationship"; defined "Confidential Information" with similar exceptions to those in the MNDA before this Court, *see supra* note 1; and was "strictly a non-disclosure agreement, not a license," which "specifically indicates that 'no license is either granted or implied by the conveying of Confidential Information to the Recipient.'"  *Id.* at 487 (alterations adopted) (quoting the contract before the *Document Securities* court).  The parties never entered into the transaction the plaintiff desired.  Instead, the "Defendant blatantly stole [Plaintiff's] . . . technology, and has used it since that time without paying Plaintiff anything."  *Id.* at 488.  The plaintiff sued for breach of the NDA, arguing that it was entitled to damages in the form of a reasonable royalty.  The plaintiff argued "that if Defendant had complied with the NDA, it would not have used the . . . technology, and that since Defendant used the technology, Defendant should have to pay for it, otherwise it would result in Defendant being able to use the technology for free without any consequences."  *Id.* at 495.  Applying New York law, the court rejected this argument, reasoning that "if Defendant had complied with the NDA and not used the . . . technology, Plaintiff would not have been entitled to any payment.  Consequently, even assuming that Defendant breached the agreement, Plaintiff did not suffer any expectation damages thereby, and any payment that it now receives would place it in a better position than if the contract had been performed."  *Id.* at 496.  The court further reasoned that, to the extent that the plaintiff did not view these as traditional expectation damages, but a different measure of damages in the form of reasonable royalties, "New York law does not permit the recovery of such damages for a breach of contract, where the agreement itself did not provide for royalties."  *Id.*

In *Jill Stuart (Asia) LLC v. Sanei International Co., Ltd.*, 2013 WL 3203893 (S.D.N.Y. June 17, 2013), another court in this District rejected a similar attempt by the plaintiffs there to recover through breach of contract the relief available under copyright law of a reasonable royalty, when the court had previously dismissed plaintiffs' copyright claims. *Id.* at *5. The plaintiffs in *Jill Stuart* were a company that managed the business of fashion designer Jill Stuart and a trust that held much of the company's intellectual property. *Id.* at *1. The defendant was an apparel and accessories designer and seller who had "a longstanding contractual relationship" with Jill Stuart. *Id.* In the relevant contracts, the defendant "received the right to use certain Jill Stuart trademarks, but agreed that '[the defendant] shall not sell or copy any products copied for the designs of the Trust or any Affiliate of JS Asia without the prior written consent of the Trust or such Affiliate of JS Asia.'" *Id.* (quoting the contracts before the *Jill Stuart* court). The defendant violated that provision by copying one of Jill Stuart's prints on several occasions, without consent and without paying for such use. *Id.* The plaintiffs sought to recover a reasonable royalty as a measure of contract damages, but the court found that this "appear[ed] to attempt an end-run around the . . . Order dismissing their copyright claims." *Id.* The court held that "[t]he goal of damages for a breach of contract under New York law is to place the non-breaching party in the position it would have found itself had the contract been performed," *id.* at *3, and that no provision existed in the contract for plaintiffs to be paid a royalty for the unauthorized use of its trademarks, *id.* at *5. It further held that "[u]se of a royalty theory of recovery is generally limited to situations where the parties have had a . . . licensing relationship that facilitates computation of the reasonably royalty." *Id.* (internal quotation marks omitted) (quoting *Juicy Couture, Inc. et al. v. L'Oreal USA, Inc.*, 2006 WL 1359955 (S.D.N.Y. May 19, 2006)). The court granted the defendant summary judgment on the alternative grounds that no

authority existed for plaintiffs' theory of contract damages and that, even if such a theory were applicable, plaintiffs did not raise a triable issue that the damages were foreseeable rather than speculative. *Id.*

The same result follows here. The Court starts with the language of the MNDA. *See Document Securities*, 55 F. Supp. 3d at 486–87; *see also Beal Savings Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) ("Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms."). That agreement makes clear that neither party was entitled to expect from the sharing of its Evaluation Material that the other party would enter into an agreement whereby it would pay for the use of such Evaluation Material. Had "IDL performed on its contract," McElroy Expert Report, Jan. 27, 2020 ¶ 141, the Evaluation Material would not have been embodied in an article manufactured by IDL; IDL would not necessarily have agreed to a contract that such article would be manufactured in connection with a licensing agreement with TNC. Like the agreement in *Document Securities*, the MNDA starts with the proposition that neither side is agreeing to necessarily do business with the other; there is a need for each side to share information with the other "to pursue the mutual business purpose of a *possible* transaction involving IDL and [TNC] and/or their respective affiliates." Dkt. No. 47-2 at 1 (emphasis added). It goes on to explicitly provide that notwithstanding the sharing of Evaluation Material, "no party has any obligation to the other party or any of its Representatives to authorize or pursue with the other party the Transaction." *Id.* ¶ 6. It further provides that neither party will be bound to engage in a transaction with the other party unless the agreement is in writing: "Each of the Receiving Party and the Disclosing Party may at any time terminate any discussions or negotiations regarding the Transaction that may be taking place, and only those

terms and conditions of the Transaction, if any, which are made in a final definitive agreement, when and if executed, will have any legal effect." *Id.* There is no provision that the disclosing party would be entitled to a royalty upon the use by the receiving party of the disclosing party's Evaluation Material.

Under the MNDA, each of IDL and TNC was entitled to expect that the other would not use its Evaluation Material for any purpose other than to evaluate a transaction and would keep that information "strictly confidential." *Id.* ¶ 2. Each of IDL and TNC would be entitled to recover the damages that would naturally and probably flow from the unauthorized use and disclosure of the information—the decrease in value of the information as a result of its use and disclosure. However, no party could have reasonably expected that the other would license its information or pay for the use of it. The MNDA expressly provided that each party could review the material and, having reviewed it, and even if it thought the information to be valuable, walk away from any potential transaction. Neither side was obligated to do business with the other or to pay the other any royalty. Had the MNDA been performed, Defendants would not have used IDL's information and that information would not have been placed in the public domain. Defendants would not necessarily have agreed to engage in a transaction with Plaintiffs. In this respect, Plaintiffs are seeking through the breach of the MNDA to recover the damages they would have received had Defendants in fact entered into the transaction that Plaintiffs failed to convince Defendants to enter into—and had Defendants then breached that agreement.

The point is readily illustrated. Plaintiffs' expert opines that with respect to the Aramid Fiber Luggage project, TNC is entitled to breach of contract damages based on a ten percent royalty rate that the parties discussed in connection with a potential transaction to use Kevlar in the project. McElroy Expert Report, Jan. 27, 2020 ¶ 148. But the Court already has determined

that Mangano's email in which she states "OK we must move ahead," and upon which TNC bases its claim for damages, did not express an agreement by IDL to pay TNC a ten percent royalty—the language was "indefinite" and did not reflect an agreement on terms.  Dkt. No. 331 at 108–09.  Similarly, McElroy's damages calculation with respect to the CloseDrier project relies on the theory that if Defendants had not breached the MNDA, they instead would have purchased CloseDrier units from Plaintiffs, and therefore they should have to pay TNC what they would have paid to purchase the CloseDrier units.  But the Court has already determined that Plaintiffs' breach of contract claims should be dismissed "to the extent that such claims rest upon a purported obligation on the part of Defendants to purchase . . . the revised CloseDrier from Plaintiffs," because "Defendants did not issue a purchase order for . . . the CloseDrier Project," and "TNC never succeeded in creating a product to Defendants' specifications."  *Id.* at 108.  Plaintiffs might be entitled to those measures of damages had IDL agreed that it would enter into a future transaction with TNC in connection with the Aramid Fiber Luggage or CloseDrier projects, or had it licensed the information for use in connection with such a project.  But it did not do so.  It made clear that it had the right to do business with any number of potential product designers and agreed only to consider the information in connection with a potential transaction and to keep the information confidential.  Accordingly, it can be held liable only for the damages caused by the fact that it did not keep the information confidential, not for damages caused by the fact that it did not enter into any future transaction.

This conclusion follows New York's respect for the freedom of contract and for the parties' ability to define for themselves their reasonable expectations at the time of contracting and the relief that would follow from the breach of those reasonable expectations, as well as the value it recognizes in certainty of contracting.  *See, e.g.*, *U.S. Bank National Association v. DLJ*

*Mortgage Capital, Inc.*, --- N.E.3d ---, 2022 WL 801440, at *3 (N.Y. Mar. 17, 2022) ("Freedom of contract is an important and deeply rooted public policy in this state. . . . By disfavoring judicial upending of the balance struck at the conclusion of the parties' negotiations, our public policy in favor of freedom of contract both promotes certainty and predictability and respects the autonomy of commercial parties in ordering their own business arrangements."). Parties can, as a matter of contract, agree that each will develop projects only with the other and that information shared by one party will entitle that party to a reasonable royalty when the information is misappropriated by the other; in those circumstances the non-breaching party is entitled to the relief it would have received had the contract been performed—the royalty to which it was contractually entitled. In *Apfel v. Prudential-Bache Sec. Inc*, 616 N.E.2d 1095 (N.Y. 1993), for example, after the parties had initially signed a confidentiality agreement, the defendant signed a sale agreement with the plaintiffs giving the defendant the right to use techniques developed by the plaintiffs in exchange for a stipulated rate based on the use of the techniques. *Id.* at 474. Likewise, *AU New Haven*—upon which Plaintiffs rely, *see* Dkt. No. 421 at 2—did not involve just a non-disclosure agreement but an agreement pursuant to which the defendant licensed information from the plaintiff for a fee. *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *2 (S.D.N.Y. Mar. 19, 2019); *see also* 1:15-cv-03411, Dkt. No. 90. Similarly, in *Fresh Del Monte*, another court in this District awarded damages in the form of reasonable royalty for a breach of contract claim—but that claim, again, was for breach of a license agreement. *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 658–59 (S.D.N.Y. 2013). Finally, in *Jill Stuart*, the court expressly distinguished the case before it—where the contract did not contain an express royalty provision—from the case cited by the plaintiffs, *Tivo Inc. v. Goldwasser*, 2013 WL 586856 (S.D.N.Y. 2013)—where the contract at

18

issue did contain such a provision.  *See* 2013 WL 3203893, at *5.  In all of the cases under New

York law cited by Plaintiffs, then, the parties did not exchange information merely in the hope

that they might agree to a transaction with one another, but actually had agreed to a transaction.

In those circumstances, damages are appropriately measured in light of the harm suffered when

the non-breaching party lost the benefit of its bargain—*i.e.*, the relief the breaching party would

have received had the contract been performed.[2]

The principle also respects the integrity of contract law and its difference from

intellectual property law.  A party is entitled to a "reasonable royalty" under patent law or federal

trade secret law if its protectable invention or secret is misappropriated.  *See Document

Securities*, 55 F. Supp. 3d at 496 ("'[R]easonable royalty' damages are frequently awarded in

patent and trade secret cases.").  Those laws come with important limitations.  A patent can be

obtained on "any new and useful process, machine, manufacture, or composition of matter, or

---

[2] Plaintiff relies upon *Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d
1354 (Fed. Cir. 1998).  But that court applied California law to reach the opposite conclusion:

> Celeritas was undoubtedly harmed.  It is in the business of licensing its technology.
> Celeritas entered into the NDA with Rockwell with the reasonable expectation that
> Rockwell would compensate it for any use made of the disclosed information.  This
> expectation was the motivating factor for Celeritas to share its knowledge with
> Rockwell.  After Celeritas disclosed its proprietary technology to Rockwell,
> Rockwell was faced with two legitimate choices: it could have used the technology
> and entered into a licensing agreement with Celeritas or it could have refrained
> from using the technology.  It chose instead to use the technology without
> compensating Celeritas.  To compensate Celeritas for the breach, the jury properly
> determined the license fee Rockwell would have paid had it not breached the
> agreement.

*Id.* at 1359.  California law, however, expressly distinguishes New York law on this point.  *See,
e.g.*, *Artifex Software, Inc. v. Hancom, Inc.*, 2017 WL 4005508, at *3 (N.D. Cal. Sept. 12, 2017)
(distinguishing *Jill Stuart* as "under New York law," and stating that "[u]nder California law, a
reasonable royalty may be used to measure damages for breach of contract"); *see also Grail
Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.*, 170 Cal. Rptr. 3d 581, 588
(Cal. Ct. App. 2014) (concluding that the trial court did not err in finding that the amount the
breaching party would have paid to license the technology could be used to measure damages
from breach of an NDA).

any new and useful improvement thereof," 35 U.S.C. § 101; it cannot be obtained on "[l]aws of nature, natural phenomena, and abstract ideas," *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks omitted) (quoting *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 576 (2013)).  Patent law involves an important trade-off.  In exchange for exclusivity, the patentholder forgoes confidentiality and agrees that its invention can be used by others after the patent expires.  *See BondPro Corp. v. Siemens Power Generation Inc.*, 463 F.3d 702, 706–07 (7th Cir. 2006) ("Publication in a patent destroys the trade secret because patents are intended to be widely disclosed—that is the quid for the quo of the patentee's exclusive right to make and sell the patented device." (internal citations omitted)).  Federal law protects trade secrets, which are defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information," if "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839.  Whether information constitutes a trade secret depends on a number of factors that need not be satisfied for information to be contractually protected as Evaluation Material, including, among others, "the extent of measures taken by the business to guard the secrecy of the information," "the value of the information to the business and its competitors," "the amount of effort or money expended by the business in developing the information," and "the ease or difficulty with which the information could be properly acquired or duplicated by others."  *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Ashland Management Inc. v. Janien*, 624

N.E.2d 1007, 1013 (N.Y. 1993)).  The satisfaction of those factors, and others, is necessary for the information to be recognized as property and to be protected as such.

By contrast, information that is not entitled to trade secret or patent protection may still be entitled to protection under the law of contract—two parties can reach an agreement that each will keep confidential information belonging to the other without having to satisfy the stringent standards applicable to trade secret or the publication requirements applicable to patent law.  *See, e.g.*, *Apfel*, 616 N.E.d 1095.  But, in that instance, those parties are entitled only to the damages that contract law under the *Hadley v. Baxendale* rule provides; they not entitled to the tort-like or property-like damages available under intellectual property law.  In other words, while parties to an agreement may define "Evaluation Material" more broadly than intellectual property law would permit, and may obtain for breach of that contract the damages the contract reasonably contemplates, they cannot under the guise of contract law seek an end-run around the limitations of intellectual property law in order to obtain the damages they would be entitled to on a patent law claim or on a trade secret claim.  *See Rodgard Corp. v. Miner Enterprises, Inc.*, 1998 WL 864943, at *5 (W.D.N.Y. Dec. 8, 1998) ("The plaintiffs' alternative contention that they are entitled to a reasonable royalty also fails.  Such measure of damages is often appropriate where a defendant has been found to have misappropriated a trade secret or to have infringed a plaintiff's patent.  However, such is not the instant case.  The defendants bargained for the right to utilize the . . . technique in foreign countries and, while they clearly utilized the technique in a manner violative of the terms of their agreements, the plaintiffs have not demonstrated that they lost any royalty—or were otherwise harmed—as a result.").

In this case, neither side could have had a reasonable expectation that, in sharing information with the other, the two would have signed a licensing agreement requiring the party

using the information to pay a royalty to the other for the use of the information.  Under the MNDA, each party sharing information expressly forswore any understanding that the party receiving the information would be obligated to enter into any kind of a transaction with it. Regardless whether it had already shared confidential information with the Receiving Party, whether those business activities or interests were competitive with the other party, and whether the agreement or transaction was similar to the agreement or transaction with the other party, the Disclosing Party was free to take the Evaluation Material it developed and use it to "pursu[e] any of its present or future business activities or interests" and to "ente[r] into any agreement or transaction with any person."  Dkt. No. 47-2 ¶ 12.

Thus, Plaintiffs' damages may properly be measured by any decrease in value of a transaction it would be able to enter into with a third party as a result of Defendants' appropriation of its Evaluation Material.  On the assumption that the Evaluation Materials "had substantial value" and Defendants' use of that Evaluation Materials "destroyed" that value by putting it in the public domain and "making each reverse-engineerable," Plaintiffs would be entitled to damages flowing from the decrease in value of that Evaluation Material.  Dkt. No. 421 at 1.  Plaintiffs' damages may not be measured on the assumption that Defendants would have entered into an agreement that the MNDA expressly permitted each side to forego at any point until there was a written document.  As *Document Securities* stated, Plaintiffs are entitled to be put back in the position they would have been in had Defendants not breached.  That position would have been that TNC's information would not have been used by IDL and would have remained confidential.  It would not have been that TNC would have had an agreement with IDL for IDL to enter into a wholly new contract with TNC to license or purchase the information any

more than if TNC had used IDL's information to manufacture a product with another party, IDL would have been entitled to a reasonable royalty for the use of its information.

Two arguments remain to be addressed.  First, the "residuals clause" of the MNDA expressly provides that a party can use information that it develops from the residual use of Evaluation Material without incurring an obligation to pay a reasonable royalty.  It states:

> This Agreement shall not be construed to limit the Disclosing Party's, the Receiving Party's, or any of their respective Representatives' right to independently develop or acquire products, services or technology without use of the other party's Evaluation Material.  Further, the Receiving Party shall be free to use for any purpose any residuals resulting from consideration of the Disclosing Party's Evaluation Material, provided that the Receiving Party shall not disclose the Disclosing Party's Evaluation Material except as expressly permitted pursuant to the terms of this Agreement.  The term "residuals" means information in intangible form, which is retained in memory by persons who have had access to Evaluation Material, including ideas, concepts, know-how or techniques contained therein. *Neither the Receiving Party nor any of its Representatives shall have any obligation to limit or restrict the assignment of such persons or to pay royalties for any work resulting from the use of residuals*.  However, this paragraph shall not be deemed to grant to the Receiving Party a license under the Disclosing Party's copyrights or patents.

Dkt. No. 47-2 ¶ 11 (emphasis added).  It could be argued that, if the contract precluded the Disclosing Party from obtaining royalties upon the unauthorized use of any Evaluation Material, the explicit contractual provision permitting a party to use residuals derived from Evaluation Material would be surplusage.  Residuals appear to be a subset of Evaluation Material.  The provision that a party has no obligation to pay royalties for any work resulting from residuals must do some work.  On this theory, it provides any exception from a general principle under the contract that would permit the Disclosing Party to receive royalties upon the unauthorized use by the Receiving Party of Evaluation Material.  The contract must contain an implicit requirement that the unauthorized use of Evaluation Material results in royalties to avoid rendering the provision in the residuals clause surplusage.

The argument rests on a false premise.[3]  The presumption against surplusage is an application of the general principle under the law of contracts in all the fifty States that an agreement is to be read in its entirety.  *See, e.g.*, Restatement (Second) of Contracts § 202 (1981) (discussing the proposition that "[w]here the whole can be read to give significance to each part, that reading is preferred" as an application of the principle that a contract is to be read as a whole); 28 N.Y. Practice, Contract Law § 10:7 (2022) (reiterating, in the section discussing surplusage, that "[t]he language of the contract must be considered as a whole so that meaning can be given to each term").  The conclusion that the Disclosing Party is not entitled to consequential damages for an agreement that the Receiving Party was not under any obligation to enter rests upon a proposition of New York contract damages law.  There is no tension between the contract provision that explicitly provides that the Disclosing Party is not entitled to royalties for the use of residuals and the contract provision that states that each party is entitled from the other to the "remedies at law or in equity to which the Disclosing Party may be entitled." Dkt. No. 47-2 ¶ 7.  The parties need not have spelled out the remedies available under New York law for a breach of contract for those remedies to be applicable to the extent a court would apply New York law; the limitation on remedies operates as a matter of law.  The Court need not read into the MNDA a provision entitling the Disclosing Party to a royalty upon the unauthorized use of Evaluation Material in order to give meaning to the actual contract provision limiting the relief available for the use of residuals.[4]  The latter provision makes clear that even if

---

[3] TNC cannot be faulted for making the argument.  The Court itself raised the point unsolicited at oral argument of this motion.

[4] Indeed, the argument rests upon a second false premise.  The beginning of the residuals clause provides that the Receiving Party may use residuals "for any purpose" without breaching the MNDA.  The remainder of the clause, which provides that a party using residuals does not have to pay royalties, is necessarily surplusage; a party would not have to pay for using information within its contractual rights regardless whether the provision later specified that no royalty need

New York were to decide to apply what is now the law of California and permit a form of royalties for the violation of a naked non-disclosure agreement, the Receiving Party—as a matter of the plain language of the MNDA—would not be entitled to that relief.

Finally, at oral argument, Plaintiffs proffered an alternate theory as to why they are entitled to damages in the form of a reasonable royalty or lost profits on a future transaction. Plaintiffs argue that at the time of the breach, they "would have . . . been entitled to some kind of injunction that would have prevented the defendants from going forward with this product," but that at this point, "the cat's already out of the bag," and so instead they are entitled to "the proxy for what the value of that injunction would be," which they assert would be evaluated by "looking at the defendant's [sic] profits because that is what they made for it."  June 9, 2022 Oral Argument Transcript ("Oral Argument Tr.") at 31:19–32:4.  They note that the MNDA explicitly contemplates that there would be remedies other than an injunction.  It states:  "Both parties agree that money damages may not be a sufficient remedy for any breach of the terms of this Agreement by the Receiving Party or any of its Representatives, and that, in addition to all other remedies at law or in equity to which the Disclosing Party may be entitled, the Disclosing Party may be entitled to . . . injunctive . . . relief as a remedy for any such breach."  Dkt. No. 47-2 ¶ 7.

This provision also does not do the necessary work for TNC.  There are many reasons why "money damages may not be a sufficient remedy for any breach of the terms of th[e] Agreement," including that the Disclosing Party was not entitled to a reasonable royalty for the use by the Receiving Party of its Evaluation Material—whether the Receiving Party was TNC or it was IDL.  That is why the Receiving Party "may" have been entitled to injunctive relief upon

---

be paid.  Thus, reading the rest of the MNDA to imply an obligation to pay royalties for use of Evaluation Material would not eliminate the surplusage concern with respect to the penultimate sentence of the residuals provision.  The clause in that sentence still would be surplusage.

the breach of the MNDA—its damages would not have been reparable.  *See, e.g.*, *North Atlantic Instruments*, 188 F.3d at 49.  It may, at this point, be too late for TNC to get relief through an injunction that is completely effective—IDL's product is already out on the market and, on TNC's theory, it can be reverse-engineered and the value of IDL's intellectual property thereby diminished.  The most TNC could get would be to bar IDL from continuing to sell its product (and there presumably only if TNC could overcome a laches argument).  But that does not mean that Plaintiffs get reasonable royalty damages as a substitute—were that the case the damages Plaintiffs, and others in its position, would suffer might not be irreparable.  In short, Plaintiffs' injunctive relief would only extend to the limits of its contractual right—the right not to have its information used.  It would not have been able to compel Defendants to enter into a transaction with Plaintiffs.  The value of that injunction, therefore, is no greater than the value of the contract right it would have protected—that is, the right for Defendants not to use the information, but not the right to enter into a transaction with Defendants.

Under this reasoning, McElroy's MNDA damages opinions do not "fit" the facts of the case.  His opinions, both with respect to the CloseDrier Project and with respect to the Aramid Fiber Luggage project, are premised on the notion that Plaintiffs are entitled, under the MNDA, to the profits they would have received had the parties reached an agreement to enter into a transaction wherein Defendants would pay to license or use the Evaluation Material, or to manufacture the products with the Plaintiffs and pay Plaintiffs for that.  The MNDA, however, does not anticipate that the parties would necessarily reach such an agreement—and indeed, they did not.  As such, under New York law, damages for breach of contract cannot put Plaintiffs in a better position than they would have been in had the contract been performed.  Plaintiffs may be entitled to damages to make up for any depreciation in the value of their Evaluation Material as a

result of its unconsented use and disclosure, but they are not entitled to the benefit of a bargain for which they never contracted.

### A.      Trade Secret Misappropriation under Federal Law

The second claim remaining for trial is a claim for misappropriation of Factory Trade Secret 2 in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.[5]  Although Factory Trade Secret 2 is also Evaluation Material, the Court has concluded that Plaintiffs offered sufficient evidence to create a triable issue whether it also is entitled to trade secret protection.  Accordingly, assuming Plaintiffs prove entitlement to that protection and that Defendants misappropriated that protected trade secret to the satisfaction of the factfinder, Plaintiffs would be entitled to the relief federal law provides for misappropriation of a trade secret.

The DTSA clearly outlines the various forms of damages a court may award in such an action:

> In a civil action brought under this subsection with respect to misappropriation of a trade secret, a court may . . . award--
>
> (i)     damages for actual loss caused by the misappropriation of the trade secret; and
>
> (ii)    damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or
>
> (iii)   in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

18 U.S.C. § 1836(b)(3)(B).  The law stands in stark contrast to the New York law of contract damages.  Under the DTSA, there are three possible ways to measure damages for trade secret

---

[5] Plaintiffs also bring a parallel claim under New York common law; the Court addresses the measure of damages available for that claim below.

misappropriation.  First, damages may be measured by the actual losses sustained by the plaintiff caused by the misappropriation.  Second, damages may be measured by the defendant's unjust enrichment caused by the misappropriation, to the extent that such damages are not duplicative of any damages awarded for actual loss.  "This is measured by the profits the defendant obtained from using the trade secret," *Stanacard v. Rubarb LLC*, 2016 WL 6820741, at *1 (S.D.N.Y. Nov. 10, 2016)—in short, disgorgement.  A plaintiff may recover both measures of damages—actual losses and unjust enrichment—"only to the extent that the latter is not taken into account in computing the former."  *Id.* (internal quotation marks omitted) (quoting *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998)).  Third, regardless whether the plaintiff has a contract right to such relief, a plaintiff may recover damages in the form of a reasonable royalty for misappropriation of a trade secret "when the plaintiff's losses or the defendant's unjust enrichment provide inadequate compensation to the plaintiff."  *Id.*  "A reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from [the] plaintiff."  *Id.* (internal quotation marks omitted) (quoting *Vermont Microsystems*, 88 F.3d at 151).

With regard to damages for trade secret misappropriation, Plaintiffs' proffered expert recites the DTSA's formulation of the various ways a court may award damages.  *See* McElroy Expert Report, Jan. 27, 2020 ¶ 96.  He then applies that formulation to calculate trade secret damages relating to Defendants' use of Plaintiffs' factory relationships, *see id.* at IX.A.  His initial report calculates these damages using the unjust enrichment method described above.  *Id.* ¶ 257; *see also* Oral Argument Tr. at 8:16–9:9.  The report calculates that Defendants' "profits associated with the alleged misappropriation of Plaintiffs' factory trade secrets is at least $227,000," McElroy Expert Report, Jan. 27, 2020 ¶ 258, and notes that "trade secret defendants

are required to demonstrate deductions and offsets that may reduce the quantification of profit disgorgement," *id.* ¶ 259.

Defendants do not take issue with McElroy's proposition that unjust enrichment is a proper measure of trade secret damages. Under the DTSA, it plainly is. Rather, they challenge McElroy's method and the $227,000 figure he derives from it, arguing that it fails to apportion those profits between the three asserted factory trade secrets—only one of which remains in the case—and between the protectable trade secret itself and other unprotected elements of the products sold which may have driven up Defendants' profits. *See* Dkt. No. 353 at 27. Defendants argue that McElroy's calculation is flawed because he calculates Defendants' unjust enrichment for the factory trade secrets by reference to Defendants' sale of all the cleaning supplies produced by Defendants at that factory but "makes no effort to apportion the damage amount between the one remaining protectible trade secret, Factory Trade Secret 2, and any other features of these cleaning supplies." *Id.* Plaintiffs counter that, because the infringed trade secret was the factory itself, "without the factory, that product is not going to be made." Oral Argument Tr. at 10:5–7. In essence, Plaintiffs argue that they are "entitled to disgorgement of the full amount of profits that [Defendants] made from that factory but only from that factory." *Id.* at 10:19–22.

These arguments need not be addressed by the Court pretrial. *See, e.g.*, *3DT Holdings*, 2022 WL 2037853, at *1 ("The Court finds it efficient to address the Defendant's *Daubert* motion only after it has heard Defendant's cross-examination of [the expert]."). They are highly fact-specific, and the Court will benefit from hearing the direct and cross examination of McElroy at trial. *See id.* ("In this case, since the Court has already been exposed to Mr. Waddell's analysis and to competing arguments regarding its weight and admissibility,

29

permitting cross-examination and permitting the Defendant to renew its *Daubert* motion after Mr. Waddell has stepped off the stand will only permit the Court to analyze the Rule 702 issues on a more complete record."); *see also Joseph S.*, 2011 WL 2848330, at *2 (stating that, in a bench trial "expert testimony should be admitted so that the Court could have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions").  McElroy may testify at trial as to his calculation of unjust enrichment damages for Factory Trade Secret 2, and Defendants may raise on cross-examination—and subsequently by renewed *Daubert* motion—their arguments that such calculation is either inadmissible or not subject to great weight because of its failure to apportion the profits as between the asserted trade secrets and as between protected and unprotected elements.

**B.**    **Trade Secret Misappropriation and Idea Misappropriation under New York Common Law**

Plaintiffs' third claim remaining for trial is a claim for misappropriation of Factory Trade Secret 2 under New York common law.  "The requirements for showing a misappropriation of a trade secret are similar under state and federal law."  *Free Country v. Drennan*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).  Because of this similarity, the Court addressed the trade secret misappropriation claims under federal and state law together at the summary judgment phase. *See* Dkt. No. 339 at 34 n.12.  However, while the *requirements* for showing such misappropriation are similar under federal and state law, the *damages* available once such misappropriation has been shown are not the same.  As such, the Court addresses the state law claim separately from the federal claim, and in conjunction with Plaintiffs' fourth claim remaining for trial—a claim for misappropriation of Luggage Idea (d) under New York common law.

Under New York common law, the laws of trade secrets and idea misappropriation protect similar—but not identical—interests.  "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *North Atlantic Instruments*, 188 F.3d at 43–44.  A trade secret is broadly defined—it is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."  *Id.* at 44 (quoting *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997)).  Secrecy is critical to trade secret protection:  "The subject matter of a trade secret must be secret."  *Speedry Chemical Products, Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962) (Marshall, J.) (quoting Restatement of Torts, § 757).

By contrast, secrecy is not an element of a protectible idea under New York law; there is no parallel secrecy requirement in New York idea misappropriation law.[6]  *See Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 450 F. Supp. 2d 175, 182–83 (D. Conn. 2006) ("FP continues to press its theory . . . that a successful misappropriation claim must prove that the idea allegedly misappropriated was 'secret,' a position that neither resonates in New York misappropriation law nor reflects the realities of the toy industry."); *see also id.* ("A requirement that the idea be

---

[6] This requirement does appear in idea misappropriation claims in other states, but it is absent in New York.  *Compare Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir. 2000) (listing factors relevant to a determination of novelty in idea misappropriation cases under New York law but not listing secrecy as a relevant consideration), *with Vent v. Mars Snackfood US, LLC*, 611 F. Supp. 2d 333, 336 (S.D.N.Y. 2009) (applying New Jersey idea misappropriation law, and listing the same factors as *Nadel* but adding, inter alia, an additional factor: "(6) the idea's secrecy (did an otherwise novel idea lose its novelty status because of inadequate steps taken to maintain the idea's secrecy?)").

'secret,' however, does not appear in New York misappropriation law."). The work done in the law of trade secrets by the requirement of secrecy thus is done by the requirements of novelty and concreteness that do not appear in trade secret law.[7] Those requirements "ensure that an obligation is not wrongly imposed on a defendant for either a non-protectible idea or an idea which the defendant had no duty not to use without compensation, but the secrecy requirement urged by defendant is inapplicable." *Id.*

New York law does not impose a novelty requirement on a trade secret. To determine whether confidential information constitutes a trade secret, "New York courts have considered the following factors":

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting *Ashland Management*, 624 N.E.2d at 1013). The "novelty" requirement for a protectible idea is not a factor to be considered in evaluating whether something is a protectible trade secret.

Thus, the two concepts are similar but not coextensive. Confidential information that a party keeps secret may constitute a trade secret without being novel and constituting a protectible idea, just as information that is novel may constitute a protectible idea without being secret and constituting a protectible trade secret. *Compare, e.g.*, *McGhan v. Ebersol*, 608 F. Supp. 277, 287 (S.D.N.Y. 1985) ("If the idea or suggestion is already the subject of general knowledge, or has as

---

[7] The cause of action for misappropriation of ideas under New York law broadly contains two similar elements: "(1) a legal relationship between the parties in the form of a fiduciary relationship, an express contract, implied contract, or quasi contract; and (2) an idea that is novel and concrete." *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 692 (1st Dep't 2015).

its basis an improvement of a standard technique, or better use of existing means, or the mixture

or known ingredients in different proportions the idea has no value as property." (internal

quotation marks and alterations omitted) (quoting *Seymore v. Readers' Digest Association*, 493

F. Supp. 257, 265 (S.D.N.Y. 1980))), *and Futter v. Paramount Pictures, Inc.*, 69 N.Y.S.2d 438,

440 (Sup. Ct. N.Y. 1947) ("[M]erely combining these obvious elements cannot convert a general

idea, which is not novel, into a unique concept."), *with Softel*, 118 F.3d at 968 (recognizing that

"a combination of public domain elements may be a trade secret"); *see also American Bio

Medica Corp. v. Bailey*, 341 F. Supp. 3d 142, 158 (N.D.N.Y. 2018) ("An idea can constitute a

trade secret, but an action will not sound in tort for the misappropriation of an idea unless the

idea was novel."). *But see Ring v. Estee Lauder, Inc.*, 702 F. Supp. 76, 78 (S.D.N.Y. 1988)

(dismissing trade secret claim because of the lack of novelty). Factory Trade Secret 2 provides

an illustration. A list of the limited number of factories qualified to do a particular type of work,

just like a list of customers, might be entitled to trade secret protection. If Plaintiffs devote time

and resources to the expensive and difficult endeavor of putting together such a list and keep the

information secret, it may be a trade secret even if it is not novel. But the investment and effort

that are sufficient to qualify a network of factories (or of customers) as a trade secret may not be

sufficient to qualify it as novel or an "idea" to entitle it to protection against idea

misappropriation.

The types of damages available for a claim of trade secret misappropriation and at least

some types of idea misappropriation, however, are identical. Trade secrets are traditionally

thought of in terms of property rights. *See Speedry*, 306 F.2d at 330 ("There is a 'property right'

in trade secrets, which may be protected against those who acquire and use the knowledge

thereof wrongfully."). "[D]amages in trade secret actions [are] measured by the losses incurred

by the plaintiff," which may "be measured by a defendant's increased profits . . . to the extent that those profits are evidence of the plaintiff's own losses." *E.J. Brooks Co. v. Cambridge Security Seals*, 105 N.E.3d 301, 310–11 (N.Y. 2018)

Claims of idea misappropriation come in two forms—as contractual claims and as claims of deprivation of property rights. *See Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 374 (2d Cir. 2000) (distinguishing between the "novelty" requirement for contract-based claims and property-based claims). Where a plaintiff seeks to recover for misappropriation of an idea based on contract law principles, that claim and analysis are identical to a straightforward breach of contract claim. Indeed, courts discuss this in terms of breach of contract, not in terms of a distinct tort of idea misappropriation. *See, e.g.*, *id.* ("In *Apfel*, the Court of Appeals discussed the type of novelty an idea must have in order to sustain a contract-based or property-based claim for its uncompensated use. Specifically, *Apfel* clarified an important distinction between the requirement of 'novelty to the buyer' for contract claims, on the one hand, and 'originality' (or novelty generally) for misappropriation claims, on the other hand.").

A party may also bring a claim, however, for misappropriation of its property right in a protectible idea. *See, e.g.*, *Downey v. Gen. Foods Corp.*, 286 N.E.2d 257, 259 (N.Y. 1972) ("An idea may be a property right. But, when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements."). In that instance, as with respect to trade secrets, "compensatory damages [are available to] return the plaintiff, as nearly as possible, to the position it would have been in had the wrongdoing not occurred—but do no more." *E.J. Brooks Co.*, 105 N.E.3d at 304. As the New York Court of Appeals put it in *E.J. Brooks*:

The fundamental purpose of compensatory damages is to have the wrongdoer make the victim whole.  Put another way, these measure fair and just compensation, commensurate with the loss or injury sustained from the wrongful act.  The goal is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred.  The damages cannot be remote, contingent, or speculative.  They need not be immediate, but need to be so near to the cause only that they may be reasonably traced to the event.  The standard is not one of mathematical certainty but only reasonable certainty.

*Id.* at 307 (internal quotation marks, citations, and alterations omitted).  The Court of Appeals further explained that such damages may be calculated using a defendant's profits, but only to the extent that those reasonably approximate the plaintiff's losses:

To be sure, courts may award a defendant's unjust gains as a proxy for compensatory damages in an unfair competition case.  However, the accounting for profits in such circumstance is not *in lieu of* damages, but is *a method of computing* damages.  Such a computation of damages may be appropriate where a plaintiff's actual losses cannot be traced with even approximate precision, but even in those cases it must first be shown that there is some approximate relation of correspondence, a causal relation not wholly unsubstantial and imaginary, between the gains of the aggressor and those diverted from his or her victim.  Without that evidence of correspondence, there is no presumption of law or of fact that what a defendant has gained will competently measure what the plaintiff has lost.  Furthermore, if a plaintiff seeks to establish an inference that its compensable losses are linked to the value of the defendant's gains, then the defendant must be afforded an opportunity to challenge the link with its own rebuttal evidence.

*Id.* at 308–09.

As such, a plaintiff who prevails under a New York common law claim in this genre—be it unfair competition, trade secret misappropriation, or idea misappropriation—may recover compensatory damages that return it to the position it would have been had the wrong not occurred; such damages may be measured using the plaintiff's actual losses or the defendant's gains, but only to the extent that the plaintiff has demonstrated a connection between those gains and the plaintiff's losses such that they reasonably approximate the actual loss.[8]  Such a

---

[8] The Second Circuit has also noted that "in those trade secret cases where measuring either the defendant's profits or the plaintiff's losses is too hard or speculative, we have approved the concept of a 'reasonably royalty award' that attempts to measure a hypothetically agreed value of

circumstance might arise, for example, in a case where the parties are direct competitors in a two-player market, and any gain by one party would necessarily translate as a loss to the other party.

In this case, McElroy proffers a damages calculation for misappropriation of Factory Trade Secret 2 under New York common law that mirrors his calculation for the federal trade secret misappropriation claim.  He states that "New York law allows for three ways to calculate trade secret damages," including "a calculation of Plaintiff's losses, . . . a calculation of Defendants' unjust enrichment, and the calculation of a reasonable royalty."  McElroy Expert Report, Jan. 27, 2020 ¶ 98.  He offers one calculation for "trade secret damages"—the calculation discussed above—measured by Defendants' unjust gains and does not differentiate between New York common law and federal law in that calculation.  As outlined above, under New York common law, however—unlike under federal law—damages in the form of a defendant's gains are available only if the plaintiff can show that they do no more than compensate the plaintiff for its actual losses.  McElroy's opinions are devoid of any reasoning supporting a connection between Plaintiffs' losses and Defendants' gains here.  As such, McElroy's damages opinions as they relate to damages measured by unjust enrichment for the misappropriation of Factory Trade Secret 2 under New York common law do not "fit" the facts of the case and are excluded under Federal Rule of Evidence 702.

With regard to Plaintiffs' claim that Defendants misappropriated Luggage Idea (d), McElroy states in his supplemental expert report that "New York law allows for damages that

---

what the defendant wrongfully obtained from the plaintiff.'"  *E.J. Brooks Co. v. Cambridge Security Seals*, 858 F.3d 744, 748 (2d Cir. 2017) (quoting *Vermont Microsystems*, 88 F.3d at 151).  Plaintiffs, however, do not put forward a theory of damages based on a reasonable royalty for the trade secret claims under New York common law.

reflect the value of the property misappropriated," and that "this can be done through the calculation of lost profits and through the calculation of Defendants' unjust enrichment."  Dkt. No. 354-4 ("McElroy Supplemental Expert Report, June 15, 2020") ¶ 22.

First, with respect to unjust enrichment, as is true for misappropriation of a trade secret under New York common law, unjust enrichment is available as a measure of damages for misappropriation of an idea under New York common law only to the extent that it is demonstrated to reasonably approximate the plaintiff's actual losses, here the losses suffered by Defendants' alleged misappropriation of Luggage Idea (d).  *See E.J. Brooks*, 105 N.E.3d at 308–09.  But McElroy assumes no facts and Plaintiffs point to none that would demonstrate a connection between the alleged enrichment obtained by Defendants as a result of their exploitation of Luggage Idea (d), which relates to the spacing in the weave of fabric to be used for the luggage, and the loss suffered by Plaintiffs as a result of the exploitation of that idea.  TNC and IDL do not compete with one another, such that the gain by Defendants could reasonably be construed to be equivalent to the loss to Plaintiffs.  One is a supplier to the other.  Defendants' gain bears no necessary or reasonable relationship to Plaintiffs' loss.  As such, McElroy is precluded from offering any opinions as to unjust enrichment as a measure of damages for idea misappropriation under the *Daubert* "fit" test.

With respect to lost profits, McElroy opines that "it would be . . . difficult for Defendants to commercialize the Accused Luggage Products without the Luggage Ideas," and that, accordingly, "the appropriate calculation for lost profits for the misappropriation of the Luggage Ideas is mathematically equivalent to the calculation of lost profits for breach of contract"—in other words, a reasonable royalty, which McElroy calculates at ten percent for a total of

"approximately $1.3 million."[9]  McElroy Supplemental Expert Report, June 15, 2020 ¶¶ 40–41.

His theory, essentially, is that Defendants would not have been able to produce the luggage that

allegedly misappropriated Luggage Idea (d) without using that luggage idea, and that, therefore,

Plaintiffs' losses can be measured in the form of the royalty Defendants should have had to pay

them to use that idea.  This is the precise theory that the Court has rejected in the context of

Plaintiffs' breach of contract claim, above.  However, the measure of damages available for

breach of contract claims and for property-based misappropriation claims under New York

common law is not the same.  The two protect different interests.  Contract law protects the value

of the promise—Plaintiffs are entitled to damages equivalent to what they would have received

had Defendants performed.  The tort of idea misappropriation by contrast protects the value of

the property and protects the plaintiff from unfair competition.  Plaintiffs are entitled to be

compensated for the loss of one or the other (or all) of the bundle of rights that constitute the

property that Defendants have stolen.  In idea misappropriation cases, as well as in trade secret

cases, that loss may be measured (particularly when it is otherwise too hard or speculative) by

the value of what the defendant would have paid for the property had it not stolen it, *i.e.*, a

reasonable royalty.[10]  *Cf. E.J. Brooks Co. v. Cambridge Security Seals*, 858 F.3d 744, 748 (2d

---

[9] Defendants move to strike McElroy's Supplemental Report of October 5, 2021.  Dkt. No. 397.
They argue that McElroy's Supplemental Report introduces a new theory of damages for idea
misappropriation in the form of reasonable royalty, and that prior to this report he had only
offered theories of damages for idea misappropriation based on unjust enrichment and actual
losses.  The motion is denied.  McElroy's prior Supplemental Expert Report of June 15, 2020—
the first report to address damages available for the idea misappropriation claims after they were
reintroduced to the case—calculates "actual losses" in the form of a royalty, and explicitly
references his trade secret damages calculations.  The Supplemental Report of October 5, 2021
does not introduce any wholly new theory of damages.
[10] Thus, the distinction between the torts of trade secret misappropriation law and idea
misappropriation law lies not in the measure of damages available but in the manner of
information or concept that is entitled to protection.  This differs from an approach that would
distinguish such torts by saying that the measure of damages *must* be always different.  That may

Cir. 2017) ("[I]n those trade secret cases where measuring . . . the plaintiff's losses is too hard or speculative, we have approved the concept of a 'reasonably royalty award' that attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff.'" (quoting *Vermont Microsystems*, 88 F.3d at 151)).  McElroy will be permitted to present this theory of damages to the Court, sitting as factfinder, at trial.

### C.      Patent Infringement

As previously noted, on summary judgment TNC either abandoned or the Court granted summary judgment on all of TNC's trade secret claims with respect to the CloseDrier.  Those claims would have entitled TNC, under federal trade secret law, to damages in the form of TNC's actual losses, IDL's unjust enrichment, or a reasonable royalty.  The principal claim relating to the CloseDrier remaining for trial is based on the patent Plaintiffs obtained in the design of the CloseDrier—the D399 patent.  During the course of its work with IDL on the CloseDrier, inventors working for TNC obtained a design patent in the design of the CloseDrier.  Defendants allegedly sold a CloseDrier that was manufactured by one of TNC's competitors—Global Homes—that infringed on that patent.  Among other things, Plaintiffs seek lost profit

---

or may not, as an empirical matter, be a practical result of how a jury evaluates the worth of concepts or information that are entitled to these various kinds of protection, but it is not what distinguishes the torts as a matter of law.  *Cf. LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002) (holding, in context of an information misappropriation claim under New York common law that is yet broader than trade secret or idea misappropriation, that a reasonable royalty is available as a measure of damages, but that in determining what that amount should be, the jury should consider "(1) the time spent developing the information, (2) the money invested, (3) the labor invested, and (4) a reasonable portion of the expected profitability of the final product that incorporates the misappropriated information, measured at the time of a hypothetical negotiation for the sale or licensing of the property created by plaintiff's labor, skill and expenditures," and reasoning that "[b]ecause plaintiff's work does not rise to the level of a trade secret, plaintiff is not entitled to the full reasonable royalty that would be paid for the use of a trade secret," because "[t]rade secret law places a premium on the value of secrecy," and "[m]isappropriation of information cannot be used as an end-run around the secrecy requirement").

damages of $214,710, constituting the profits it would have made had Defendants entered into an agreement to purchase the CloseDrier units from TNC rather than from Global Homes.  McElroy Expert Report, Jan. 27, 2020 ¶ 131.

To understand Plaintiffs' contention, a brief discourse on the development of damages under patent law is appropriate.[11]

Article I, section 8, clause 8 of the Constitution endows Congress with the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  In 1790, implementing that constitutional power, Congress passed the first patent statute; it provided little guidance with regard to patent damages, simply stating that infringers "shall forfeit and pay to the said patentee or patentees . . . such damages as shall be assessed by a jury."  Patent Act of 1790, ch. 7, 1 Stat. 109–12, § 4.  In 1793, Congress passed a more detailed patent statute.  It provided that infringers "shall forfeit and pay to the patentee, a sum, that shall be at least equal to three times the price, for which the patentee has usually sold or licensed to other persons, the use of the said invention."  Patent Act of 1793, ch. 11, 1 Stat. 318–23, § 5. Because the language of the statute referenced the price for which the patentee "has usually sold or licensed to other persons" the invention, it tied any award of patent damages to the question whether the patentee did in fact sell or license the invention, and limited recovery to treble that license amount.

However, "as experience began to show that some inventions or discoveries had their chief value in a monopoly of use by the inventor, and not in a sale of licenses, the value of a

---

[11] This opinion does not address Plaintiffs' claim for damages under Section 289 of the patent statute, which provides an alternative measure of damages for claims of design patent infringement.  *See* McElroy Expert Report, Jan. 27, 2020 ¶¶ 107–115.

license could not be made a universal rule, as a measure of damages." *Seymour v. McCormick*, 57 U.S. 480, 488 (1853). In 1800, Congress again revised the patent statute to reflect this new understanding. Under the 1800 act, the infringer had to "forfeit and pay the patentee a sum equal to three times the actual damage sustained by such patentee." Act of Apr. 17, 1800, ch. 25, 2 Stat. 37, 38 § 3; *see also Seymour*, 57 U.S. at 488. This revision allowed for more flexibility in awarding patent damages; instead of tying patent damages to license fees in every case, it allowed courts to instead calculate "the actual damage" sustained by the patentee, which would not in every case be measurable simply in the form of a license fee. In 1836, Congress again amended the patent statute; this time, it simply removed the mandatory treble damages, "confin[ing] the jury to the assessment of 'actual damages,'" and leaving the "power to inflict vindictive or punitive damages . . . to the discretion and judgment of the court within the limit of trebling the actual damages found by the jury." *Seymour*, 57 U.S. at 489. This revision responded to an understanding that an across-the-board award of treble damages would not always fit the facts of the case:

> Experience had shown the very great injustice of a horizontal rule equally affecting all cases, without regard to their particular merits. The defendant who acted in ignorance or good faith, claiming under a junior patent, was made liable to the same penalty with the wanton and malicious pirate. This rule was manifestly unjust. For there is no good reason why taking a man's property in an invention should be trebly punished, while the measure of damages as to other property is single and actual damages.

*Id.* The *Seymour* Court emphasized that, under the 1836 statute, "[a]ctual damages must be actually proved, and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact." *Id.* at 490. It stated that "[w]hat a patentee 'would have made, if the infringer had not interfered with his rights,' is a question of fact and not 'a judgment of law,'" and that "[t]he question is not what speculatively he may have lost, but what actually he did lose." *Id.* In *Seymour* itself, the facts demonstrated that the patent holder, McCormick, had sold

41

licenses to use his patents, including to the defendants, who refused to pay that license fee for some of the products they sold. *Id.* at 491. "Beyond the refusal to pay the usual license price, the plaintiff showed no actual damage." *Id.* Under that circumstance, the *Seymour* Court found that an award beyond that amount was "enormous and ruinous," and reversed the verdict below. *Id.*

After *Seymour*, and under the 1836 Act, the Supreme Court's approach to patent damages varied somewhat between cases. As a general rule, in actions at law, patent holders could recover only actual damages from the infringement.[12] Plaintiffs would typically demonstrate actual damages by pointing to evidence of either "an established license rate or specific lost profits." *See* 6A Chisum on Patents § 20.02. In cases before the Court, a question repeatedly

---

[12] The early patent laws created a distinction between remedies available in actions at law and remedies available in actions in equity. In 1819, Congress "acted to confer jurisdiction on the circuit courts 'in equity as well as at law' of all actions arising under the patent and copyright laws." 6A Chisum on Patents § 20.02. "The 1819 act empowered such courts 'upon any bill in equity' to 'grant injunctions, according to the course and principles of courts of equity, to prevent the violation of the rights of any authors or inventors' secured to them by federal law." *Id.* Subsequently, the 1836 Act, which provided for actual damages in suits at law as set forth above, also provided "for suits in equity to obtain injunctions 'according to the course and principles of courts of equity.'" *Id.* This provision "fostered a cleavage as to monetary recovery which a patent owner could obtain from an infringer: at law, the plaintiff could recover his damages (but not the defendant's profits); in equity, the plaintiff (complainant) could, as an incident to a claim for injunctive relief, recover the defendant's profits (but not damages) through the equitable remedy of an accounting." *Id.* Subsequently, in the Patent Act of 1870, Congress "expanded the power of equity to include the award of damages." *Id.* Section 55 of the Act provided that:

> [T]he court shall have power, upon bill in equity filed by any party aggrieved, to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent, on such terms as the court may deem reasonable; and upon a decree being rendered in any such case for an infringement, the *claimant* [complainant] shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby . . . .

Patent Act of 1870, ch. 230, 16 Stat. 198–217, § 55. Under that act, a patent holder could, at law, recover only actual damages, but in equity could recover, in addition to an injunction, both the infringer's profits and the claimant's damages.

arose:  What damages, if any, were available where there was no question that a patent was valid

and was infringed, but the patent holder did not or could not provide evidence of an established

royalty for that patent or specific lost profits resulting from the infringement?  In other words,

where there was no evidence that the patent holder had actually commercialized his patent, could

he recover, and in what amount?

In *New York v. Ransom*, the Supreme Court set forth the *Seymour* rule as follows:

"[W]here the profit of the patentee is derived neither from an exclusive use of the thing patented,

nor from a monopoly of making it for others to use, the actual damage which he suffers by the

use of his improvement without his license, is the price of it, with interest, and no more."  64

U.S. 487, 489 (1859).  Applying that principle, and emphasizing that a damages award may not

be speculative, the Court held that "if [a patent holder] fails to furnish any evidence of the proper

data for a calculation of his damage, he should not expect that a jury should work out a result for

him by inferences or presumptions founded on such subtle theories."  *Id.* at 491.  Where the

patent holder fails to present any evidence—*i.e.*, "[i]f he rest his case, after merely proving an

infringement of his patent"—"he may be entitled to nominal damages, but no more."  *Id.* at 488.

As such, where the plaintiff presented no evidence of either prior license fees or specific lost

profits, he could not recover anything more than nominal damages for the infringement of his

patent.

In *Suffolk Co. v. Hayden*, the Supreme Court again addressed the question of what

damages could be awarded where the plaintiff could not point to evidence of an established

royalty or specific lost profits; it concluded that "[t]here being no established patent or license

fee in the case, in order to get at a fair measure of damages, or even an approximation to it,

general evidence must necessarily be resorted to."  70 U.S. 315, 319 (1865).  "[A]ppropriate"

43

and "pertinent" evidence included evidence of "the utility and advantage of the invention over

the old modes or devices that had been used for working out similar results"—in other words, the

value of the patented invention.  *Id.* at 320.  "With a knowledge of these benefits to the persons

who have used the invention, and the extent of the use by the infringer, a jury will be in

possession of material and controlling facts that may enable them, in the exercise of a sound

judgment, to ascertain the damages, or, in other words, the loss to the patentee or owner, by the

piracy, instead of the purchase of the use of the invention."  *Id.*  The *Suffolk* Court thus held that,

even where a patent holder could not point to concrete evidence of an established royalty or of

specific lost profits, he could still recover for his loss from the infringement by pointing to

evidence of the value of his invention, the benefit its use conferred upon the infringer, and the

extent of the use by the infringer.  This reasoning seems to approximate the concept of a

reasonable royalty, which would not formally make its way into that patent statute for some time.

In *Rude v. Westcott*, the Supreme Court again considered this question.  It reiterated the

holdings in *Ransom* and *Suffolk*, and the rule that, where a patent holder could point to an

established royalty, that was an acceptable measure of damages—"it is undoubtedly true that

where there has been such a number of sales by a patentee of licenses to make, use, and sell his

patents as to establish a regular price for a license, that price may be taken as a measure of

damages against infringers."  130 U.S. 152, 165 (1889).  The Court, however, set forth

limitations on the availability of a royalty as a measure of damages, stating that such damages

were only available where there was sufficient evidence of an established royalty.  "In order that

a royalty may be accepted as a measure of damages against an infringer, who is a stranger to the

license establishing it, it must be paid or secured before the infringement complained of; it must

be paid by such a number of persons as to indicate a general acquiescence in its reasonableness

by those who have occasion to use the invention; and it must be uniform at the places where the licenses are issued." *Id.* The Court added that, in this case, "[t]here was no question . . . of damages arising from lost sales, or injurious competition, for no machines had been manufactured and put on the market by the patentee, or by the complainants, his assignees." *Id.* at 167. Thus, where there was no evidence of specific lost profits and no evidence of an established royalty—in other words, where the patent holder had merely invented and patented something but had taken no steps towards commercializing that invention—there was "[n]o legal ground . . . for the recovery of specific damages for the alleged infringement of the patents," and the complainants were entitled only to nominal damages. *Id.*

Similarly, in *Coupe v. Royer*, the plaintiffs relied, in seeking damages, on evidence of the money the defendants had saved by infringing the patent. The court below had instructed the jury that this was an appropriate way to calculate damages, because plaintiffs "undertake to show the value of this invention to any person using it, and the law deems it a fair inference that whatever value has been received by the defendants through the use of this invention so much has been taken from the plaintiffs, and they are entitled to have it restored to them." 155 U.S. 565, 581 (1895). The Supreme Court rejected that instruction. It recognized that "[t]he topic is one upon which there has been some confusion and perhaps some variance in the cases," but set forth the "true rules" which it said "have become well settled:

> There is a difference between the measure of recovery in equity and that applicable in an action at law. In equity, the complainant is entitled to recover such gains and profits as have been made by the infringer from the unlawful use of the invention; and since the act of July 8, 1870, in cases where the injury sustained by the infringement is plainly greater than the aggregate of what was made by the defendant, the complainant is entitled to recover the damages he has sustained in addition to the profits received. At law, the plaintiff is entitled to recover, as damages, compensation for the pecuniary loss he has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts; the measure of recovery in such cases being, not what the

defendant has gained, but what plaintiff has lost.  As the case in hand is one at law, it is not necessary to pursue the subject of the extent of the equitable remedy . . . .

But even in equity the profits which the complainant seeks to recover must be shown to have been actually received by the defendant.  As was said in the case just referred to:  'The infringer is liable for actual, not for possible, gains.  The profits, therefore, which he must account for are not those which he might reasonably have made, but those which he did make, by the use of the plaintiff's invention; or, in other words, the fruits of the advantage which he derived from the use of that invention, over what he would have had in using other means then open to the public, and adequate to enable him to obtain an equally beneficial result. If there was no such advantage in his use of the plaintiff's invention, there can be no decree for profits.'  And in *Manufacturing Co. v. Adams*, 151 U.S. 139, 14 Sup. Ct. 295, this court reversed the decree of the circuit court, because, in assessing the damages, that court based the amount on evidence showing, not what the defendant had made out of the invention, but what third persons had made out of the use of the invention.

*Coupe*, 155 U.S. at 582–83.  Based on those principles, the Supreme Court concluded that the judge below had "applied the wrong standard in instructing the jury that they should find what the defendants might be shown to have gained from the use of the patented invention."  *Id.* at 583.  The Court further noted that even if the defendants' gains could as a legal matter be used as a measure of liability, the evidence did not justify the instruction given "because that evidence tended to show what [the plaintiff] estimated that the defendants' profits might have been, and not what they actually were."  *Id.*  As such, the Court concluded that in such a situation—"the evidence disclosing the existence of no license fee, no impairment of the plaintiffs' market," and "in short, no damages of any kind"—the court should have given the instruction that if the jury "found for the plaintiffs at all, to find nominal damages only."  *Id.  Coupe*, therefore, can be fairly read to definitively set forth the rule under the Patent Act of 1870 that where there was no evidence of an established license fee or of concrete lost profits, the patent holder could recover as damages in an action at law only nominal damages.  *Cf.* 6A Chisum on Patents § 20.02 ("Some lower courts read *Coupe v. Royer* as conclusive against any recovery of substantial damages absent evidence of either an established royalty or lost sales revenue.  Other courts,

46

however, noting that *Coupe* did not disapprove of *Suffolk v. Hayden*, took a contrary view: *Coupe* involved an absence of proof plus confusion by the lower court between the damages remedy at law and the equitable remedy of recovering the defendant's actual illicit profits.").

Against this somewhat confused backdrop, the Sixth Circuit, in *United States Frumentum Co. v. Lauhoff*, developed a reasonable royalty theory that would ultimately be adopted by both the Supreme Court and by Congress.  In *Lauhoff*, the plaintiff was found to have held a valid patent; the defendant was found to have infringed that patent.  The plaintiff proceeded on a lost profits damages theory.  It was "clear that, as the case was presented to the master, his ultimate finding of damages must rest on the premise, proved or presumed, that the plaintiff would have made the sales in question if the defendants had not made them."  216 F. 610, 614 (6th Cir. 1914).  The Sixth Circuit reiterated that "[o]bviously, where plaintiff seeks damages on the theory of lost sales, this premise is an essential step."  *Id.*  In *Lauhoff*, however, there was "no direct proof":

> It was shown (and we assume sufficiently) that plaintiff had factory facilities for manufacturing the additional amount and so could have filled the order, but the proof stopped there.  There was no testimony that defendants' customers had formerly bought from plaintiff, nor that they were in negotiation with plaintiff or in a territory in which the plaintiff was selling, nor of others of those circumstances sometimes held sufficient and sometimes held insufficient to raise the presumption that plaintiff would have made the sales.  This presumption is not one of law.  If it exists, it must be raised by the proofs as one of fact.  No doubt this presumption may sometimes follow from the mere fact that some one buys or uses the infringing article, . . . but . . . in those cases generally, the infringing article was a special piece of apparatus, and it did not appear that anything else accomplishing the same purpose or generally similar was on the market.  In the present case, the record is clear that plaintiff supplied only a small part of the market demand for the general product consisting of raw or partially cooked corn flakes and used chiefly by maltsters; that several other apparently similar, but noninfringing, products under various trade-names had a large sale; that these products were so similar that the ordinary user would not notice the difference, and, indeed, so similar that plaintiff, when its factory was broken down, had supplied its customers with one of the other products without objection.  In this condition of the record, a presumption of fact that defendants' customers would have bought plaintiff's product if they had not

47

> bought defendants' does violence to the rules of natural inference; there can be no
> such presumption.

*Id.* (internal citations omitted).  The court concluded, therefore, that because there was no direct

proof of lost profits, "the District Court was right in directing nominal damages only," and that

"it would ordinarily follow in this condition of the case that the judgment below would be

affirmed."  *Id.*  Nevertheless, the Sixth Circuit stated that it "was not satisfied to have this case

take that course."  *Id.*  It reiterated that there was a finding of a valid patent, of extensive

infringement, and that "defendant's sales were so large that no one can doubt the actual existence

of substantial damages."  *Id.* at 615.  The Sixth Circuit reasoned that "[u]nder such

circumstances, to have plaintiff recover nothing, because the difficulty of absolute definite proof

is insuperable, is a result so unfortunate that, if avoidable, it should not be permitted."  *Id.*

Rather, it set forth "another theory of recovery which may be available."  *Id.*  It began with the

principle that "[i]nfringement upon the patentee's rights is a tort; it is a taking of the patentee's

property," and that damages for such a tort may be understood by comparison to "the rules of

damages as applied to property generally."  *Id.*  Such damages, the Sixth Circuit said, are

traditionally and first thought of in terms of market value, which is the "ordinary, normal

measure of damages"; in a patent infringement case, where the wrongful act is the "manufacture

or sale of a patented article, the thing taken is the right to manufacture and sell," which would

lawfully only "be given by a license from the patentee."  *Id.*  Where, however, there is no

evidence of an established license fee or royalty, there is no "market value" of the thing taken,

"and this criterion of damages must fail."  *Id.*  In such a case, as with other property, where there

is no market value, "the law always looks for some other appropriate measure."  *Id.*  The most

common alternative measure, the Sixth Circuit stated, is "in the owner's entire loss of a sale, or

lessened profits on a sale he does make," and "the profits which the owner would have made

except for the unlawful interference are the familiar measure"; "[t]his has come to be independently considered as a criterion of damages, sometimes an alternative for and sometimes displacing the 'primary' criterion." *Id.* at 616.  In patent cases, of course, the analogue is an award of damages in the form of lost profits "where a loss of sales or diminution of selling price or increase of selling expense by plaintiff can be fairly traced to defendant's infringement." *Id.* Thus far, those two measures of damages were well established in patent law.  The Sixth Circuit carried the analogy to other property damages further, stating that in those circumstances, "there remains a class of cases or a group of instances where no market value existed and where no loss or impairment of sales can be definitely proved":

> The law is not, in such case, impotent.  Plaintiff is not compelled to go away with nominal damages just because he cannot show that his property, or other like it, was commonly bought and sold on the market, or because he did not wish to sell, or because it was returning him no income.  The real value—the actual value—of what has been taken is always the ultimate question.  Proof of market value is one way to show this actual loss; proof of lost sales is another way.  But, if neither of these methods can be followed, the law permits other available, pertinent proofs.  Those familiar with real estate estimate and testify to the real value or fair value of land which is without market value; and these witnesses and the jury may take into account all the special circumstances of the situation as bearing on the ultimate question.  The same thing is true as to personal property of such character that it has no market value.  Instances of the application of this rule as to both real and personal property are too familiar for citation.  . . .

> We can see no reason why the owner of a patent may not be compensated upon the same principles, or why the perfect analogy between the rules of damages as to general property and as to patent property which apply with reference to market value and with reference to lost sales should be discarded when we come to what may, for convenience, be called general damages.  The jury, in a patent case, can be shown what plaintiff's patent property was, to what extent defendant has taken it, its usefulness and commercial value as shown by its advantages over other things and by the extent of its use and as shown by the profits and savings which could be made upon its sale or adoption.  The jury can learn how much of the realizable profit should be credited to the manufacturing process and business risk and how much to the patent, also, what share of the profits or of the selling price it may be customary in that or similar business to allow for the use of such an invention.  Experts may be amply qualified to give useful opinions as to the value of the property which is to be appraised.  More or less of these things may appear in a given case, all having a bearing on the real value of that for which plaintiff is to be

> compensated, and the case presents no greater difficulty in computing and ascertaining damages than is met by a hundred juries every day. This damage or compensation is not, in precise terminology, a royalty at all, but it is frequently spoken of as a 'reasonable royalty'; and this phrase is a convenient means of naming this particular kind of damage.

*Id.* at 616–17.

Shortly after *Lauhoff*, in *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, the Supreme Court considered a case where the plaintiff, the patent holder, manufactured and sold a grain drill using its patented improvement, and the defendants (unknowingly) purchased infringing drills from the plaintiff's competitors. 235 U.S. 641, 643 (1915). The courts below had stated that only nominal damages were available. *Id.* The Supreme Court stated that "as the patent had been kept a close monopoly, there was no established royalty. In that situation it was permissible to show the value by proving what would have been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved." *Id.* at 648. Although the Court agreed with the judgment below that the evidence was insufficient to prove lost profits and that there was no evidence of an established royalty, it reversed the decree and remanded the case to allow consideration of damages in the form of a reasonable royalty.

In 1922, Congress again amended the patent statute; this amendment reflected the development in the case law to allow for damages in the form of a reasonable royalty. The amended act provided:

> If on the proofs it shall appear that the complainant has suffered damage from the infringement or that the defendant has realized profits therefrom to which the complainant is justly entitled, but that such damages or profits are not susceptible of calculation and determination with reasonable certainty, the court may, on evidence tending to establish the same, in its discretion, receive opinion or expert testimony, which is hereby declared to be competent and admissible, subject to the general rules of evidence applicable to this character of testimony; and upon such evidence and all other evidence in the record the court may adjudge and decree the payment by the defendant to the complainant of a reasonable sum as profits or general damages for the infringement.

50

Act of Feb. 21, 1922, ch. 58, 42 Stat. 392, § 8.  Although the act does not explicitly use the term

reasonable royalty, "the lower courts tended to read the 1922 Act as simply codifying the

analysis in *Lauhoff* and *Dowagiac*."  *See* 6A Chisum on Patents § 20.02 (citing cases).  The act,

however, added this concept "only to the equitable remedy provision, leaving unchanged the

legal damage provision," despite the fact that cases like *Lauhoff* and *Dowagiac* referred

explicitly to the role of the jury in determining a reasonable royalty, suggesting that such an

award should be available in actions at law.  *Id.*  Significantly, the act provides for "a reasonable

sum as profits or general damages for the infringement" only where the complainant has proven

"that the complainant has suffered damage from the infringement or that the defendant has

realized profits therefrom to which the complainant is justly entitled."  In other words, the

statutory text seemed to contemplate that there might still be situations where a patent was

infringed but the patent holder might not have suffered any actual harm, and therefore might still

be able to recover no more than nominal damages.

In 1946, Congress again amended the equitable remedies portion of the patent statute.

The statute, as amended, read:

> Upon a judgment being rendered in any case for an infringement the complainant
> shall be entitled to recover general damages which shall be due compensation for
> making, using, or selling the invention, not less than a reasonable royalty therefor,
> together with such costs, and interest, as may be fixed by the court.

Act of Aug. 1, 1946, ch. 726, 60 Stat. 778, § 1.  Two changes are worth highlighting—the

amended act uses the specific phrase "reasonable royalty" and it eliminates any explicit reference

to the defendant's profits.

Finally, in 1952, Congress once again amended the patent statute.  It incorporated both the monetary remedies at law and in equity—previously divided into different sections—into one section, Section 284.[13]  Section 284, which remains the law today, states:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

> When damages are not found by a jury, the court shall assess them.  In either event the court may increase the damages up to three times the amount found or assessed.

35 U.S.C. § 284.

Section 284 remains the governing statute on patent damages today.  As the Supreme Court has interpreted Section 284, Congress intended therein to "ensure that the patent owner would in fact receive full compensation for 'any damages' the patentee suffered as a result of the infringement."  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544–45 (Fed. Cir. 1995) (internal quotation marks omitted and alteration adopted) (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 653–54 (1983)).  In other words, "while the statutory text states tersely that the patentee receive 'adequate' damages, the Supreme Court has interpreted this to mean that 'adequate' damages should approximate those damages that will *fully compensate* the patentee for infringement."  *Id.* at 1545.  The Supreme Court has further explained the statutory standard for measuring such damages, stating that "[t]he question to be asked in determining damage is 'how much had the Patent Holder and licensee suffered by its infringement.  And that question is primarily: had the Infringer not infringed, what would the Patentee Holder–Licensee

---

[13] Historically, this followed shortly on the heels of the broader merger of law and equity; in 1938, adoption of the Federal Rules of Civil Procedure, which, as then-adopted, declared that "[t]here shall be one form of action to be known as 'civil action,'" effectuated a "near universal merger of law and equity."  *Pereira v. France*, 413 F.3d 330, 337 (2d Cir. 2005) (quoting Fed. R. Civ. P. 2).

have made?'" *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507

(1964).  This test, the Federal Circuit has explained, encompasses elements of both but-for

causation—"the general rule for determining actual damages to a patentee that is itself producing

the patented item is to determine the sales and profits lost to the patentee because of the

infringement," *Rite-Hite*, 56 F.3d at 1545—and proximate causation—"the 'test' for

compensability of damages under § 284 is not solely a 'but for' test in the sense that an infringer

must compensate a patentee for any and all damages that proceed from the act of patent

infringement," because "judicial relief cannot redress every conceivable harm that can be traced

to an alleged wrongdoing," *id.* at 1546.  In sum:

> [U]nder § 284 of the patent statute, the balance between full compensation, which
> is the meaning that the Supreme Court has attributed to the statute, and the
> reasonable limits of liability encompassed by general principles of law can best be
> viewed in terms of reasonable, objective foreseeability.  If a particular injury was
> or should have been reasonably foreseeable by an infringing competitor in the
> relevant market, broadly defined, that injury is generally compensable absent a
> persuasive reason to the contrary.

*Id.*

Under Section 284, courts award damages that broadly fall into two categories—

categories analogous to those that existed under prior versions of the patent statute.  First, in

situations "when the patentee does not seek to make and sell the invention," *see Hebert v. Lisle

Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996), or when lost profits cannot be established with

reasonable certainty, *see Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1157

(6th Cir. 1978), the patentee may recover damages in the form of a reasonable royalty—even

where it does not have evidence of an established royalty for that patent and even where the

patentee was not in the business of licensing.  In this respect, case law following the 1922, 1946,

and 1952 amendments to the patent statute deviate from earlier case law interpreting the prior

statutes that did not contemplate damages in the form of a reasonable royalty and awarding only

nominal damages where the patent holder had not proven that it had commercialized the patent or that it had suffered harm.  Rather, the Federal Circuit has held that "the fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated." *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990) (citing 6A Chisum on Patents § 20.02); *see also Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) ("The statute guarantees patentees a reasonable royalty even when they are unable to prove entitlement to lost profits or an established royalty rate."); *Promega Corp. v. Life Technologies Corp.*, 875 F.3d 651, 659–60 (Fed. Cir. 2017) ("Under 35 U.S.C. § 284, a finding of infringement 'establishes the fact of damage because the patentee's right to exclude has been violated.'  'The statute is unequivocal that the district court must award damages in an amount no less than a reasonable royalty' when infringement is found." (internal citations omitted) (first quoting *Lindemann*, 895 F.2d at 1406; and then quoting *Dow Chemical Co. v. Mee Industries, Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003))); *Zegers v. Zegers, Inc.*, 458 F.2d 726, 729 (7th Cir. 1972) ("[W]e assume *arguendo* that plaintiff suffered no actual damages in the form of lost sales; we hold that he is nevertheless entitled to recover a reasonable royalty.  . . .  If the patentee is a manufacturer, he may prove his damages by evidence of lost sales and profits.  But if such proof is inadequate, or if he does not himself sell the product, he may nevertheless be injured by the unlicensed practice of his invention.  The reasonable royalty which he might lawfully have collected from the infringer is he had been a licensee may then be the measure of damages.").  Once entitlement to a reasonable royalty measure of damages is established, the only remaining question is how that reasonable royalty should be calculated.  In *Georgia-Pacific*, relying on the reasoning in cases including *Lauhoff* and *Dowagiac*, the Southern District of New York outlined a comprehensive

list of fifteen factors "relevant, in general, to the determination of the amount of a reasonable royalty for a patent license."[14]  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Those factors include some that would only be relevant where the patent holder had already licensed out its patent, either to the infringer or to others, such as "[t]he royalties received by the patentee for licensing of the patent in suit, proving or tending to prove an established royalty."  *Id.*  This did not, however, collapse the remedy of a reasonable royalty into that of an established royalty; the factors also included, verbatim, factors articulated in *Lauhoff*, such as "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results."  *Id.*  Such factors are intended to help determine what a reasonable royalty for the patent is, even where there is no established royalty.  In *Georgia-Pacific* itself, "[t]he parties agree[d] that there was no 'established' royalty for [the patented invention].  Consequently, it [was] necessary to resort to a broad spectrum of other evidentiary facts probative of a 'reasonable' royalty."  *Id.*

Second, in situations where "the patentee and the infringer sell substantially similar products in the same market," *BIC Leisure Products v. Windsurfing International*, 1 F.3d 1214, 1219 (Fed. Cir. 1993), and where "it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales," *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989), damages may

---

[14] An earlier case had established that a reasonable royalty was the appropriate measure of damages.  It began by highlighting that the 1946 amendment had eliminated the reference to the infringer's profits even in actions at equity; it concluded that this amendment was intended to foreclose this as an independently recoverable remedy and to limit recovery to compensatory damages, which may not be equivalent to the infringer's profits.  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 243 F. Supp. 500, 515–16 (S.D.N.Y. 1965).  Instead, the court found that the appropriate measure of damages in that case was a reasonable royalty, which "is an amount which a person, desiring to use a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to use the patented article at a reasonable profit."  *Id.*

include lost profits including "due to diverted sales . . . caused by the infringement." *Hebert*, 99 F.3d at 1119.  Although since the 1946 amendment the patent statute has not included specific reference to lost profits as an appropriate measure of damages, there is no question that it remains available in factual situations where manufacturers are directly competing in the same market.  As the statute makes clear, even though it references only reasonable royalty explicitly, a reasonable royalty is the *minimum* measure of damages available, not the *only* measure of damages available.  *See Rite-Hite*, 56 F.3d at 1544 ("Section 284 further instructs that a damage award shall be 'in no event less than a reasonable royalty'; the purpose of this alternative is not to direct the form of compensation, but to set a floor below which damage awards may not fall.").  "Thus, the language of the statute is expansive rather than limiting.  It affirmatively states that damages must be adequate, while providing only a lower limit and no other limitation."  *Id.* Lost profits remain available where the plaintiff has demonstrated that lost profits are an appropriate way to measure what they would have made that the infringer not infringed; in other words, where lost profits are the best measure of damages in the but-for world where the defendant had not infringed, they are available to fully compensate the patent holder for the infringement.  *See, e.g.*, *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996) ("Beyond a reasonable or established royalty, a claimant must prove actual damages to establish entitlement to lost profits.  Proof of actual damages must include a causal connection between the infringement and the lost profits.").

     In *Panduit Corp. v. Stahlin Bros. Fibre Works*, the Sixth Circuit set forth the widely used four-factor test to determine when lost profits damages are available:

> To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing

> substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of profit he would have made.

575 F.2d at 1156 (citing 3 R. White, *Patent Litigation: Procedure and Tactics* § 9.03[2]). The *Panduit* factors speak to the critical question whether the plaintiff in fact would have made the sales made by the infringer, absent the infringement. *See Wechsler v. Macke International Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007) ("The issue . . . is not whether Wechsler *could* have sold his product to those individuals; the issue is whether Wechsler *would* have sold his product to those individuals."); *Oiness*, 88 F.3d at 1029 ("To recover lost profits as actual damages, a patent holder must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales."); *Hebert*, 99 F.3d at 1119 ("To measure damages by lost profits the patentee must establish, by a preponderance of evidence, that but for the infringement he would have earned the profits he asserts were lost."); *id.* ("[W]hen the patentee asserts that lost profits are the appropriate measure, the patentee must establish to a reasonable probability that but for the infringement the patentee would have made the sales and profits that were lost due to the infringement.").

As noted above, the cases applying *Panduit*—finding that patent holders were entitled to damages in the form of lost profits—arise in the context where the plaintiff manufactures and markets or seeks and has the ability to manufacture and market a product embodying its patented invention in the same market as the defendant sells the infringing product. That was the case, for example, in *Panduit* itself. Panduit, the plaintiff, sold a certain type of duct to which it had acquired a patent; Stahlin, the defendant, began to manufacture and sell ducts that infringed upon the patent. *See Panduit*, 575 F.2d at 1155. That factual backdrop informs *Panduit*'s formulation of its test for lost profits: "[t]o obtain as damages the profits on sales he would have made absent the infringement, *i.e., the sales made by the infringer*." *Id.* at 1156. *Panduit* thus assumes that

the patent holder's lost profits are in the form of the sales made *by* the infringer, *i.e.*, that the patent holder and the infringer are direct competitors in the same market.[15]  The same is true of *Rite-Hite*, where the question the Federal Circuit considered was whether "Rite-Hite was entitled to lost profits for *lost sales of its devices that were in direct competition with the infringing devices.*"  56 F.3d at 1542 (emphasis added).  So too, for example, in *Oiness*, in which the patent holder, Sun Global, and the patent infringer, B & E Sales Co., both manufactured and sold folding headrests to consumers.  *See* 83 F.3d at 1028.

By contrast, the Federal Circuit has held that lost profit damages are not available as a matter of law where the plaintiff did not have the ability and intent both to manufacture and market a product embodying the patented invention in the same market in which the defendant sold the allegedly infringing product.  In *Wechsler*, for example, the plaintiff and patent holder was the president of a company formed to develop, manufacture and market a pet product who had engaged in negotiations with the defendants to license to them his invention for a portable device to carry and dispense water for a pet.  486 F.3d at 1289–90.  After the licensing negotiations broke down, the plaintiff sought lost profit damages based on the defendants' sale of an infringing product, and the jury agreed, awarding him $630,000 in lost profits.  *Id.* at 1290.  The defendants appealed on the theory that lost profits damages were not available as a matter of law.  The court agreed.  The plaintiff had to show that but for the infringement, he would have

---

[15] Nonetheless, the Sixth Circuit in *Panduit* ultimately found that Panduit was not entitled to its lost profits on lost sales because it could not establish the fourth element of this test—the amount of profit he would have made.  575 F.2d at 1156.  Panduit did not provide evidence of its fixed costs; without this, a factfinder could not establish with reasonable certainty the profits Panduit would have made.  The Sixth Circuit therefore proceeded to consider damages in the form of a reasonable royalty, as a fallback, since lost profits could not be proven.  *Id.* at 1157 ("When actual damages, e.g. lost profits, cannot be proved, the patent owner is entitled to a reasonable royalty.").

made additional profits.  "'Normally, if the patentee is not selling a product, by definition there can be no lost profits.'  The only exception is where the patentee has the ability to manufacture and market a product, but for some legitimate reason does not.  Even in these situations, though, 'the burden on a patentee who has not begun to manufacture the patented product is commensurately heavy.'"  *Id.* at 1293 (first quoting *Rite-Hite*, 56 F.3d at 1548; and then quoting *Hebert*, 99 F.3d at 1120).  Because the plaintiff lacked "the ability to manufacture and market the patented device during the period of infringement," he could not establish that but for the infringement he would have obtained additional profits.  *Id.* at 1293–94.[16]  In *BIC*, the court held that in order to obtain lost profits damages under a *Panduit* theory, the plaintiff must show "that the patent owner and the infringer sell products sufficiently similar to compete against each other in the same market segment."  1 F.3d at 1218.  In that case, both the patentee (Windsurfing) and the infringer (BIC) sold windsurfing boards but not in the same market: "Windsurfing and BIC sold different types of sailboards at different prices to different customers."  *Id.* at 1219.  Accordingly, the court held that Windsurfing could not "show 'but for' causation under a correct application of *Panduit* or otherwise."  *Id.*  "[T]he infringer's customers would not necessarily

---

[16] The Federal Circuit did note that Wechsler might be able to receive lost profit damages "if [the] infringing sales preempted subsequent sales by Wechsler and/or eroded the market price Wechsler was able to charge for his product."  *Id.* at 1294.  That too, however, was unsupported by the evidence in the record.  While Wechsler argued that he could have sold his product later to some of the people who had purchased the infringing product, the Federal Circuit highlighted that "[t]he issue . . . is not whether Wechsler *could* have sold his product to those individuals; the issue is whether Wechsler *would* have sold his product to those individuals," and "[n]othing in the record indicates that that would have happened."  *Id.*  Wechsler also argued that there was a difference between the price Wechsler originally wanted to charge for his product and price he ended up charging for the product; the Federal Circuit rejected this too as a potential measure of damages, reasoning that "nothing in the record links this price difference to [the infringing product's] earlier presence in the market," "nothing in the record indicates that Wechsler ever attempted to sell his product at his originally intended price," and the two products were never on the market contemporaneously, so "there could not have been any direct price competition between the two."  *Id.*

transfer their demand to the patent owner's product in the absence of the infringer's product." *Id.* Finally, in *ICM Controls Corp. v. Honeywell International Inc.*, the patent holder and the patent infringer sold two different products in two different markets. 2021 WL 3032697, at *2 (S.D.N.Y. July 19, 2021). The patent holder did not manufacture a competitive product in the market in which the patent infringer was selling its infringing products. *Id.* The patent holder argued that it should be able to recover lost profits nonetheless, because the products use the same base technology and it had the ability to manufacture a product that would compete with the infringing product. The court reasoned that "the ability to make a competitive product is not the same as actually making a competitive product." *Id.* at *3. Because the patent holder did not manufacture a competing product and never attempted to enter that market, any finding that the patent holder *would have* made the infringer's sales, absent the infringement, would have been purely speculative. *Id.* The court relied on *Wechsler*'s reasoning: "[A] plaintiff must have made a competitive product in order to be entitled to damages seeking to rectify any potential lost sales of that product." *Id.* at *2 (citing *Wechsler*, 486 F.3d at 1293).

In *Hebert*, the patent holder was the proprietor of an automobile shop who invented and patented a tool to remove and reinstall warped engine exhaust manifolds. 99 F.3d at 1112. He submitted his idea to the defendant, who was a manufacturer of specialty automotive tools, as part of a program where the defendant solicited novel tool ideas with the promise that the ideas might be produced and sold by the defendant in exchange for a reasonable royalty; the submission was rejected, but the defendant later commercialized a similar tool. *Id.* The Federal Circuit set out the applicable principles that the district court should apply on remand.[17] "To

---

[17] The district court had not reached the issue of damages because the jury concluded—improperly and on the basis of insufficient evidence—that the plaintiff's patent was unenforceable due to inequitable conduct before the Patent and Trademark Office. *Id.* at 1112.

measure damages by lost profits the patentee must establish, by a preponderance of evidence, that but for the infringement he would have earned the profits he asserts were lost." *Id.* at 1109. "When the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages." *Id.* At the same time, however, the patentee does not need to prove that it is currently manufacturing the product in order to obtain lost profit damages. *Id.* at 1119–20. It is sufficient that the patentee prove that it intended to manufacture a product embodying the invention and that the defendant's sales of the infringing product prevented it from entering the market. *Id.* at 1119.

Plaintiffs here posit a novel theory of lost profit damages—one for which neither party has been able to identify a precedent. They claim that even though TNC did not compete in the same market as IDL and did not have the intent or ability to compete or to sell in that market, it is entitled to lost profit damages for the sale of products embodying TNC's invention that it wanted to make to IDL but was unable to make because IDL purchased a product embodying that same patented invention from another party. McElroy assumes that TNC invested significant time and hundreds of thousands of dollars in an effort to design, build and test a redesigned CloseDrier, McElroy Expert Report, Jan. 27, 2020 ¶ 30, and notes that it filed a design patent application for what ultimately issued as the D399 Patent on October 17, 2017, *id.* ¶ 32. He further assumes that in negotiations over whether Defendants would purchase a CloseDrier embodying TNC's patent from Plaintiffs, TNC quoted a price of $41 per unit that HSN stated that it was willing to accept and that there were communications between the parties that included sales estimates of between 50,000 and 85,000 units. *Id.* ¶ 38. Defendants chose not to purchase the CloseDrier from Plaintiffs purportedly on the basis that Plaintiffs' factory was unable to manufacture the product with the size of fan that Plaintiffs required. *Id.* ¶ 39.

Thereafter, Defendants sent Plaintiffs' design drawings to TNC's competitor, Global Home, in connection with discussions for Global Home to be the source of the CloseDrier, with a note that it reflected where Plaintiffs wanted to be "aesthetically" but that Global Home should not "be copying this exactly," and received a rendering by Global Home that "ha[d] been slightly changed to not infringe." *Id.* ¶ 40.  It then ordered 35,000 units of the CloseDrier from Global Home, *id.* ¶ 43, which it marketed selling over 34,000 on a gross basis and 27,000 net of returns, generating sales revenue net of returns of $2.4 million, *id.* ¶¶ 44–45.[18]

Based on these assumed facts, McElroy opines that TNC is entitled to patent damages in the form of lost profits of $214,710, constituting the profits it would have made in the but-for world in which Defendants would have purchased the 35,000 units from TNC rather than from Global Home and at the price of $41.00 per unit that had been discussed between the parties but never agreed, less the expenses TNC would have had to incur to produce those units.  *Id.* ¶ 131. In McElroy's view, in the but-for world in which Defendants had not infringed, "TNC's revenue on CloseDrier products would have been equal to the number of units sold to IDL multiplied by the ASP [average selling price] IDL would have paid to TNC for those units," because "but for the alleged infringement of the D399 Patent, TNC would have sold the same 35,000 units of the CloseDrier that IDL ultimately purchased from Global Home." *Id.* ¶¶ 128–129.  He arrives at that conclusion based on what he claims to be an application of *Panduit*.  There was demand for the patented product—IDL purchased 35,000 of an allegedly similar and infringing product from Global Home.  *Id.* ¶ 119.  There is an absence of any non-infringing substitute that would have been acceptable to IDL—IDL wanted a product that was different from the original CloseDrier

---

[18] Defendants also sold over 15,000 four packs of the CloseDrier compatible Forever Fragrant discs, generating $166,372 in gross sales and $157,271 net of returns.  *Id.* ¶ 46.

and all of the other designs that had been offered to IDL by TNC's competitors had been rejected by it.  *Id.* ¶¶ 120–124.  TNC would have been able to supply the CloseDrier units to IDL.  *Id.* ¶ 127.  And, because there was no "non-accused design that [IDL] found acceptable and that would have allowed it to achieve its design and timing goals for the CloseDrier," and "TNC had sufficient capacity to supply 35,000 units," "but for the alleged infringement of the D3999 Patent, TNC would have sold to IDL the same 35,000 units of the CloseDrier that IDL ultimately purchased from Global Home."[19]  *Id.* ¶ 128.

McElroy's analysis might have supported a lost profits claim against Global Homes which, according to the facts assumed by the expert, sold TNC 35,000 units of the allegedly infringing product and thereby diverted those sales from TNC.  Dkt. No. 354-3 ¶¶ 40, 43–45; *see also BIC*, 1 F.3d at 1219.  Based on McElroy's analysis, TNC and Global Home offered similar products in the same market, there was demand in that market for a product manufactured by either TNC or Global Home and an absence of an acceptable non-infringing product, and TNC had the ability to manufacture the product and to market it to a retailer such as IDL.

McElroy's analysis does not support an award of lost profits damages against IDL.[20]  The analysis is based on the assumption that in the but-for world where IDL had not infringed TNC's patent, it would not have purchased the 35,000 units from Global Home.  But Plaintiffs' patent claim is not based on IDL's misappropriation of TNC's trade secret or protectible idea and does not turn upon the relationship between the parties, or any breach in that relationship.  It turns

---

[19] McElroy also opines that, while he has not conducted a reasonable royalty calculation for the infringement of the D399 Patent, he does not believe that that form of damages would maximize TNC's recovery—in other words, it would be less than the $214,710 in lost profits.

[20] Federal Circuit law also permits an award of lost profits due to "price erosion, and increased expenditures caused by the infringement."  *Hebert*, 99 F.3d at 1119.  Plaintiffs do not assert a claim for damages on those theories.

upon the alleged fact that, regardless of fault, Defendants *sold* a product that embodied the invention disclosed in the patent.  Plaintiffs allege that "Defendants have infringed and continue to infringe the D399 Patent by using, selling and/or offering to sell in the United States, and/or importing into the United States the JOY CloseDrier with FF products, which embody the ornamental design covered by the D399 Patent" and that "Defendants IDL and Mangano have at least used, sold, offered for sale, and/or imported into the United States an infringing product" and "Defendant HSN has at least sold or offered for sale an infringing product."  Dkt. No. 47 ¶ 146.[21]  Plaintiffs do not claim that Defendants violated the patent law by purchasing an infringing product.  Plaintiffs' patent claim thus is not dependent on the existence of the MNDA between Plaintiffs and Defendants or on the alleged facts that TNC provided renderings of the CloseDrier to IDL or that IDL shared those renderings with Global Home and asked it to make a CloseDrier that approximated the renderings.  IDL and HSN would have been equally patent infringers had they never known of TNC's renderings or of the existence of TNC's patent.[22]  As TNC emphasized in the brief it filed with the Court on the question whether it waived a jury trial, the act of infringement occurred only when Defendants offered the CloseDrier and requires only a comparison of "TCL's patent to the accused CloseDrier to determine infringement."  Dkt. No. 413 at 17.  The claim asks only whether "an ordinary observer would view the design [of the product sold by Defendants] as substantially the same [as the design patented by Plaintiffs] and

---

[21] Section 271(a) of Title 35, the provision Defendants are charged with having violated, provides in relevant part "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent."  35 U.S.C. § 271(a).
[22] Knowledge of the patent would go to willfulness but not to infringement.  *See, e.g.*, *Olaf Sööt Design, LLC v. Daktronics Hoist, Inc.*, 325 F. Supp. 3d 456, 461 (S.D.N.Y. 2018) ("In order 'to willfully infringe a patent, the patent must exist and the accused infringer must have knowledge of it.'" (quoting *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985))).

be induced into purchasing one supposing it was the other." *Id.* at 17–18.  Defendants' knowledge of TNC's design, the context in which it received that design, its negotiations with TNC regarding the value of the design, and its conduct in providing the design to Global Home might all go to the separate patent law issues of bad faith and willfulness and the availability of enhanced damages and the calculation of a reasonable royalty.  *Id.* at 17.  They do not go to the question of infringement and the existence of lost profit damages flowing from that infringement themselves.

There is thus a mismatch between Plaintiffs' theory of patent infringement and its theory of patent damages.  Its theory of patent infringement is that Defendants imported and sold or offered for sale into the retail market CloseDrier units that embodied the ornamental design covered by the D399 Patent.  McElroy Expert Report, Jan. 27, 2020 ¶ 146.  Its but-for world is one in which Defendants would not have imported and sold the CloseDrier units; it is not one in which Defendants would have purchased Plaintiffs' product—that is a theory of trade secret misappropriation or breach of contract.  Plaintiffs' theory of patent damages does not assert that it lost profits as a result of the infringement, *see Hebert*, 99 F.3d at 1109, *i.e.*, the sale or offer for sale of the CloseDrier.  Its theory is that it suffered a loss when Defendants chose to purchase the CloseDrier from Global Home rather than from it.  But Plaintiffs had no right under the Patent Act for Defendants to purchase the CloseDrier from it.  It had the right under the Patent Act to prevent Defendants from selling into the market a product that embodied the design on which it had a patent and a corresponding entitlement to damages for the harm directly caused by that act.  Plaintiffs' expert assumes no evidence (and there is none that has been proffered to the Court) that TNC had the ability or intent to sell to IDL's customers or in IDL's market or that IDL's sales of its CloseDrier diverted from TNC sales that TNC would have made.

The facts that McElroy's analysis assumes, if proven, thus would not demonstrate the loss of sales that TNC would have made but for the act of IDL selling products to its customers that infringed the D399 Patent.  They demonstrate the loss of "the right to manufacture and sell." *Lauhoff*, 216 F. at 215.  TNC thus would be entitled to the compensation for the value of what it lost—the right it could have granted Defendants but that Defendants assumed for themselves to sell the allegedly infringing product, *i.e.* a reasonable royalty. [23]  In the alternative, it is entitled to design patent damages under Section 289.  TNC is not entitled to lost profit damages on the theory that it would have made those profits but for Defendants' acts of patent infringement.[24]

---

[23] Plaintiffs' expert, however, does not proffer any reasonable royalty analysis for the patent infringement claim.  *See* McElroy Expert Report, Jan. 27, 2020 ¶¶ 132–133.  Their expert is therefore precluded from offering testimony as to the measure of damages available under Section 284.

[24] Even if it were appropriate to consider—on a patent law lost profits analysis—not sales that the alleged infringer made to others but purchases it would have made from the patentee, the Court would conclude that such damages are not available in this case and that McElroy cannot testify to them.  As noted, under *Panduit*, the question is not whether the plaintiff could have sold the product embodying its invention to the market where there was demand but whether it would have.  *See Wechsler*, 486 F.3d at 1294.  The Court has already held that, with respect to the CloseDrier, "TNC never succeeded in creating a product to Defendants' specifications."  Dkt. No. 331 at 108.  That holding is dispositive of the lost profits question here.  Because TNC never succeeded in creating a product that it could have sold to IDL, it cannot recover damages in the form of lost profits it would have made on such a sale.  *See Wechsler*, 486 F.3d at 1293 ("[T]he record demonstrates that . . . Wechsler lacked the capability to manufacture his device during the period of infringement."); *ICM*, 2021 WL 3032697, at *2 ("[A] plaintiff must have made a competitive product in order to be entitled to damages seeking to rectify any potential lost sales of that product.").

**CONCLUSION**

The *Daubert* motions are GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 348, 350, 352, and 397.


SO ORDERED.


Dated: July 14, 2022
      New York, New York

                                    LEWIS J. LIMAN
                              United States District Judge